**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| QS HOLDCO INC.,<br><br>     Plaintiff,<br><br>  -against-<br><br>BANK OF AMERICA CORPORATION; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MERRILL LYNCH L.P. HOLDINGS, INC.; CREDIT SUISSE AG; CREDIT SUISSE GROUP AG; CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE FIRST BOSTON NEXT FUND, INC.; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN, SACHS & CO. LLC; GOLDMAN SACHS EXECUTION & CLEARING, L.P.; J.P. MORGAN CHASE & CO.; J.P. MORGAN SECURITIES LLC; J.P. MORGAN PRIME, INC.; J.P. MORGAN STRATEGIC SECURITIES LENDING CORP.; J.P. MORGAN CHASE BANK, N.A.; MORGAN STANLEY; MORGAN STANLEY CAPITAL MANAGEMENT, LLC; MORGAN STANLEY & CO. LLC; PRIME DEALER SERVICES CORP.; STRATEGIC INVESTMENTS I, INC.; UBS GROUP AG; UBS AG; UBS AMERICAS INC.; UBS SECURITIES LLC; UBS FINANCIAL SERVICES INC.; EQUILEND LLC; EQUILEND EUROPE LIMITED; and EQUILEND HOLDINGS LLC,<br><br>     Defendants. | Index No.<br><br><u>**COMPLAINT**</u><br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

OVERVIEW OF THE ACTION ....................................................................................1

JURISDICTION AND VENUE ..................................................................................10

PARTIES ....................................................................................................................12

    A.    Plaintiff ....................................................................................................12

    B.    Defendants ...............................................................................................13

FACTUAL ALLEGATIONS ......................................................................................25

I.     OVERVIEW OF THE STOCK LOAN MARKET ..........................................25

    A.    The History and Function of the Stock Loan Market ..........................25

    B.    The Structure of the Stock Loan Market...............................................28

    C.    The Lack of Evolution in the Stock Loan Market .................................34

II.    QUADRISERV INTRODUCES PRICE TRANSPARENCY AND
     ELECTRONIC TRADING TO THE STOCK LOAN MARKET .....................38

    A.    Quadriserv Creates Quadriserv Data Services Inc. to Provide Price
        Transparency...........................................................................................38

    B.    Quadriserv Creates Quadriserv Securities and Matches More Than $2
        Billion of Open Stock Loan Transactions..............................................39

    C.    Quadriserv Creates AQS to Develop an Anonymous, Electronic Platform
        with Central Clearing of Stock Loan Transactions................................40

    D.    Quadriserv Launches Its Electronic Platform with Central Clearing of
        Stock Loan Transactions........................................................................44

III.   DEFENDANTS CONSPIRE TO BOYCOTT QUADRISERV/AQS..............48

    A.    The Prime Broker Defendants Strengthen Their Boycott of AQS as the
        Platform Gained Momentum ..................................................................51

    B.    Defendants Use EquiLend to Organize and Ultimately Boycott AQS .................58

    C.    Defendants Succeed in Neutralizing and Ultimately Acquiring AQS..................60

IV.   THE PRIME BROKER DEFENDANTS' USE OF EQUILEND AS A FORUM
     FOR COLLUSION TRIGGERS SPECIAL SCRUTINY UNDER THE
     ANTITRUST LAWS ........................................................................................72

V.     DEFENDANTS SIMILARLY CONSPIRED TO BOYCOTT OTHER STOCK
       LOAN MARKET SOLUTIONS AIMED AT PROMOTING PRICE
       COMPETITION AND TRANSPARENCY ...................................................79

       A.     SL-x: Alternative Stock Lending Exchange Platform ...........................79

       B.     Data Explorers: Stock Lending Trade Data Provider ...........................82

VI.    DEFENDANTS' CONSPIRACY CAUSED ANTICOMPETITIVE HARM ................89

EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS ............................93

CAUSES OF ACTION .......................................................................................95

FIRST CAUSE OF ACTION (VIOLATION OF SECTION 1 OF THE SHERMAN
       ACT) ..............................................................................................95

SECOND CAUSE OF ACTION (VIOLATION OF THE DONNELLY ACT)..........................97

THIRD CAUSE OF ACTION (UNJUST ENRICHMENT) ...........................................98

FOURTH CAUSE OF ACTION (TORTIOUS INTERFERENCE WITH BUSINESS
       RELATIONS) ....................................................................................98

FIFTH CAUSE OF ACTION (VIOLATION OF DECEPTIVE PRACTICES ACT) ................99

PRAYER FOR RELIEF ...................................................................................100

JURY DEMAND ...........................................................................................101

Plaintiff QS Holdco Inc. ("Plaintiff"), by and through its attorneys, brings this action against Defendants, and alleges as follows:

## OVERVIEW OF THE ACTION

1.      This case concerns a conspiracy among the dominant prime brokerage banks (the "Prime Broker Defendants") to boycott an anonymous, electronic trading platform for stock loans developed and formerly owned by Plaintiff. The Prime Broker Defendants conspired to boycott Plaintiff's stock lending platform in order to keep the stock loan market as an inefficient and opaque over-the-counter ("OTC") marketplace that they collectively dominate and from which they derive billions of dollars of profit each year.

2.      The stock loan market is one of the largest and most important financial markets in the world. Stock lending is the temporary transfer of stock from one investor to another. In exchange for cash or noncash collateral and subject to the payment of a "borrowing fee," the owner of shares lends its stock to the borrower, which in turn holds the stock for a period of time and then returns the equivalent stock to the lender at the end of the "borrowing" period.

3.      Stock lending plays a vital role in maintaining the liquidity of financial markets. It improves the performance of institutional investors who buy and hold large quantities of shares of publicly traded companies by allowing them to earn an additional return on their investments while holding a stable interest in such companies. Stock lending also facilitates a trading strategy known as "short selling." This strategy involves the sale of a stock that the seller does not own. For most short sales, the seller must "borrow" the stock from an entity that owns the stock (the "beneficial owner") in order to cover the short sale. Selling short without borrowing stock is generally prohibited because trading on assets that the trader does not possess creates risk that the trader will not be able to complete the promised trade. Stock lending goes hand in hand with most short selling that occurs in the United States equities markets today.

4.      Despite the size and importance of the stock loan market, however, relatively little is known about this market because transactions are usually only visible to the two parties directly involved.[1] The stock loan market is often referred to as the best kept secret on Wall Street given its high profits for leading prime brokers. The market remains one of the most closed, inefficient, and opaque major financial markets in the world. Observers describe stock lending as a trillion-dollar "mother of all dark pools."[2]

5.      There is no good reason why this market remains so opaque and inefficient. Stocks themselves trade in a transparent fashion on various exchanges that are open widely to market participants. In the stock loan market, by contrast, there is no central marketplace. Borrowers and lenders have no way to transact with each other or to see the prices paid on both sides of the market. They must instead transact through intermediaries, which are almost always the Prime Broker Defendants. These banks sit in the middle of nearly all stock loan transactions and take a major cut of almost every single trade, while keeping the size of that cut largely hidden from other transaction participants.

6.      Essentially, the Prime Broker Defendants act as "exclusive matchmakers" for stock lenders and borrowers on every trade. If an investor, for example, wants to borrow a stock to facilitate a short sale, it must contact its broker-dealer. The broker will locate or acquire the stock from its own inventory or an entity that owns the stock, and the broker will then quote the investor a price (or rate) for the trade. For their matchmaking services, which involve very little

---

[1] Adam C. Kolasinski, et al., *A Multiple Lender Approach to Understanding Supply and Search in the Equity Lending Market*, 68:2 J. OF FIN. 559, 559-60 (2013) (observing that "[t]he general dearth of empirical research on the equity lending market is inherently linked to its opacity").

[2] Terry Flanagan, *Securities Lending: A $2 Trillion 'Dark Pool*,' MARKETS MEDIA (Apr. 17, 2015), http://marketsmedia.com/securities-lending-a-2-trillion-dark-pool/. A "dark pool" is a private exchange or trading venue that, unlike public exchanges, does not publish price quotations and is therefore opaque or "dark," as customers have little visibility as to price or market conditions.

risk, the Prime Broker Defendants take approximately *65%* of the gross revenues generated each year in the stock loan market, amounting to more than *$9 billion annually*—far more than the returns paid to any other market participant, including the beneficial owners of the stock being lent.[3]

7.     Since the early 2000s, there has been significant demand from borrowers and lenders for electronic platforms that would allow them to execute stock loan trades at lower costs and with better returns, such as in the cash equities and other financial markets.

8.     Defendants' illegal boycott conspiracy harmed Plaintiff and Quadriserv Inc., an entity that sold its electronic trading assets to Plaintiff and later assigned its claims in this action to Plaintiff. Quadriserv was formed in 2001 by a group of industry veterans with the goal of developing financial applications to meet the demand for electronic stock-loan trading, including a revolutionary independent trading platform called AQS. AQS was an electronic trading platform on which stock loan trades could be executed and centrally cleared at transparent prices.[4] Quadriserv recognized that such platforms were a natural step in the evolution of the stock loan market, and many in the industry (including some within the Prime Broker Defendants) agreed.

9.     The AQS platform garnered support by key market participants, including financial regulators (such as the Federal Reserve Bank of New York), one of the largest lenders

---

[3] Some Prime Broker Defendants also have agent lending businesses. However, the profitability of those operations is smaller than that of the prime brokerage businesses, and the needs of the prime brokerage businesses generally take priority.

[4] Central clearing virtually eliminates counterparty risk by interposing a "clearinghouse" between the borrower and lender in a stock loan transaction. The clearinghouse becomes the borrower to every lender and the lender to every borrower. In the event one party fails to meet its obligations, the clearinghouse steps in and assumes the obligation. The clearinghouse maintains sufficient capital to stand behind every trade it clears, and typically requires more margin from both buyers and sellers than would be expected in bi-lateral, over-the-counter transactions. By doing so, the clearinghouse mitigates systemic risk, allowing borrowers and lenders to trade with dramatically diminished concern of counterparty default.

of stock (asset manager Barclays Global Investors), one of the largest borrowers of stock (the hedge fund Renaissance Technologies), the oldest venture capital fund in the country (Bessemer Ventures), and one of the largest stock exchanges in the world (Deutsche Bourse, through its Eurex AG and International Securities Exchange subsidiaries). AQS also connected to SunGard Data System's Loanet, a universal accounting and settlement processing system for securities lending, which settles through the Depository Trust Company ("DTC"). In addition, AQS secured an agreement with the Options Clearing Corporation ("OCC") to allow stock lending trades on AQS's platform to be centrally cleared through OCC.

10.     By 2009, the Prime Broker Defendants recognized the severe threat AQS posed to their outsized profits, and they jointly agreed to boycott AQS and starve it of liquidity. The Prime Broker Defendants' conduct was primarily driven by Defendants Goldman Sachs and Morgan Stanley. Goldman Sachs and Morgan Stanley are the two largest prime brokers in the market, with the most to lose from the market becoming more open and transparent.[5] As detailed below, from time to time, senior personnel from these two banks met in person, one-on-one, to reach agreements on how to protect their dominant market position as the "gatekeepers" of all stock loan trading. This complaint details the dates and attendees of some of these meetings, along with the subject matter of the agreements reached. To be clear, the fact of these illicit meetings is not a matter of inference. They are known to have *actually occurred*.

11.     To ensure that their agreements to boycott and squash AQS and other new platforms would be effective, Goldman Sachs and Morgan Stanley recruited the other Prime Broker Defendants to join their scheme, including certain banks that were initially receptive to AQS. Goldman Sachs and Morgan Stanley recruited the other Prime Broker Defendants

---

[5] In 2009, Goldman Sachs and Morgan Stanley together controlled nearly 45% of the market for prime brokerage services.

primarily through Defendant EquiLend, a dealer consortium that gave the Prime Broker

Defendants a convenient excuse for meeting and coordinating their conduct in the stock loan

market. Representatives of all the Prime Broker Defendants were board members of EquiLend,

and they agreed that they would not act individually in the stock loan market, but would instead

coordinate their actions to protect their institutions' collective market dominance.

12.     The masterminds and chief coordinators of Defendants' conspiracy were high-

ranking principals at the Prime Broker Defendants. These individuals used a variety of known

forums and channels to communicate with one another, including EquiLend meetings, private

dinners, industry associations (such as the Securities Industry and Financial Markets Association,

"SIFMA") and phone conversations. Such communications, and the forums and channels

through which they took place, were entirely different in their content and purpose from the

communications that brokers routinely have with one another in the ordinary course of the prime

brokerage business on a trading desk, such as discussions to locate shares for borrowing. The

communications and coordination among these principals in furtherance of the conspiracy were

not a necessary part of the Prime Broker Defendants' everyday broker activities, and could not

possibly be mistaken for a necessary part of those activities.

13.     Remarkably, in numerous private conversations, multiple personnel from the

Prime Broker Defendants used the same phrasing to describe the stock loan operations of the

Prime Broker Defendants collectively. Specifically, these personnel characterized the Prime

Broker Defendants as "the five families" of the stock loan market—a reference to the major New

York City organized crimes families of the Mafia. For example, on April 10, 2014, Credit Suisse

managing director Shawn Sullivan recommended "get[ting] all the members of the five families

together" to discuss AQS and related stock loan regulatory issues. On another occasion, the head

of securities lending at Bank of America similarly expressed an intent to convene a meeting of "the five families." The fact that multiple Prime Broker Defendants used the same organized-crime reference to describe themselves suggests that they knew they had formed an illegal cartel (though not made up of exactly five members). Indeed, it suggests they were proud of it.

14.     Emails, records of Bloomberg chats, and other electronic messages exchanged among EquiLend members reflecting the collusive agreement among the Prime Broker Defendants *exist today* on the servers of EquiLend and the Prime Broker Defendants who were its owners. These communications indicate that EquiLend representatives, including CEO Brian Lamb, had been instructed not to "break ranks" and not to take independent actions in the marketplace until the "EquiLend banks" determined as a group whether they would support any of the new platforms.

15.     The Prime Brokers blocked AQS by collectively refusing to participate on the platform, and thereby keeping their trade flow and trade data (which represented most of the liquidity in the stock loan market) outside of the platform's electronic market. The collective decision by the Prime Broker Defendants not to use AQS meant that other market participants who wanted to use the AQS platform, such as hedge fund borrowers and asset manager lenders, could not access the vast majority of stock lending market liquidity through AQS.

16.     The Prime Broker Defendants did not limit their conspiracy to jointly withholding liquidity from the AQS trading platform, but also took concerted steps to prevent other market participants from transacting on AQS. The Prime Broker Defendants pressured their hedge fund clients to stop using AQS by threatening loss of access to other critical prime broker services, such as assistance raising capital. The Prime Broker Defendants also refused to give their hedge fund customers the necessary support to facilitate and clear trades on AQS. The Prime Broker

Defendants' point-blank denial of access for their clients to AQS meant that those clients simply could not trade on the platform.

17.     Hedge funds including D.E. Shaw, Millennium Management, and SAC Capital were all threatened by Prime Broker Defendants with retaliation if they moved their stock lending business to AQS. In another instance, BNY Mellon (then Bank of New York) agreed to participate as an agent lender on the AQS platform, but abruptly withdrew its support after it was threatened by Goldman Sachs with a complete loss of further stock loan business from Goldman Sachs. Similarly, the asset manager Barclays Global Investors (acquired by BlackRock in 2009) pulled out of multiple planned investments in Quadriserv after senior personnel were pressured by Prime Broker Defendants.

18.     On July 27, 2015, after suffering millions of dollars in losses as a result of Defendants' boycott, Quadriserv sold its ownership interest in AQS to Plaintiff, which continued to try to develop the AQS platform, but was similarly thwarted by Defendants' conspiracy. Plaintiff and Quadriserv spent almost $100 million to develop the revolutionary AQS technology and bring it to market.

19.     In late 2015, the Head of Global Securities Lending at Goldman Sachs, William Conley, and the Global Head of Bank Resource Management at Morgan Stanley, Thomas Wipf, held a series of private meetings and dinners in New York City to reach an explicit agreement (later joined by the other Prime Broker Defendants) that the Prime Broker Defendants would use EquiLend to purchase AQS and finally bury the threat of an all-to-all platform for securities lending. By killing AQS (and the ability of any other market participants to access the platform), the Prime Broker Defendants would remain the exclusive "gateway" through which all stock

loan transactions must pass, subject as always to their exorbitant fees. Conley and Wipf gave their plan the apt name of "Project Gateway."

20.     With the agreement reached by January 2016, Wipf reported the details to his Morgan Stanley colleagues internally on a "pipeline call." On this call, Wipf stated that he and Conley had met and agreed that it was time for both institutions to "get a hold of this thing"—referring specifically to AQS. Wipf informed the group that Goldman Sachs and Morgan Stanley had agreed to launch Project Gateway, whose main purpose was to use EquiLend to acquire the assets of AQS, take control of its operations, and shut it down. The plan succeeded.

21.     On July 31, 2016, the Prime Broker Defendants, through EquiLend, acquired the assets of AQS from Plaintiff. As the Prime Broker Defendants planned and intended, by their joint action, they now control all "gateways" to central clearing for stock lending. The market remains frozen in time, and the Prime Broker Defendants continue to dominate an inefficient and opaque OTC market.

22.     After succeeding in starving AQS of liquidity and leaving it struggling to stay afloat, the Prime Broker Defendants swooped in, using their ownership and influence over Defendant EquiLend, a vehicle for their conspiracy, to acquire the crippled platform. Having bought the platform, the Prime Broker Defendants then shut down and shelved its innovative all-to-all technology so no one would ever be able to use AQS to threaten their stranglehold on the market.

23.     The Prime Broker Defendants used similar methods to neutralize other companies seeking to offer price competition and transparency to the stock lending market, including SL-x and Data Explorers. The Prime Broker Defendants' coordinated interference, over seven years,

allowed the Prime Broker Defendants to maintain their role as intermediaries in a market that otherwise was rapidly evolving toward an electronic exchange-based model.

24.     As a result of their collusion to boycott and squash market entrants, the Prime Broker Defendants secured their role as permanent toll collectors on every stock loan transaction—to the detriment of all other market participants and the United States economy as a whole. The victims are the owners and investors in the technology and solutions intended to transform the stock loan marketplace into a transparent and cost-minimizing exchange, including Quadriserv and Plaintiff, which developed and owned AQS, the premier exchange trading platform. Instead of becoming an exchange conservatively estimated to earn over $300 million annually within five years of its operation, AQS burned through nearly $100 million of its investors' cash because of Defendants' collective boycott, forcing Plaintiff to sell AQS for approximately $4 million in 2016.

25.     Additional victims of Defendants' conspiracy include market participants in stock loan trades that continue to receive less favorable financial terms on every transaction and whose trading volume and ability to negotiate prices are artificially restricted by the bottleneck and information opacity imposed by the Prime Broker Defendants.

26.     This lawsuit is brought under the federal antitrust laws to address the "supreme evil of antitrust":  collusion among companies that are supposed to compete.[6] Free-market competition is, and has long been, the fundamental economic policy of the United States. As the Supreme Court has explained, this policy is enshrined in the Sherman Act, which makes it *per se* illegal for competitors (like Defendants) to conspire and coordinate with each other to limit

---

[6] *Verizon Commc'ns v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004).

competition in the marketplace.[7] Absent legal action, the Prime Broker Defendants' stranglehold over the stock loan market will persist—to the detriment of Plaintiff, stock loan participants, and the United States economy as a whole.

27.     As set forth herein, Plaintiff asserts antitrust claims against the Prime Broker Defendants for violation of the Sherman Act, 15 U.S.C. § 1, *et seq*., and New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq*., as well as for unjust enrichment, tortious interference with business relations, and violation of New York's Deceptive Practices Act, N.Y. Gen. Bus. Law § 349.

## JURISDICTION AND VENUE

28.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiff, alleged herein, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

29.     The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a).

30.     Defendants' activities, and those of their co-conspirators, were within the flow of, and were intended to have, and had, a substantial effect on interstate commerce.

31.     The Court has jurisdiction over Defendants pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22. Most Defendants are subject to personal jurisdiction in the United States because they were formed in or have their principal places of business in the United States. The other Defendants are members of the conspiracy and are subject to personal jurisdiction in the United States because the conspiracy was directed at, and had the intended

---

[7] *See N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 4 (1958).

effect of, causing injury to Plaintiff residing in, located in, or doing business throughout the United States. For example, the conspiracy involved boycotting AQS, an electronic trading platform located in New York City. In addition, Defendants directly conspired through and with EquiLend, whose principal place of business is in New York City. They also met and conspired at EquiLend Board of Directors meetings in New York City and elsewhere, including at private dinners in New York City.

32.     Defendants are also subject to personal jurisdiction because each, either directly or through its respective agents or affiliates, transacted business throughout the United States, including in this District, which was directly related to the claims at issue in this action. Specifically, the stock loans at issue were regularly traded through the desks of the Prime Broker Defendants located in New York City. The Prime Broker Defendants are also subject to personal jurisdiction here because their affiliates conducted stock lending in the United States as their agents, and if they did not, the Prime Broker Defendants would have to have made those trades themselves.

33.     The Court has jurisdiction over most Defendants because they have their principal place of business in New York State.

34.     The Court also has jurisdiction over Defendants pursuant to N.Y. C.P.L.R. § 302, because Defendants transact business in New York State; Defendants had substantial contacts with New York State; Defendants committed overt acts in furtherance of Defendants' conspiracy in New York State; each Defendant is an agent of the other Defendants; Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in New York State; and Defendants own, use, or possess real property in New York State.

35.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, because all Defendants are found or transact business in this District.

36.     Venue is also proper pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the relevant period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

**PARTIES**

**A.      Plaintiff**

37.     Plaintiff QS Holdco Inc. ("QS Holdco") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Glenview, Illinois. QS Holdco was formerly known as PDQ Inc.

38.     Quadriserv Inc. ("Quadriserv") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Jersey City, New Jersey. Pursuant to an asset purchase agreement dated July 27, 2015, Quadriserv transferred to QS Holdco a securities lending platform operated through Quadriserv's subsidiary Automated Equity Finance Markets, Inc. ("AQS"). Quadriserv and QS Holdco share common ownership, and they are similarly situated as the developers and former owners of AQS.

39.     On July 31, 2016, QS Holdco and EquiLend entered into an asset purchase agreement that included AQS. As a consortium controlled by the Prime Broker Defendants, EquiLend has no incentive to develop the AQS platform as originally intended, and indeed, EquiLend has halted the emergence of AQS as an all-to-all trading platform for the stock lending marketplace.

40.     Upon the sale of AQS to EquiLend, QS Holdco and Quadriserv became the only entities remaining to prosecute antitrust claims arising out of Defendants' collusive and anti-competitive conduct.

41.     As of January 25, 2018, Quadriserv assigned its antitrust and other claims against Defendants to QS Holdco.

**B.     Defendants**

42.     Whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its subsidiaries, affiliates, officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

43.     ***Bank of America Defendants***. Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina. Until sometime after BAC's 2009 acquisition of Merrill Lynch & Co., BAC offered prime brokerage services through its subsidiary Banc of America Securities LLC, a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York, New York. Banc of America Securities LLC merged into Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated, effective November 1, 2010.

44.     On January 1, 2009, BAC acquired Merrill Lynch & Co., Inc. and its subsidiaries. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York. It is a wholly-owned subsidiary of BAC. MLPFS is registered

13

as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC"), and is a clearing member of OCC.

45.     Defendant Merrill Lynch Professional Clearing Corp. ("MLPCC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. MLPCC is registered as a broker-dealer with the SEC, and is a clearing member of OCC.

46.     Defendant Merrill Lynch L.P. Holdings, Inc. ("MLLPH") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. It is a subsidiary of BAC. MLLPH is a part owner of EquiLend through Defendant EquiLend Holdings LLC.  As used herein, the term "Merrill Lynch" includes Defendants MLPFS, MLPCC, MLLPH, and their parents, subsidiaries, and affiliates

47.     As used herein, the term "Bank of America" includes Defendants BAC, MLPFS, MLPCC, MLLPH, and their parents, subsidiaries, and affiliates (including Banc of America Securities LLC). Bank of America directly engaged in stock lending transactions. Bank of America agreed with the other Defendants to boycott AQS and then acquire it. Bank of America was a co-owner of EquiLend and Bank of America employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[8]  Bank of America employees served on OCC's Board of Directors in 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017 and on the Depository Trust Clearing Corporation's ("DTCC") Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

---

[8] Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

48.     Bank of America regularly transacts business in and has substantial contacts with New York, New York. For instance, one of Bank of America's largest branch offices is located at the "Bank of America Tower," in New York, New York. According to BAC's website, it has at least 50 financial centers or ATMs in New York, New York. BAC also has many direct and indirect subsidiaries in New York, New York, and offered prime brokerage services through those subsidiaries in New York, New York, during the relevant period. As discussed above, MLLPH, MLPCC, and MLPFS each have their principal place of business in New York, New York. MLLPH, MLPCC, and MLPFS each engaged in stock lending transactions in New York, New York during the relevant period. In addition, BAC also engaged in stock lending transactions in New York, New York (either directly or through affiliates and agents) during the relevant period.

49.     *Credit Suisse Defendants*. Defendant Credit Suisse Group AG ("CSG") is a corporation organized and existing under the laws of Switzerland, with its principal place of business in Zurich, Switzerland. Defendant Credit Suisse AG ("CS") is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland. It is a wholly-owned subsidiary of CSG.

50.     Defendant Credit Suisse Securities (USA) LLC ("CSSUS") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. CSSUS is a wholly-owned subsidiary of CS, and thus ultimately of CSG. CSSUS is registered as a broker-dealer with the SEC, and is a clearing member of OCC.

51.     Defendant Credit Suisse Prime Securities Services (USA) LLC ("CSPSS") is a limited liability company organized and existing under the laws of the State of Delaware, with its

principal place of business in New York, New York. CSPSS is registered as a broker-dealer with the SEC.

52.     Defendant Credit Suisse First Boston Next Fund, Inc. ("CSFBNF") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. It is a wholly-owned subsidiary of CS, and thus ultimately of CSG. CSFBNF is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

53.     As used herein, the term "Credit Suisse" includes Defendants CSG, CS, CSSUS, CSPSS, CSFBNF, and their parents, subsidiaries, and affiliates. Credit Suisse transacts business in New York, New York. Credit Suisse, directly or through its affiliate agents, engaged in securities lending. Credit Suisse agreed with the other Defendants to boycott AQS and then acquire it. Credit Suisse was a co-owner of EquiLend and Credit Suisse employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[9]

54.     Credit Suisse regularly transacts business in and has substantial contacts with New York, New York. For instance, in their 2016 Annual Report, CS and CSG listed their main office in the Americas as being located in New York, New York.[10]  CS is registered to do business in New York, has direct and indirect subsidiaries in New York, New York, and in 2016, all 105 of CS's U.S.-based employees were located in New York, New York. As discussed above, CSSUS, CSPSS, and CSFBNF each have their principal place of business in New York, New York. CSSUS and CSPSS engaged in stock lending transactions in New York, New York during the relevant period. In addition, CSG, CS, and CSFBNF also engaged in stock lending

---

[9] Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

[10] See Credit Suisse Group AG & Credit Suisse AG, *Annual Report 2016*, at A-12 (2017).

transactions in New York, New York (either directly or through affiliates and agents) during the relevant period.

55.     ***Goldman Sachs Defendants***. Defendant The Goldman Sachs Group, Inc. ("GSG") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. GSG is a direct part owner of EquiLend through Defendant EquiLend Holdings LLC.

56.     Defendant Goldman Sachs & Co. LLC ("GSC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. GSC is a wholly-owned subsidiary of GSG, is registered as a broker-dealer with the SEC, and is a clearing member of OCC.

57.     Defendant Goldman Sachs Execution & Clearing, L.P. ("GSEC") is a Limited Partnership organized and existing under the laws of the State of Utah, with its principal place of business in New York, New York. GSEC is or was until recently a wholly-owned subsidiary of GSG, is registered as a broker-dealer with the SEC, and engaged in prime brokerage services in the United States before transferring its brokerage services to GSC in 2016.

58.     As used herein, the term "Goldman Sachs" includes Defendants GSG, GSC, GSEC, and their parents, subsidiaries, and affiliates. Goldman Sachs, itself and through its affiliate agents, directly engaged in securities lending transactions. Goldman Sachs agreed with the other Defendants to boycott AQS and then acquire it. Goldman Sachs was a co-owner of EquiLend and Goldman Sachs employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[11] Goldman Sachs employees served on OCC's Board

---

[11] Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

of Directors in 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017 and on DTCC's

Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

59.     Goldman Sachs regularly transacts business in and has substantial contacts with

New York, New York. As discussed above, GSG, GSC, and GSEC each have their principal

place of business in New York, New York. GSC and GSEC engaged in stock lending

transactions in New York, New York during the relevant period. In addition, GSG also engaged

in stock lending transactions in New York, New York (either directly or through affiliates and

agents) during the relevant period.

60.     ***JP Morgan Defendants***. Defendant J.P. Morgan Chase & Co. ("JPMC") is a

corporation organized and existing under the laws of the State of Delaware, with its principal

place of business in New York, New York.

61.     Defendant J.P. Morgan Securities LLC ("JPMS") (formerly known as "J.P.

Morgan Securities Inc.") is a limited liability company organized and existing under the laws of

the State of Delaware, with its principal place of business in New York, New York. JPMS is

registered as a broker-dealer with the SEC, and is a clearing member of OCC. JPMS is also the

successor in interest to J.P. Morgan Clearing Corp., itself a successor to Bear Stearns Securities

Corp. Both J.P. Morgan Clearing Corp. and Bear Stearns Securities Corp. were engaged in prime

brokerage services in the United States, and were part owners of EquiLend through Defendant

EquiLend Holdings LLC. J.P. Morgan Clearing Corp. merged with JPMS in 2016.

62.     Defendant J.P. Morgan Prime, Inc. ("JPMP") is a corporation organized and

existing under the laws of the State of Delaware, with its principal place of business in New

York, New York. JPMP is a wholly-owned subsidiary of JPMS, and thus ultimately of JPMC. It

is registered as a broker-dealer with the SEC, and provides prime brokerage services in the United States.

63.     Defendant J.P. Morgan Institutional Investments Inc. ("JPMII") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. JMPII is registered as a broker-dealer with the SEC. Defendant J.P. Morgan Strategic Securities Lending Corp. ("JPMSSL") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Wilmington, Delaware. JPMSSL is a subsidiary of JPMC, and is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

64.     Defendant J.P. Morgan Chase Bank, N.A. ("JPMCB"), a wholly-owned subsidiary of JPMC, is a federally chartered national banking association with its principal place of business in New York, New York. JPMCB was formerly a part owner of EquiLend through Defendant EquiLend Holdings LLC.

65.     As used herein, the term "JP Morgan" includes Defendants JPMC, JPMS, JPMP, JPMII, JPMSSL, JPMCB, and their parents, subsidiaries, and affiliates (including J.P. Morgan Clearing Corp. and Bear Stearns Securities Corp.). JP Morgan, itself and through its affiliate agents, directly engaged in securities lending transactions. JP Morgan agreed with the other Defendants to boycott AQS and then acquire it. JP Morgan was a co-owner of EquiLend and JP Morgan employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[12]  JP Morgan employees served on OCC's Board of Directors in 2009 and on DTCC's Board of Directors in 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

---

[12] Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

66.     JP Morgan regularly transacts business in and has substantial contacts with New York, New York. As discussed above, JPMC, JPMS, JPMP, MPJII, and JPMCB each have their principal place of business in New York, New York. JPMS, JPMP, and JPMII engaged in stock lending transactions in New York, New York during the relevant period. In addition, JPMC, JPMSSL, and JPMCB also engaged in stock lending transactions in New York, New York (either directly or through affiliates and agents) during the relevant period.

67.     ***Morgan Stanley Defendants***. Defendant Morgan Stanley ("MS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

68.     Defendant Morgan Stanley Capital Management, LLC ("MSCM") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. MSCM is a wholly-owned subsidiary of MS.

69.     Defendant Morgan Stanley & Co. LLC ("MS&C") (formerly known as Morgan Stanley & Co., Inc.) is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. MS&C is a registered broker-dealer with the SEC and a clearing member of OCC.

70.     Defendant Prime Dealer Services Corp. ("PDSC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. PDSC is a wholly-owned subsidiary of MS&C, and thus ultimately of MS. It is also a registered broker-dealer with the SEC. PDSC engages in securities borrowing and lending in support of MS&C's prime brokerage services.

71.     Defendant Strategic Investments I, Inc. ("SII"), a subsidiary of MS, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. SSI is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

72.     Defendant Morgan Stanley Distribution, Inc. ("MSDI") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in New York, New York. MSDI is registered with as a broker-dealer with the SEC.

73.     As used herein, the term "Morgan Stanley" includes Defendants MS, MSCM, MS&C, PDSC, SII, MSDI, and their parents, subsidiaries, and affiliates. Morgan Stanley, itself and through its affiliate agents, directly engaged in securities lending transactions. Morgan Stanley agreed with the other Defendants to boycott AQS and then acquire it. Morgan Stanley was a co-owner of EquiLend and Morgan Stanley employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[13]  Morgan Stanley employees served on OCC's Board of Directors in 2010, 2011, 2012, 2013, and 2014 and on DTCC's Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

74.     Morgan Stanley regularly transacts business in and has substantial contacts with New York, New York. As discussed above, MS, MSCM, MS&C, PDSC, SII, and MSDI each have their principal place of business in New York, New York. MS, MS&C, PDSC, and MSDI engaged in stock lending transactions in New York, New York during the relevant period. In addition, MSCM and SII also engaged in stock lending transactions in New York, New York (either directly or through affiliates and agents) during the relevant period.

---

[13] Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

75. ***UBS Defendants***. Defendant UBS Group AG ("UBSG") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland. Defendant UBS AG is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland. It is a wholly-owned subsidiary of UBSG.

76. Defendant UBS Americas Inc. ("UBSA"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Stamford, Connecticut. UBSA is a part owner of EquiLend through Defendant EquiLend Holdings LLC. Defendant UBS Securities LLC ("UBSS") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in New York, New York. It is a subsidiary of UBSA, and thus ultimately of UBSG. UBSS is a registered broker-dealer with the SEC and a clearing member of OCC.

77. Defendant UBS Financial Services Inc. ("UBSFS") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Weehawken, New Jersey. UBSFS is a registered broker-dealer with the SEC and a clearing member of OCC. Defendant UBS Investment Bank ("UBSIB") is a corporation organized and existing under the laws of England, with its principal place of business in London, England. UBSIB, a subsidiary of UBS AG, provides prime brokerage services. It was formerly known as UBS Warburg until it changed its name in 2003.

78. Defendant UBS Asset Management (US) Inc. ("UBSAM") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. UBSAM is a registered broker-dealer with the SEC.

79.     Defendant UBS Fund Services (USA) LLC ("UBSFSU") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Hartford, Connecticut. UBSFSU is a registered broker-dealer with the SEC.

80.     As used herein, the term "UBS" includes Defendants UBSG, UBS AG, UBSA, UBSS, UBSFS, UBSIB, UBSAM, UBSFSU, and their parents, subsidiaries, and affiliates. UBS, itself and through its affiliate agents, directly engaged in securities lending. UBS agreed with the other Defendants to boycott AQS and then acquire it. UBS was a co-owner of EquiLend and UBS employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[14]  UBS employees served on DTCC's Board of Directors in 2009.

81.     UBS regularly transacts business in and has substantial contacts with New York, New York. For instance, UBS AG has a major branch office, which serves as one of its U.S. headquarters, in New York, New York. This "flagship" office employs over 150 employees, and derives substantial revenue for UBS, in New York, New York. UBSA, UBSS, UBSFS, and UBSAM are each registered to do business in New York, and UBSIB maintains an office in New York, New York. As discussed above, UBSS and UBSAM both have their principal place of business in New York, New York. UBSS, UBSFS, UBSAM, and UBSFSU engaged in stock lending transactions in New York, New York during the relevant period. In addition, UBSG, UBS AG, UBSA, and UBSIB also engaged in stock lending transactions in New York, New York (either directly or through affiliates and agents) during the relevant period.

82.     ***EquiLend Defendants***. Defendant EquiLend Holdings LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant EquiLend LLC is a limited liability company

---

[14] Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. It is a subsidiary of EquiLend Holdings LLC. Defendant EquiLend Europe Limited is a private limited company incorporated in England and Wales, with its principal place of business in London, United Kingdom. It is a subsidiary of EquiLend Holdings LLC.

83.     As used herein, "EquiLend" includes Defendants EquiLend Holdings LLC, EquiLend LLC, EquiLend Europe Limited and their parents, subsidiaries, and affiliates.[15] EquiLend is owned in part by Defendants Bank of America, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS. As explained below, EquiLend conspired with the Prime Broker Defendants to prevent the emergence of efficient electronic trading systems in stock lending markets, including AQS.

84.     EquiLend regularly transacts business in and has substantial contacts with New York, New York. For instance, EquiLend Europe Limited has multiple officers and directors based in New York. As discussed above, EquiLend Holding LLC and EquiLend LLC both have their principal place of business in New York, New York and are registered to do business in New York.

---

[15] Allegations that an individual was a board member of EquiLend mean that the individual was on the board of at least one EquiLend entity.

## FACTUAL ALLEGATIONS

I.   **OVERVIEW OF THE STOCK LOAN MARKET**

    A.   **The History and Function of the Stock Loan Market**

    85.    Stock lending plays a vital role in capital markets and has been called the "oil in the efficient market machine."[16] By July 2015, the market value of securities on loan globally was approximately $1.75 trillion.

    86.    Although the stock loan market has existed for decades, it saw a massive increase in volume in the mid-1960s, as a flourishing U.S. economy attracted investors. The increased sophistication of financial market participants and their use of increasingly complex financial instruments (such as convertible securities, futures, options, and other derivative instruments) and transactions (including corporate mergers, acquisitions, and restructurings) fueled the need for increased liquidity and market stability through the borrowing of stock. The trading strategies underlying the growth in the derivatives and options markets relied on effective hedging and risk management, and the upsurge in mergers and restructuring transactions created opportunities for stock traders to speculate for profit on the success of these proposed transactions by buying one company long and selling another short.

    87.    The dramatic rise in trading activity on Wall Street that took place in the 1960s and 1970s made it difficult for securities exchanges, their members, and the securities depositories to settle (or consummate) the increased volume of securities transactions that they were processing, which led to unprecedented massive settlement failures. The automation of securities trading together with an increase in stock lending activity enabled securities firms to begin to reduce the number of settlement failures by borrowing the securities underlying the

---

[16] Quadriserv Comment Letter on SEC Extension of Temporary Interim Final Rule 204T, File No. S7-30-08, (June 19, 2009), https://www.sec.gov/comments/s7-30-08/s73008126.pdf.

trades and providing these securities "on loan" to the traders to settle the transactions that were

driving their investment strategies. This booming growth in the stock loan market continued

throughout the 1980s and 1990s with the advent of index products and increasingly more

complex trading strategies. All of these strategies required the ability to borrow and lend shares

of stock.

88.     A primary use of stock lending is to facilitate short selling. Short selling is used

for many purposes, including to profit from an expected downward price movement, to provide

liquidity in response to unanticipated buyer demand, and to hedge the risk of a long position in

the same security or a related security. A seller may short sell a stock at a price certain with the

belief that the stock price will decrease, at which point the seller can then buy the stock at the

lower price and make a profit on the difference.

89.     For example, if a hedge fund believes that Company A, which is trading at $50,

will decline in price, it can borrow 100 shares of Company A stock and sell them. The hedge

fund is now "short" 100 shares of Company A since it sold shares it did not own in the first

place. The sale was made possible by borrowing the shares. If a month later, Company A's stock

drops to $45, the hedge fund can close the short position by buying 100 shares of Company A on

the open market to replace the borrowed shares. The hedge fund's profit on the short sale,

excluding lending fees and commissions, is $500.

90.     In most instances, short sellers do not own the stock being sold. In these cases, to

ensure that it can deliver the stock on the settlement date, the seller must confirm it will be able

to arrange to "borrow" the stock from an existing "beneficial owner" via a process known as

"locate." Practically speaking, when traders wish to take a short position, they typically use the

services of broker-dealers who provide the "locate," execute the short trade, and borrow the

underlying stock necessary to settle that trade (assuming the broker-dealer does not have the stock in its own inventory).

91.     Notably, short sellers have to continue to pay for the right to keep the short position open in the form of interest on the stock being borrowed, adequate collateral to secure the short position, and other fees. Thus over time, short sellers believing a particular stock will go down may be priced out of their position. Such fees are especially onerous in today's OTC marketplace because they are unilaterally foisted upon the short sellers by the Prime Broker Defendants.

92.     As of the first quarter of 2015, U.S. equities comprise nearly half of all securities available for lending (the pie chart on the left), and account for over 30% of the securities on loan (the pie chart on the right).

 

*Figure 1*

### B.     The Structure of the Stock Loan Market

93.     The stock loan market involves a number of participants:

a.     **Stock lenders** who own the stock and make it available to loan are referred to as "**beneficial owners.**" By lending out stock that would otherwise sit idle in their portfolios, these lenders are able to generate additional revenues on the securities.

b.     **Agent lenders** act as intermediaries for the beneficial owners to facilitate the lending of the beneficial owner's stock. Agent lenders are typically custodian banks (such as State Street and BNY Mellon/Bank of New York) and large asset managers (such as BlackRock and Vanguard) that maintain the lenders' securities portfolios in custodial accounts,[17] or in some cases specialist third-party lending agents that are neither custodians nor asset managers (such as eSecLending). These agent lenders interact with broker-dealers to facilitate lending transactions, and the beneficial owners pay them a portion of the lending fee received by the beneficial owners. The size of that portion and numerous other aspects of the beneficial owner/lending agent relationship are established in detailed agreements negotiated between beneficial owners and the lending agents.

c.     **Broker-dealers** include the **Prime Broker Defendants** Bank of America/Merrill Lynch, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS. These broker-dealers act as intermediaries or "matchmakers" on every stock loan trade, bringing together a prospective borrower looking to borrow a certain stock with a lender (often through its agent lender) who has the stock available. The broker-dealers do not reveal to the lender the amount of the fee that they receive from the borrower, nor do they tell the borrower the amount of the fee they are paying to the lender. The broker-dealers typically take a huge cut of the

---

[17] Custodial banks who act as agent lenders are sometimes called "custodial lenders."

proceeds on each trade, and act as the gatekeepers for which trades are made, between whom, and at what price.

> d.    **Stock borrowers** are typically investors, such as hedge funds, engaged in investment strategies that require short selling or risk hedging activities. In order to engage in these strategies, investors need to borrow the stocks underlying their hedges or short sale trades. In addition to putting up cash as collateral for the borrowing, stock borrowers also typically pay a fee, which is allocated among the broker-dealer and the beneficial owner of the stock.[18]

94.    The stock loan market is an "over-the-counter" ("OTC") market, meaning that there is no central marketplace or exchange through which market participants can send their bids and offers to the entire market or obtain real-time trading data such as price and volume information. Instead, stock loan transactions go through a broker-dealer intermediary that provides the prospective borrower with a single price for the transaction in an opaque market with very limited information.

95.    For example, when a fund wants to borrow stock, it must contact its prime broker directly, via the telephone or an electronic message. The prime broker will give the borrower a yes or no to the trade and, if yes, a borrowing rate. The borrower must either agree or decline to trade, with very limited opportunities to "price shop" by calling competing broker-dealers and comparing their offers (as that is costly and causes delay). Trades are executed without other market participants being aware of the pricing terms on which the transactions were effected. As a result, there is little to no price transparency for end users. This process is inefficient and

---

[18] This fee sometimes comes in whole or in part in the form of a below-market interest rate on cash collateral. In other words, lenders will pay borrowers interest on the borrowers' cash collateral below the market rate for cash loans. Hard to borrow stocks often come with a "negative rebate," meaning that the borrower gets no interest on its collateral and pays an additional rate to borrow the stock.

opaque and severely limits price competition, which helps keep the fees collected by prime brokers very high.

96.     The stock loan market can be visualized, in simplified form, as follows:



*Figure 2*

97.     As Figure 2 illustrates, under the current market structure, the ultimate borrowers of securities have no viable way to transact directly with lenders. Instead, they must negotiate with and borrow securities from the Prime Broker Defendants, who in turn source the requested securities from the lenders (through their agents). Indeed, stock lending transactions are conducted almost exclusively by both lenders and borrowers through intermediary agents—the agent lenders on the lender side and the broker-dealers on the borrower side.[19]

98.     The Prime Broker Defendants dominate the market for stock lending. The market for prime brokerage services—which encompasses stock lending—is highly concentrated. Between 2014 and 2017, the top 10 prime brokers accounted for between 89% and 95% of the market, with the Prime Broker Defendants alone holding between 76% and 80% market share.

---

[19] Viktoria Baklanova, et al., *Reference Guide to U.S. Repo and Securities Lending Markets*, *Federal Reserve Bank of New York Staff Reports*, No. 740, 27 (Sept. 2015, rev. Dec. 2015), https://www.newyorkfed.org/medialibrary/media/research/staff_reports/ sr740.pdf.

One analyst estimated in 2013 that the Prime Broker Defendants realized approximately 80% of the total securities lending-related revenue generated by the top 10 prime brokers.

99.     In the OTC stock loan market, the Prime Broker Defendants' advantage is enhanced by their complete control over real-time price data, which is unavailable to both borrowers and lenders. (As in many OTC markets, real-time trading volumes and prices can only be guessed at through discretionary self-reports and incomplete or delayed data from service providers.)  Because customers have little visibility into this market, they have little practical ability to compare or negotiate with the Prime Broker Defendants. Consequently, there is no market mechanism that imposes consistency in pricing or any restraint on the Prime Broker Defendants from charging different customers whatever they like.

100.    The lack of real-time price information has been a limiting factor in establishing best-execution metrics, and has made performance benchmarking of service providers like the Prime Broker Defendants close to impossible. These concepts are second nature to investors in other more efficient markets and help generate better economic terms for investors. But these benefits are denied to participants in the stock loan market. In essence, the inefficient OTC structure of the stock loan market prevents borrowers and lenders from using the natural forces of competition to drive pricing.

101.    Despite the name, stock "loan" transactions involve an exchange of legal title. The lender transfers title of the security to the borrower for the duration of the loan—with an irrevocable obligation to return equivalent securities at a later date—and the borrower in turn transfers legal title of collateral to the lender. The collateral is usually cash or safe securities such as U.S. Treasuries. The loaned stock is marked-to-market daily, with the required amount of collateral adjusted accordingly.

102.    Although the lender technically gives up legal ownership, the economic benefit of any corporate actions accruing to the benefit of the stock holder (such as a stock split or dividend payment) are typically retained by the lender—although any voting rights associated with the stock are not. Stock loans are typically "open," meaning that the loan has no specific term or tenor. Either party can terminate the transaction at any time. When the trade concludes, the borrower returns the "equivalent" securities to the lender, along with any outstanding fee.[20] The lender is obligated to return the collateral.

103.    In a typical stock loan transaction, a lender that is sitting on a portfolio of securities acts through its custodial bank or other third-party lending agent. The custodial bank often has access to the stock portfolios of any number of institutional clients and can draw from the aggregate basket of securities in its custodial accounts.[21]

104.    Borrowers, in turn, are required to place orders through one of several broker-dealers (including the Prime Broker Defendants) who interface with agent lenders to secure the stock to be borrowed. Agent lenders transact directly with broker-dealers, which in turn interface with borrowers.

105.    Stock loan documentation is highly standardized. Each stock loan uses a Master Securities Lending Agreement ("MSLA"), which provides uniformity across transactions and establishes the legal rights and obligations of the parties to the transaction. The Prime Broker

---

[20] Because securities are generally fungible, it is understood that the borrower will return the "equivalent" securities to the lender at the end of the loan's term—i.e., will return the same amount and kind of stock that was borrowed, not the exact shares that were borrowed from the lender.

[21] While most agent lenders tend to be the large banks that maintain institutionalized investors' securities portfolios in custodial accounts, there are also a select few institutions that have established a specialist practice as agent lenders. These specialist agent lenders are often large asset management firms.

Defendants have established MSLA agreements with each of their agent lender counterparts and borrower clients.

106.     The following figure illustrates the make-up of stock lenders in the market from 2008 to 2015:[22]



*Figure 3*

107.     While stock lending was historically an ancillary business for large lenders, they increasingly use stock lending as an important income-enhancing strategy. Essentially, through stock lending, lenders can collect "rental" fees on otherwise idle assets. In return for lending the stock, the lender receives collateral from the borrower (consisting of cash or "safe" securities) that the lender holds (and can invest) for the duration of the loan. Upon termination of the loan,

---

[22] Viktoria Baklanova, et al., *Reference Guide to U.S. Repo and Securities Lending Markets*, *Federal Reserve Bank of New York Staff Reports*, No. 740, 55 (Sept. 2015, rev. Dec. 2015), https://www.newyorkfed.org/medialibrary/media/research/staff_reports/ sr740.pdf.

the stock-for-collateral transaction is unwound, and the lender receives any outstanding fees from the borrower.

108.    Stock borrowers pay a fee for the right to use the borrowed stock, often as part of executing a short sale trade. That fee is ultimately allocated in part to the broker-dealer as intermediary and in part to the stock lender and its agent. The borrowing rate depends in large part on whether the stock is listed as "hard to borrow" or "general collateral." "Hard to borrow" is a designation applied to scarce or highly volatile securities. "General collateral" stocks are highly liquid securities that a broker-dealer has "reasonable assurance" to believe will be readily available in the market upon a borrower's request. These designations change frequently, and are often highly uncertain, due in large part to the market's lack of transparency.

109.    In the current OTC market structure, borrowers and lenders are required to use the services of and transact through the broker-dealers. Broker-dealers set the price and terms of the trade, and in return take a hefty fee. The domination of this market by the Prime Broker Defendants means that they take the majority of the overall fee for nearly every stock loan trade. In 2016, for example, the Prime Broker Defendants skimmed more than 65% off a pot of some $9.15 billion in global lender-to-broker revenue.[23]  These profits far exceed the benefit of the service provided by the Prime Broker Defendants, who take virtually no risk in brokering these transactions and whose "matching" function could be done far more efficiently, such as through the AQS platform described below.

C.       **The Lack of Evolution in the Stock Loan Market**

110.    Financial markets typically evolve over time. Many financial markets have evolved from an inefficient and high-transaction-cost OTC market to an exchange where

---

[23] *See Sec Lending Experts Discuss Last Year's Top Trades*, Global Investor/ISF (Jan. 31, 2017), http://www.globalinvestormagazine.com/Article/3657556/Sec-lending-expertsdiscuss-last-years-top-trades.html.

participants can meet and transact. Although the stock loan market has made other markets more efficient, it has not itself grown more significantly efficient over time. The stock loan market today remains almost exclusively an opaque, OTC market that has not been meaningfully improved, or scarcely even been touched, by more modern, transparent trading methods.

111.    There is no legitimate reason for the stock loan market to continue to operate this way. There are no technological or structural reasons that this market could not be transformed into a modernized electronic marketplace, as has happened with a number of other financial services markets. The quintessential example of a modern centrally-cleared electronic trading platform is the publicly-traded stock exchange. Stocks are almost entirely traded on technology-driven electronic exchange platforms, which afford participants instantaneous information on trading flow, pricing, and volume. These exchanges also provide a marketplace through which buyers and sellers can directly transact via clearing brokers who provide access to and "sponsorship" on the exchange for a minimal and transparent fee. This allows sellers of securities to offer shares to the entire market and take the highest price, and buyers of securities to make an offer to the entire market and take the lowest price, via a central limit order book. But this is the Prime Broker Defendants' nightmare for the stock loan market.

112.    Electronic trading is unquestionably beneficial to market participants. It provides greater price and volume transparency on market trades, expands the number and type of potential counterparties, and does not involve a "middleman" or intermediary between the buyer and seller.[24] Consequently, such trading results in greater efficiency and significantly better

---

[24] As a technical matter, an electronic exchange has a clearinghouse and clearing brokers standing between the parties to match their trades and eliminate counterparty risk, but they do so on a transparent commission basis. In other words, the profits from these services come from the increased transaction volume that is driven by transparency and low fees. In contrast, in OTC markets the middleman stands in the center of an opaque market with the explicit objective of capturing the largest possible spread between transacting parties; that is, profits are

prices for both sides. This method of trading is the norm for the securities of most publicly traded companies.

113.    The efficiencies created by electronic trading would reduce the cost of portfolio management strategies for investors, increase the number of borrowers, reduce the cost of borrowing, and stimulate more stock loan trading and investment. It would also increase the returns that lenders earn on their portfolios. All of this would further lower the cost for companies to raise capital in the equity markets.

114.    But the stock loan market has none of this. It is devoid of a central marketplace where buyers and sellers can transact or view pricing and volume information across the entire market. As a result, borrowers today complain that the Prime Broker Defendants' "middleman" pricing is volatile and opaque. Lenders suffer from this same price opacity, and further complain that they cannot lend out more than a small fraction of their available stock as transactions are bottlenecked with the Prime Broker Defendants. The inability of borrowers and lenders to find and transact with each other results in a massive waste of economic resources, yielding artificially higher costs of investment and lower returns on investment. All market participants would benefit from a more modern and efficient stock loan market.

115.    Moreover, the archaic structure of the stock lending market relies upon the Prime Broker Defendants to locate and deliver the relevant security. Prime Broker Defendants conduct daily inventories of their stock available for lending and engage in stock lending trades for their hedge fund customers, with the expectation that the trade will settle within three days as required by SEC regulation after the brokers locate and deliver the stock. As a result of market forces, the hardest to borrow stocks are those that short sellers are most interested in borrowing. As more

driven by exploiting the middleman's informational advantage as against both sides and prices are consequently not transparent or low.

short sellers "pile in" to certain stocks, the borrowing fee that the brokers can charge increases dramatically, thus increasing the pressure of the Prime Brokers to "locate" the stocks, further increasing demand. This has led to a variety of improper behaviors in the stock lending market.

116.    For example, Prime Broker Defendants that are incentivized to deliver hard to deliver stocks for their hedge fund clients may agree to lend such stock, to the brokers' benefit, while knowing that they will not be able to settle the trade within the three day window required by SEC regulation. On January 14, 2016, the SEC announced that Goldman Sachs had agreed to pay a $15 million fine to settle charges that it had violated Rule 203(b)(1) of Regulation SHO and Section 17(a) of the Exchange Act by improperly agreeing to deliver securities without first providing adequate reviews of the securities to be located.[25]   In addition, dozens of stock lending traders (including at JP Morgan and Morgan Stanley) have been convicted of bribery and kickback schemes related to the traders' deals with smaller brokerage and finder firms that were utilized to perform the "locate" function for certain securities.[26]   These types of problems are byproducts of the archaic OTC market for stock lending, and would not exist on a centralized and transparent all-to-all electronic exchange.

117.    A direct effect of the outdated OTC market structure is that the Prime Broker Defendants are able to exploit inefficiencies to reap inflated profits at the expense of borrowers and lenders. Bringing lenders and borrowers together in a regulated, centralized trading platform would lower the cost of borrowing and increase the returns on lending. In that trading

---

[25] *See SEC Charges Goldman Sachs With Improper Securities Lending Practices*, SEC Press Release (Jan. 14, 2016), https://www.sec.gov/news/pressrelease/2016-9.html.

[26] *See Executive Director of Morgan Stanley's Domestic Stock Lending Desk Convicted of Conspiracy to Commit Securities Fraud*, FBI Press Release (Mar. 24, 2009), https://archives.fbi.gov/archives/newyork/press-releases/2009/nyfo032409.htm.

environment, investors would be able to trade anonymously in real time on electronic platforms, with live, executable pricing, and with any qualified trading partner.

118.     On the New York Stock Exchange or NASDAQ, for example, buyers and sellers make offers to "all" potential counterparties simultaneously—with electronic platforms matching trades primarily based on price. The seller gets the highest price offered and the buyer gets the lowest price available. Due to the Prime Broker Defendants' illegal, collusive and monopolistic practices, the modern stock loan market does not operate in this manner.

## II.     QUADRISERV INTRODUCES PRICE TRANSPARENCY AND ELECTRONIC TRADING TO THE STOCK LOAN MARKET

119.     Quadriserv was formed in 2001 by a group of industry veterans with the goal of developing and supplying financial applications for the stock loan market. Quadriserv's founders included Martin Hakker, Sr., who had built more than 30 global exchange trading and clearing systems over a 25-year career; Gregory DePetris, a former commodities floor broker and proprietary trader who had already founded a number of other innovative and successful market structure technology companies; and Joseph Weinhoffer, a former agency securities lending executive. As these industry veterans perceived, the securities lending market was ready to evolve.

### A.     Quadriserv Creates Quadriserv Data Services Inc. to Provide Price Transparency

120.     In the early 2000s, Quadriserv created Quadriserv Data Services Inc. ("QDS"), which developed a market data service to bring some transparency to pricing in the stock loan market. Using a "give to get" model—by which a participant could gain access to the data if it contributed data on its own stock loan transactions—QDS collected stock loan trading data each day from, initially, a group of fewer than a dozen pension funds, agent lenders, hedge funds, and

38

small prime brokers. QDS assembled this data and made the full dataset available to participants or subscribers the following day.

121.    Although the dataset was limited and not real-time, it gave participants and subscribers valuable insight into how stock loan transactions were being priced across the broader market. One large hedge fund, QDS's first paying customer, later shared with QDS that the data empowered it to save many millions of dollars by renegotiating prices with its prime broker. This limited example shows just how valuable price transparency can be to investors.

**B.      Quadriserv Creates Quadriserv Securities and Matches More Than $2 Billion of Open Stock Loan Transactions**

122.    Although QDS's data services began to give agent lenders and hedge funds some insight into pricing in the stock loan market, those market participants had no way to act directly on this newfound knowledge. In 2005, Quadriserv set out to solve this problem.

123.    Quadriserv created Quadriserv Securities, Inc. and registered it as a broker-dealer. Quadriserv Securities' broker-dealer status enabled it to serve as an intermediary between borrowers and lenders in the stock loan market. It also enabled Quadriserv Securities to raise capital – including a $50 million Bank of New York line of credit – that gave market participants confidence that Quadriserv Securities was a creditworthy counterparty—confidence that helped entice agent lenders and pension funds to make their stocks available through Quadriserv Securities for loan directly to hedge funds.

124.    Borrower and lender identities remained anonymous throughout transactions brokered by Quadriserv Securities.[27] Quadriserv Securities matched trades for a flat, disclosed fee—unlike the large spreads in the traditional stock loan market, which were undisclosed and

---

[27] Trading anonymity is a highly desirable feature for stock borrowers, especially short sellers that wish to keep their trading positions unknown to brokers and other market participants. Brokers – particularly small and mid-sized – also benefit from anonymity when they loan their own stock positions to raise cash at times when disclosure of their identity as a borrower could make it harder to access the funding market.

unknown to all market participants except the relevant Prime Broker Defendants or other broker-dealers.

125.   The Quadriserv Securities product offering was immediately popular with borrowers and lenders. By late 2005, more than $2 billion of open stock loan transactions had been matched on the platform, effectively maxing out the credit exposure Quadriserv Securities was capable of assuming, given its limited capital base. In order to grow and accommodate the demand from market participants for electronic, transparent trading services, Quadriserv needed to find either a large provider of capital or obtain access to central clearing.

**C.    Quadriserv Creates AQS to Develop an Anonymous, Electronic Platform with Central Clearing of Stock Loan Transactions**

126.   In or around 2006, Quadriserv—through its wholly-owned subsidiary, Automated Equity Finance Markets, Inc. ("AQS")—began developing an electronic platform that would directly match borrowers and lenders in the stock loan market. AQS promised to enhance the profitability and performance of lenders and borrowers alike by reducing spreads, and increasing the overall efficiency of the securities lending market.

127.   In 2007 and 2008, Quadriserv spent an enormous amount of time and money on its AQS platform. Quadriserv worked with computer programmers to develop the technology necessary to permit all market participants to trade anonymously in real time on the AQS platform. In December 2008, Quadriserv also completed the requirements to have AQS registered with the SEC as an Alternative Trading System to facilitate stock loan transactions.

128.   Having created sophisticated processes backed up by a broad portfolio of patents for centralized securities lending, AQS's goal was to serve the entire stock loan market by combining a common solution to credit intermediation with an electronic platform that could use

algorithms and technology to substantially replicate the unique elements of bi-lateral, relationship-based transactions.

129.    Among AQS's patented systems was a method for using trading data to rank lenders and borrowers on the basis of the behaviors that underlie the unique incentives and disincentives of bilateral, relationship-based trading. The method's algorithms were defined in collaboration with many of the largest firms in the industry, and their effect was to replicate the standards of behavior that governed lending functions like re-rates, return of shares, and recall of shares.  Firms that exhibited good or bad behaviors in the AQS market would be prioritized accordingly. Lenders and borrowers would thus be subject to a common, transparent, and systematically applied set of standards that preserved the traditional OTC incentive structure.

130.    In order to achieve its objectives, AQS pursued access to central clearing. Central clearing largely eliminates counterparty risk by interposing a "clearinghouse" between the two counterparties to the loan. The clearinghouse becomes the borrower to every lender and the lender to every borrower. The clearinghouse maintains sufficient capital to stand behind every trade it clears. The clearinghouse thus creates a more efficient market and mitigates systemic risk, allowing borrowers and lenders to trade without concern for counterparty default.

131.    Quadriserv saw that combining loan matching with a direct route to clearing would represent a significant advance for the stock loan market. The AQS platform provided a live view of prices, allowing borrowers and lenders to come together in a regulated, centralized trading environment. In such an environment, investors could trade anonymously, with live, executable pricing and with any qualified trading partner.

132.    The Prime Broker Defendants, however, viewed central clearing as a dangerous pathway by which others could challenge their grip on the stock loan market. The Prime Broker

Defendants had long represented their "intermediary" role as a valuable service that buffered clients from credit and counterparty risk. Central clearing would largely usurp this function, leaving clients to question the value of the Prime Broker Defendants' intermediary services. As one industry veteran summarized, the very "idea of a securities lending CCP [central counterparty] is anathema to the broker-dealers that continue to intermediate loans."[28]

133.    By 2006, AQS was quietly negotiating with the Options Clearing Corporation ("OCC"), a U.S.-based central counterparty clearinghouse and the world's largest derivatives clearing organization, to provide AQS with central clearinghouse services. The OCC Board of Directors is comprised of representatives of the five exchanges that own 100% of its equity,[29] along with eight broker-dealer representatives and three "independents."

134.    Several of the Prime Broker Defendants are regularly represented on the OCC board, and they wield considerable influence there despite not having a formal majority.[30] Accordingly, when approaching OCC board members regarding its product, AQS went one-by-one to those who it believed would be its advocates. This campaign was designed to deploy supportive board members to persuade other members expected to oppose any move toward central clearing, by explaining that opposition to clearing was both bad for the market and contrary to the Prime Broker Defendants' own customers' wishes.

---

[28] *The Legends: Joe Weinhoffer*, GLOBAL CUSTODIAN, https://www.globalcustodian. com/GC-Legends/Weinhoffer,-Joe/.

[29] These exchanges are the Chicago Board Options Exchange, Incorporated; International Securities Exchange, LLC; NASDAQ OMX PHLX, LLC; NYSE MKT LLC; and NYSE Arca, Inc. *See 2016 Annual Report*, OCC, https://www.theocc.com/components/docs/ about/annual-reports/occ-2016-annual-report. Each of these five board members has an absolute veto right concerning OCC decisions.

[30] For instance, representatives of Bank of America (or Merrill Lynch, as predecessor) and Goldman Sachs each sat on OCC's board each year from 2008 to 2017. A Morgan Stanley representative sat on OCC's board from 2010 to 2014. JP Morgan employees held OCC board seats from 2008 to 2009. *See* OCC Annual Reports (2008-16), https://www.theocc.com/about/corporate-information/annual-reports/.

135.    When AQS began approaching OCC, the OCC Board of Directors included the following individuals from the Prime Broker Defendants:  *Frank J. Bisingnano*, Chief Administrative Officer at Prime Broker Defendant JP Morgan Chase; *Daniel B. Coleman*, Managing Director and Head of Equities at the Americas for Prime Broker Defendant UBS; *John P. Davidson III*, Managing Director of Equity Infrastructure at Prime Broker Defendant Morgan Stanley; *Mitchell J. Lieberman*, Managing Director, Global Securities Services at Prime Broker Defendant Goldman Sachs; *Richard R. Lindsey*, President, Bear Stearns Securities Corp.,[31] and *Gary Yetman*, Managing Director at Prime Broker Defendant Merrill Lynch.

136.    AQS eventually had a breakthrough with OCC in early 2008. Wayne Luthringshausen, the Chief Executive Officer of OCC at the time, was supportive of AQS's efforts and wanted to give AQS the ability to clear stock loans via OCC. But he knew certain Prime Broker Defendants would be concerned about AQS having access to central clearing because it would pose a threat to their way of doing business in the stock loan market. From the Prime Broker Defendants' perspective, AQS—by centralizing and standardizing counterparty credit in the stock loan industry—threatened to eliminate or neutralize the leverage that the Prime Broker Defendants wielded over other broker-dealers and bank trading counterparties. In particular, Mr. Luthringshausen understood that Mitchell J. Lieberman of Goldman Sachs, who was very influential on the OCC board, would likely oppose allowing AQS any access to OCC clearing.

137.    As a result, Luthringshausen took pains to have direct discussions with AQS. He conducted the majority of the negotiations with AQS without unnecessarily involving the board and planned specific board votes concerning the proposed deal at times when he knew its most

---

[31] Bear Stearns was acquired by Prime Broker Defendant JP Morgan in 2008.

vigorous opponent, Lieberman of Goldman Sachs, was not likely to attend. These efforts ultimately resulted in the passage by the OCC board of a proposed deal with AQS in May 2008.

138.    Going forward, Goldman Sachs was determined to organize the Prime Broker Defendants to block similar threats to their tight hold on the market. John S. Willian, Global Co-Head of Prime Brokerage, Clearing, Electronic Trading, and Futures at Goldman Sachs, criticized Lieberman for having been "asleep at the wheel" during OCC's AQS approval process and replaced Lieberman with himself on the OCC board.

139.    Following integration with OCC, AQS could conceivably act as the central marketplace for all U.S. securities lending. The potential of AQS to upset the supracompetitive profits of the Prime Broker Defendants was not lost on market participants. For example, during a meeting with the DTCC shortly before the OCC vote in May 2008, DTCC's Managing Director and General Manager Fixed Income Clearance and Settlement Group, Thomas Costa, told AQS executives that "this sounds great, but who's going to start your car in the morning?"

### D.    Quadriserv Launches Its Electronic Platform with Central Clearing of Stock Loan Transactions

140.    On January 7, 2009, AQS launched its stock lending platform with central clearing through OCC. By working with OCC, AQS was able to offer a platform that would "match lenders and borrowers using a hybrid auction and continuous price discovery mechanism" where "matched loans will be processed through OCC, which will provide central counterparty guarantees."[32] AQS offered a "hybrid auction" that allowed borrowers and lenders

---

[32] *OCC Formalizes Agreement With Quadriserv To Launch Centralized Securities Lending Marketplace*, OCC, (Jan. 7, 2009), https://www.theocc.com/about/newsroom/releases/2009/01_07.jsp.

to interact directly with each other (via a clearing broker which provided access to OCC)[33] and in which every transaction had a unique traceable identifier.

141.    Shortly before the central clearing launch, Quadriserv announced the appointment of Tom Perna, formerly a Senior Executive Vice President at The Bank of New York, to serve as Quadriserv's new CEO. During his tenure at The Bank of New York, one of the largest stock lending agents, Mr. Perna had overseen broker-dealer services, hedge fund services, and financial institutions banking services. Perna's appointment demonstrated to the market that a well-respected Wall Street figure was joining to further accelerate growth of the AQS stock lending platform.

142.    AQS's goal was to provide all market participants an automated centralized marketplace that acted as a single point of contact for trading, clearing, settlement, and post-transaction processing. AQS enabled individual lenders and borrowers to trade in a common instrument, in a common credit environment, for the benefit of all market participants. The AQS platform provided previously unrealized benefits to market participants, including price discovery, trade matching, and clearing. OCC, as central counterparty to all AQS transactions, provided anonymous trading by becoming the borrower to the lender and the lender to the borrower, guaranteed delivery of securities versus cash upon close-out of any stock loan transaction, guaranteed daily mark-to-market payments, and guaranteed rebate payments.

143.    Quadriserv embarked on a marketing campaign to introduce its product to participants in the existing stock loan market. Quadriserv highlighted that AQS had the "ability to enhance the profitability and performance of lenders and borrowers alike by reducing spreads,

---

[33] While there are only a handful of top prime brokers, there are over 60 brokerage firms with stock lending clearing privileges at OCC today. *See Member Directory*, OCC, https://theocc.com/membership/member-information (last visited Nov. 16, 2017).

and increasing the overall efficiency of the securities lending marketplace."[34] It did this by taking direct aim at the "existing inefficiencies and large spreads in the securities lending industry" by providing "confidential, un-conflicted daily price discovery and transparency by anonymously and directly connecting borrowers and lenders of securities."[35] "As a result, pension funds better realize the full intrinsic value of the securities they are lending, while hedge funds and other asset managers reduce short-selling costs by borrowing securities directly from beneficial owners of assets."[36]

144.    AQS immediately received strong encouragement from the Federal Reserve Bank of New York, which recognized that improved systemic risk controls in the stock loan market might help to stabilize financial markets in the wake of the 2008 credit crisis. AQS also regularly worked on such issues with Federal Reserve task forces.  By centralizing counterparties, AQS could reduce default and other lending risks, while providing guaranteed mark-to-market payments, mandatory corporate action settlements, and rebate rate payments through OCC. AQS shared the Federal Reserve's support of its efforts with other market participants, adding to AQS's credibility and momentum.

145.    By late 2009, AQS announced it had also reached agreement with Eurex, a European clearinghouse, to provide clearing services for stock loan transactions involving European equities. The combination of U.S. and European central clearing (through OCC and

---

[34] *Quadriserv, Inc. Highlights Securities Lending Innovations At TradeTech 2007*, NASDAQ - GLOBENEWSWIRE (March 9, 2007),
https://globenewswire.com/newsrelease/2007/03/09/356337/115225/en/Quadriserv-Inc-Highlights-Securities-LendingInnovations-At-TradeTech-2007.html.

[35] *Id.*

[36] *Id.*

Eurex), together with the electronic, transparent marketplace offered by AQS, promised to move the stock lending market into the modern world of efficient trading.

146.    Demonstrating its feasibility and value, AQS won the financial or other support of entities such as one of the largest lenders of stock (asset manager Barclays Global Investors), one of the largest borrowers of stock (the quantitative hedge fund Renaissance Technologies), the oldest venture capital fund in the country (Bessemer Ventures), and one of the largest exchanges in the world (Deutsche Bourse, through its Eurex AG and International Securities Exchange subsidiaries).

147.    Quadriserv had also gathered a group of institutional and private investors, including Bessemer Venture Partners, International Securities Exchange (ISE), Susquehanna International Group, Renaissance Technologies, Interactive Brokers Group, and Citigroup, further reinforcing the company's overall position as a reputable player in the industry.[37]

148.    In October 2010, AQS also obtained both a financial investment and a commitment from SunGard Data Systems to connect AQS to its industry-standard back-end system Loanet. SunGard's Loanet is the universal accounting and settlement processing system for securities lending, which settles through the Depository Trust Company ("DTC,"). Since its establishment in 1980, Loanet has aimed to provide the highest degree of automation possible by integrating securities lending activity with its clients' trading, bookkeeping, stock record, risk, capital, credit, regulatory, settlement, and funding systems. It was designed to become the single point of entry to control and automate the flow of information among all systems that are involved in the securities lending process, and is used by over 250 broker-dealers. SunGard integrated its Loanet Smart Loan technology with AQS in or around October 2010.

---

[37] Asset manager Barclays Global Investors signed up to invest in the Quadriserv Series C and D financing rounds, but then backed out at the last minute under pressure from Prime Broker Defendants.

149.     John Grimaldi, Executive Vice President and General Manager of SunGard's Loanet business unit, commented that "SunGard's Loanet customers have responded favorably to the first phase of our integration with the AQS securities lending market, which includes seamless access to AQS' liquidity and price discovery mechanisms. We are confident our customers will also respond favorably to our next set of initiatives with AQS, featuring greater trading and inventory control."[38]

150.     By this time, the AQS platform was primed to offer a marketplace where lenders and borrowers could directly execute stock loan transactions via clearing brokers and centrally clear them via straight-through processing, in conjunction with its partnerships with OCC, DTC, and SunGard's Loanet platform.

## III.     DEFENDANTS CONSPIRE TO BOYCOTT QUADRISERV/AQS

151.     When AQS began marketing its platform as it completed its deal with OCC on central clearing, the Prime Broker Defendants conducted several meetings with AQS executives, initially expressing (or feigning) interest in the AQS platform in order to gather intelligence on the product's offerings. Coming out of these meetings, Goldman Sachs openly refused to support the AQS platform under any circumstances.

152.     The immediate response of other Prime Broker Defendants was not as strident, at least at first. Yet it swiftly became clear to AQS executives that the Prime Broker Defendants had agreed on a common stance vis-à-vis AQS. Eventually, Prime Broker Defendants Morgan Stanley, JP Morgan, Credit Suisse, and UBS each communicated, in separate meetings with AQS executives, an identical position concerning AQS:  that the only way they would support the

---

[38] *SunGard Integrates Loanet Smart Loan with Quadriserv AQS*, FINEXTRA (Oct. 6, 2010), https://www.finextra.com/news/announcement.aspx?pressreleaseid=35958.

platform was if AQS made it a broker-only platform. They all uniformly conditioned their participation on lenders and borrowers being barred from trading on the platform.

153.    Defendants Goldman Sachs, Morgan Stanley, J.P. Morgan, Credit Suisse, and UBS also refused to give their customers access to AQS. Stock loan market standards require that a broker-dealer (acting as a "qualified borrower") be the legal borrowing entity in every stock loan transaction, and OCC's amended by-laws provided that only broker-dealer "clearing members," such as the Prime Broker Defendants, may transact through the clearing house, either as the lender or borrower. Accordingly, for borrowers and agent lenders to have access to trade on the AQS platform through OCC, they needed to be "sponsored" by, and granted access through, a broker-dealer, who would stand in to facilitate and clear their trades. Defendants Goldman Sachs, Morgan Stanley, J.P. Morgan, Credit Suisse, and UBS' point blank denial of access for their clients to AQS meant that their clients simply could not trade on the platform. This infuriated these prime brokers' customers who wanted to trade on AQS, but the prime brokers knew they faced little risk of losing any of their customers as they had all agreed to refuse to sponsor transactions on AQS.

154.    On August 12, 2008, a "summit" meeting was convened at the offices of Renaissance Technologies to attempt to find common ground for the Prime Broker Defendants to work with AQS and support offering platform access to the hedge fund borrower community. Among the meeting attendees were senior officers of prominent securities borrowers, including Renaissance Technologies and D.E. Shaw, AQS executives, and the heads of securities lending of prime brokers, including Defendants JP Morgan and Morgan Stanley. Despite the sheer scale and size of the hedge funds represented in the room that day – including three of the largest securities borrowers in the world – and despite hearing of the benefits to the industry that

enabling all-to-all trading would deliver, the Prime Broker Defendants were not moved to shift their stance on providing access to the AQS market.

155.    Some second- and third-tier broker-dealers initially recognized the benefits to the market that were offered by AQS and saw benefits to themselves from the AQS platform's ability to open up competition with the top prime brokers, Defendants Goldman Sachs, Morgan Stanley, J.P. Morgan and Credit Suisse. While these other broker-dealers—such as Interactive Brokers and Jeffries—profited from their position as market intermediaries, they did not do so nearly to the degree that Goldman Sachs and Morgan Stanley (and to a lesser degree J.P. Morgan and Credit Suisse) did. They thus recognized a potential benefit to themselves from products that might enable them to more effectively compete with Goldman Sachs and Morgan Stanley, for a larger share of the stock loan market.

156.    Among the Prime Broker Defendants, Merrill Lynch (later acquired by Bank of America, and among the smallest of the Prime Broker Defendants by market share) was initially an outlier that explored permitting some customers to access the AQS trading screen and sponsoring their AQS stock lending activity.[39] Hedge fund clients were contacting other Prime Broker Defendants opposed to AQS, and were switching to Merrill Lynch, expressly referencing AQS in their decisions to do so. As the Head of Securities Lending at Bank of America/Merrill Lynch noted in a communication with Greg DePetris of Quadriserv in August 2009, AQS was a way for Bank of America to rebuild the prime brokerage franchise of its Merrill Lynch subsidiary by winning back balances from large hedge funds by offering a unique service that was destined to come someday regardless.

---

[39] Merrill Lynch attached a servicing fee to all such AQS activity, demonstrating the commercial viability of prime-broker sponsorship of access to a centralized, electronic stock-loan market.

157.    Merrill Lynch therefore initially supported AQS and its vision for the stock loan market, making equity investments in AQS in 2007, 2008, 2009, and early 2011.[40] This early support was driven by Rohit D'Souza, who had run Capital Markets for Merrill Lynch and believed Merrill Lynch should take a leadership role in modernizing the whole industry. Senior management and business units followed through on D'Souza's mandate, under the direction and leadership of Mike Stewart (Head of Equities), Syl Chackman (co-Head of Prime Brokerage), and Artie DiRocco (Head of Securities Lending).

158.    The market momentum that AQS was gaining in 2009 and 2010 posed a major threat to the multi-billion dollar stock lending business of the Prime Broker Defendants. AQS threatened the Prime Broker Defendants' privileged intermediary position and their ability to extract huge profits on opaque and inefficient stock loan transactions.

## A.    The Prime Broker Defendants Strengthen Their Boycott of AQS as the Platform Gained Momentum

159.    Goldman Sachs—the market leader that had the most to lose from the success of AQS—recognized the threat posed by AQS from the outset, never wavering from its refusal to support the platform. As AQS began gaining momentum in and around late 2009, Goldman Sachs and Morgan Stanley brought their enormous leverage to bear to collect the other Prime Broker Defendants (all EquiLend member banks who held seats on EquiLend's board) to further neutralize and eliminate AQS as a competitive threat, for the collective economic benefit of the Prime Broker Defendants.

160.    In August 2009, Quadriserv executives learned that during a recent conversation with the Head of the Stock Loan Desk at Defendant Bank of America/Merrill Lynch, Goldman

---

[40] Citigroup also invested in AQS early on, but did not participate when AQS looked to expand its capital base in 2009. Many clients encouraged Goldman Sachs to invest, but Brad Levy and Darren Cohen of Goldman's Principal Strategic Investments Group declined to do so.

Sachs' Conley "got so angry at the mention of [AQS] that spit was coming out of his mouth!" Conley told the Bank of America executive that he was "opposed to transparency in any form," and that his opposition was driven by the above-market spread Goldman Sachs secretly made on stock loan transactions. Conley pressured Bank of America to reverse course and to join the opposition to AQS or risk being ostracized by the other Prime Broker Defendants.

161.    Recognizing Goldman Sachs' leading role in organizing the conspiracy, the Bank of America executive told a Quadriserv executive that Quadriserv needed to win over Goldman Sachs in order for AQS to grow. The executive suggested that Quadriserv let Goldman Sachs buy equity in AQS, but limit how much control Goldman Sachs could gain over AQS, as Goldman would try to use any influence it had over AQS to try to thwart the threat AQS posed to the Prime Broker Defendants.

162.    The Prime Broker Defendants became further concerned in the fall of 2009 as the SEC appeared to be considering requiring securities lending to occur on all-to-all trading platforms like AQS. The SEC, for example, scheduled a roundtable discussion for September 2009 that included panels on "Improving Securities Lending for the Benefit of Investors: Transparency; Electronic Platforms; Central Counterparties; Accountability" and "Controls on 'Naked' Short Selling:  Examination of Pre-Borrow and Hard Locate Requirements."

163.    The Prime Broker Defendants held discussions to settle on their collective messaging against all-to-all trading platforms like AQS. In advance of the September 2009 roundtable discussions, the executive from Bank of America/Merrill Lynch that had previously faced pressure from Goldman Sachs' Conley convened what he characterized as a meeting of "the five families," the Mafia-related term that the Prime Broker Defendants often used to

describe themselves collectively, to develop their uniform position on all-to-all trading platforms like AQS.

164.    This meeting was followed by another private meeting among the Prime Broker Defendant panelists, including Conley and Credit Suisse's Shawn Sullivan.[41] During this private meeting, the panelists agreed to disparage AQS and central clearing during the roundtable discussion. Right before the panel discussion, one of those present at the secret meeting expressed personal remorse to a representative of AQS who was also on the panel, quietly telling him that she felt "sorry for what we're about to do" to AQS.

165.    On September 29 and 30, 2009, the SEC held the roundtable discussions. Panel members included, among others, the Co-Founder and Chief Strategic Officer of Quadriserv, the Chief Executive Officer of Quadriserv, Goldman Sachs' Conley, Credit Suisse's Sullivan, and representatives from SunGard's Astec Analytics, agent lender Brown Brothers Harriman, and custodial lender State Street.

166.    As planned, Sullivan of Credit Suisse spoke out against the AQS platform at the roundtable discussions. He told the group that there was no proposal for central clearing that "truly addresses the unique characteristics inherent in the securities lending market," and that a central counterparty would "most likely reduce liquidity in the marketplace"—a sentiment seemingly without basis and unsubstantiated by industry or academic opinion. He also stated, contrary to the economic reality that central clearing reduces risk by placing well-capitalized clearinghouses on each side of a trade, that "if you have more bidders in the process, you're most

---

[41] Bank of America/Merrill Lynch did not attend this second meeting. At the time, the bank was divided between executives inclined to support AQS, and those influenced by their economic interest in maintaining the existing market structure as well as heavy pressure from other Prime Broker Defendants to join the AQS boycott.

likely going to have a deterioration in the credit quality of the counterparts, and that's something that a beneficial owner does not want to be exposed to."

167.     Unable to get AQS to back down, the Prime Broker Defendants met and discussed what their next move should be. They held these discussions not only at regular EquiLend board meetings as discussed below, but also among smaller groups outside those meetings.

168.     The Prime Broker Defendants decided that AQS was a "gateway drug" that could lead to a marginalization of their dominant market position, and that the only effective response was to starve AQS of its lifeblood:  liquidity. They agreed to do this by collectively refusing to participate on the platform, and thereby to keep their trade flow and trade data outside of the platform's electronic market. The collective decision by the Prime Broker Defendants not to use AQS meant that the efforts of other market participants—for example, hedge funds and other broker-dealers to use the AQS platform, which they wanted to succeed, was seriously compromised.

169.     By late 2011, Bank of America's attitude markedly changed when personnel who had formerly supported AQS left the bank or were pushed out, including Mike Stewart and Artie DiRocco. Stewart was replaced by someone more in line with Goldman Sachs, Morgan Stanley, and the other Prime Broker Defendants:  Stuart Hendel, the former head of prime brokerage at Morgan Stanley and UBS, who was named the new head of Global Prime Brokerage at Bank of America. Once appointed, Hendel immediately began shutting down internal resources dedicated to AQS and directing personnel to discourage and disavow the platform.

170.     The behavior of Bank of America also shifted in line with the pressure of Goldman Sachs, Morgan Stanley, Credit Suisse, and others. Bank of America ordered its stock loan desk to limit the volume of transactions that could be placed on the AQS platform:  Going

forward, the desk could put on only $1 billion of notional loans each day, a tiny fraction of Bank of America's normal daily volume. The new policy choked off dealer volume on AQS. Under Hendel's direction, Bank of America made no further investments in AQS and stopped providing any meaningful support.

171.    The other Prime Broker Defendants further tightened the boycott of AQS around this same time. Morgan Stanley, for example, had at one point provided AQS with billions of dollars of its proprietary stock loan liquidity as a carrot to persuade AQS to turn its platform into a broker-only venue that would not undermine the Prime Broker Defendants' control of the stock loan market.[42] Morgan Stanley, however, reversed its position consistent with the other Prime Broker Defendants and its liquidity on the AQS platform quickly evaporated to only a couple hundred million dollars. AQS executives, including Pat Cestaro, reached out to Morgan Stanley contacts, including Anthony Schiavo, for an explanation. However, Morgan Stanley simply dodged the inquiries.

172.    The conspiracy among the Prime Broker Defendants to boycott and eliminate AQS, which strengthened by 2011, is evidenced by the identical actions of each of the Prime Broker Defendants to pull its support from the AQS platform, to starve the platform of the liquidity and data that it needed to survive, and to bully and coerce others to turn their back on AQS.

173.    Besides themselves boycotting the AQS platform, the Prime Broker Defendants also took concerted steps to prevent other market participants from transacting on AQS. The Prime Broker Defendant knew that for AQS to survive it needed hedge fund borrowers at a minimum to participate on its platform. So the Prime Broker Defendants began to exercise

---

[42] Morgan Stanley provided AQS access only to its own proprietary stock loan liquidity, and never permitted any of its customers to use AQS.

leverage over their hedge fund clients. In addition to providing critical prime brokerage services across many asset classes, the Prime Broker Defendants also routinely assisted (officially or unofficially) their own alumni employees, now at hedge funds, in raising capital and accessing various financial markets, gave them access to scarce initial public offerings, shared proprietary research with them, and provided other valuable services outside of stock lending. These were services that the Prime Broker Defendants could—and did—threaten to cut off if their hedge fund clients decided to trade on AQS. By 2011, all the Prime Broker Defendants uniformly refused to give their customers access to AQS, including refusing to sponsor any trades their customers wished to complete on AQS.

174.    In many cases, the Prime Broker Defendants also outright threatened to deny hedge funds access to critical prime brokerage services if they traded on AQS. In the face of these threats, many hedge fund borrowers opted not to participate in AQS. For instance, one of the world's largest and most successful hedge funds asked each of the Prime Broker Defendants that it used for prime brokerage services for direct access to AQS. Each one not only refused, but told the fund that if it was not happy, it could take its business to another firm—an empty suggestion, as each knew that, as agreed, none of them would allow access to AQS.

175.    The same thing happened to dozens of large hedge funds, including flagship funds such as Loan Pine Capital, D.E. Shaw, Millennium Management, and SAC Capital. After inquiring about AQS, each was stonewalled by the Prime Broker Defendants. Each was told that, if it was not happy with the Primer Broker Defendants' decision to undermine AQS, it could take its business elsewhere.

176.    This strategy to deny clients access to AQS would not have worked if each Prime Broker Defendant had merely acted unilaterally. Without assurances that other Prime Broker

Defendants would also refuse, no Prime Broker Defendant would risk losing its best customers by inviting them to take their business to another Prime Broker Defendant. This only made sense because there was no viable "elsewhere" for the hedge funds to go.

177.    The Prime Broker Defendants' threats were not restricted to clients. For instance, the Prime Broker Defendants took swift action when they learned that agent lender BNY Mellon, an important source of stock lending supply, planned to use AQS for stock loan transactions. Upon learning of this in 2012, Goldman Sachs told executives at BNY Mellon, including James Slater, Head of Global Collateral Management and Securities Finance, that if BNY Mellon continued to use the AQS platform, Goldman Sachs would return open stock borrowing trades with BNY and stop trading with the BNY Mellon stock loan desk altogether. Faced with this threat, BNY Mellon withdrew its support for AQS.

178.    The Prime Broker Defendants also used their influence over AQS's U.S.-based clearinghouse, OCC, to thwart the benefits of central clearing that were available to the stock loan market.[43] From 2009 to approximately 2014, the Prime Broker Defendants (through the OCC board) jointly insisted on preserving various antiquated OCC rules whose only purpose was to make clearing less attractive to borrowers and lenders. For instance, the Prime Broker Defendants worked to ensure that "netting" of stock loan exposure on broker-dealers' balance sheets at OCC was not permitted, which, had it been permitted, would have almost certainly made AQS among the only economically viable methods of trading stock loans. During this period, Conley of Goldman Sachs, one of the chief architects of Defendants' conspiracy, was

---

[43] Affiliates of the Prime Broker Defendants are all members of OCC and many of their high-ranking employees serve on OCC's Board of Directors. For instance, in 2009, the OCC Board of Directors included Frank J. Bisignano, Chief Administrative Officer of Prime Broker Defendant JP Morgan; Mitchell J. Lieberman, Managing Director, Global Securities Services for Prime Broker Defendant Goldman Sachs; and Gary Yetman, Managing Director of Prime Broker Defendant Merrill Lynch.

speaking with Michael McClain — OCC's Chief Operating Officer who oversaw technology and operations — on a weekly basis about clearing stock lending.

### B.    Defendants Use EquiLend to Organize and Ultimately Boycott AQS

179.    Without collective action by the Prime Broker Defendants, AQS would have been a highly profitable business. Indeed, market participation in AQS reached an inflection point when numerous key players in stock lending began using the AQS platform. Included on AQS's member roster were over 30 brokers, including large institutional brokers (e.g., Citigroup, Bank of America/Merrill Lynch, and Societe Generale); medium size and independent brokers (e.g., Citadel, Jefferies, TD Ameritrade, Charles Schwab, Interactive Brokers, Fidelity, and Natixis); and small brokers (e.g., Maple Securities, Nomura, and Wedbush Morgan). Also included were hedge fund borrowers (e.g., Maverick Capital, Elliot Management, Davidson Kempner, and Och-Ziff), and agent lenders and custodian banks (e.g., Northern Trust, BNY Mellon, and BlackRock).

180.    The Prime Broker Defendants organized and effectuated their conspiracy to neutralize AQS in large part through EquiLend, a dealer consortium formed in 2001. During the relevant period, the ten owners of EquiLend included all six of the Prime Broker Defendants: Bank of America/Merrill Lynch, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS. Since EquiLend's inception, the Prime Broker Defendants have dominated and controlled the consortium through a majority of seats on the Board of Directors.

181.    Given this control and the Prime Broker Defendants' overall clout in the symbiotic relationship between brokers and agent lenders, the agent-lender owners of EquiLend routinely acquiesced to the Prime Broker Defendants. For instance, State Street met regularly with Goldman Sachs to discuss AQS and report on how State Street was dealing with the new platform. Prime Broker Defendants also successfully pressured senior management of Barclays

Global Investors – a founding member of EquiLend and subsidiary of Blackrock since 2009 – to pull out at the last minute as an investor in the Quadriserv Series C and D financing rounds. Similarly, Northern Trust personnel told another potential stock lending platform, SL-x, that despite the benefits of the platform, they could not support it given that the Prime Broker Defendants— particularly industry giants Goldman Sachs and Morgan Stanley—were aligned against the platform.

182.    EquiLend ostensibly offers a bilateral (i.e., one-to-one) trading platform for stock loan transactions along with post-trading, administrative, and other services. But the consortium has done little to develop that platform in a meaningful way. As Brad Levy and Darren Cohen of Goldman's Principal Strategic Investments Group admitted in conversations, Goldman Sachs (like other Prime Broker Defendants) did not view EquiLend as an investment with an expected return on investment, but rather a "utility" that satisfied a business objective.

183.    The CEO of EquiLend – Brian Lamb – was hired in 2005 with instructions to execute the desires of the board controlled by the Prime Broker Defendants. On major decisions, Mr. Lamb typically did not express his own opinion, instead just indicating that he would bring the issue to the board. Rather than pursue EquiLend's business interests, the Prime Broker Defendants systematically used EquiLend to coordinate their boycott of the AQS platform and other market innovations, and to pressure other EquiLend member banks not to "break ranks."

184.    The Prime Broker Defendants pursued these objectives in the course of EquiLend board meetings and while attending numerous dinners, and industry conferences and events, ostensibly on behalf of EquiLend.[44] They did this explicitly in Bloomberg chats, text messages,

---

[44] The former Vice President of Morgan Stanley's securities lending desk has previously testified that there was a high level of interaction and cooperation among supposed competitors in the securities lending market: "The securities lending industry is a very close-knit industry. . . . Persons employed in the securities lending industry frequently interact, both professionally and socially. For example, I would regularly have lunches, dinners and

internal memoranda, recorded phone calls, and emails that reside today on EquiLend's and the

Prime Broker Defendants' servers. They did this by, among other things, instructing EquiLend's

then-CEO, Brian Lamb, to advance an agenda to halt the widespread dissemination of pricing

data to the market at large.

185.    One industry publication was prescient in this regard:  Global Custodian once

described EquiLend as a "cartel-cum-service provider" formed to protect the "economics" of an

industry that "double[s] or triple[s] the price" of lent securities "before passing them on to hedge

fund managers."[45]

### C.    Defendants Succeed in Neutralizing and Ultimately Acquiring AQS

186.    AQS got a second wind in 2014 following the implementation of new regulatory

guidelines specifically designed to encourage central clearing of stock loan transactions. This

development, and the resulting renewed interest in AQS, rendered the Prime Broker Defendants'

boycott of AQS suddenly insufficient to ensure their continued dominance of the stock loan

market.

187.    On January 1, 2014, the Basel Committee on Banking Supervision issued a set of

measures called "Basel III." Basel III, which was adopted in large part by the United States

Federal Reserve, imposed new capital requirements on the Prime Broker Defendants (and other

broker-dealers) for bilateral stock loan transactions. These guidelines revised the "risk

weighting" applicable to stock loan transactions in which the Prime Broker Defendants acted as a

---

casual drinks with securities lending employees working at various prime brokers. . . . [including] the very firms
with which [I was] competing fiercely for business." Decl. of Michael A. Manzino in Supp. of Pls' Opp. to Summ.
J. dated Nov. 7, 2011 at ¶ 4, *Overstock .com Inc. v. Morgan Stanley & Co.*, CGC-07460147 (Cal. Super. Ct. San
Francisco Cnty. Nov. 10, 2011).

[45] *Hybrid or horror: Can custody and prime brokerage be mixed?*, GLOBAL CUSTODIAN (Dec. 1, 2009),
https://www.globalcustodian.com/Magazine/2009/Winter-/Hybrid-or-horror-Can-custody-and-prime-brokerage-be-
mixed-/?p=3.

direct counterparty. The revised risk weighting required the Prime Broker Defendants to carry more capital on their balance sheet to cover the same risk, which in turn reduced their rate of return on capital.

188.    The rate of return on capital is a critical financial metric as to the profitability of a bank, or a particular business line within a bank, and bankers are compensated accordingly as this metric increases or decreases.[46] For a business within an investment bank to be considered profitable, its return on capital generally must exceed a 10% benchmark. A business unit within a bank with a high rate of return on capital is considered profitable and worth a great deal—and the employees who run and work in that business are compensated accordingly. A business within a bank with a low rate of return on capital is considered unprofitable and subject to shrinkage or potential closure.

189.    Basel III essentially reduced a bank's reported rate of return on capital for stock loan transactions, unless the bank began centrally clearing its stock loan transactions, thereby offloading risk to a central clearing counterparty. For one Prime Broker Defendant, it was estimated that Basel III's capital requirements could potentially reduce its return on capital for stock loans to an "unprofitable" rate of less than 10% if it did not centrally clear its stock loans.

190.    Faced with Basel III, business units within certain banks began taking steps toward central clearing of stock loan transactions. Within large prime broker banks however, business units and reporting lines are often siloed and lack effective coordination and communication. As a result, staff responsible for balance sheet management were often kept separate from staff responsible for trading stock loan.

---

[46] Laura Noonan, *Investment Banks' Return on Equity Declines*, FINANCIAL TIMES (Feb. 21, 2016), https://www.ft.com/content/0c65e85a-d719-11e5-8887-98e7feb46f27?mhq5j=e3.

191.    Upon discovering the steps being taken by middle management working groups towards central clearing, senior management and stock loan executives at many of the Prime Broker Defendants became alarmed. They recognized that central clearing with an all-to-all market could significantly impair the outsized profits that they still managed to squeeze from every stock loan trade. In their view, this loss of profits would far outweigh any potential balance sheet cost savings resulting from central clearing. The tension between senior management and stock loan executives at the Prime Broker Defendants and their midlevel business heads in charge of balance sheet optimization in the wake of Basel III is illustrated by events that took place at Morgan Stanley in 2014.

192.    In 2014, Thomas Wipf, Global Head of Bank Resource Management at Morgan Stanley, was running a new division that Morgan Stanley had created after the financial crisis to centralize the firm's funding, securities lending, collateral management, and counterparty hedging activities. In the beginning of 2014, Wipf tasked Susan O'Flynn, Morgan Stanley's Global Head of CCP Strategy, Governance and Optimization with a project to reduce the bank's balance sheet costs and increase return on capital. O'Flynn decided to accomplish this through central clearing.[47]

193.    In early 2014, O'Flynn publicly came out in favor of central clearing via Eurex and OCC, discussing it favorably with Morgan Stanley's customers (lenders and borrowers). She set up working groups to develop "plumbing"[48] for the banks to connect to Eurex and OCC, and

---

[47] O'Flynn focused on the fact that Basel III provided an escape hatch from the onerous balance sheet costs of bilateral stock-loan trading:  central clearing. The "risk weight" for a centrally cleared stock loan was 2% under Basel III while, under its tightened standards, the "risk weight" for a traditional bilateral stock loan was between 20% and 120%. In other words, a centrally-cleared stock loan transaction was between ten and sixty times cheaper in capital terms than a traditional bilateral transaction.

[48] Plumbing refers to back office decisions regarding rules like posting initial margin / haircut; posting and receiving variation margin (e.g., amounts needed to cover varying types / changing valuations of collateral);

started lobbying to make OCC's rules friendlier to Morgan Stanley's specific needs under Basel III. While O'Flynn's direct objective was to facilitate central clearing of Morgan Stanley's own stock loan trades, her vocal support of central clearing in general, and her efforts to improve the bank's infrastructure for central clearing, constituted a significant step down the path toward wider market adoption of central clearing on all stock loan trades—something that, unbeknownst to her at the time, was very dangerous to the Prime Broker Defendants' privileged intermediary positions and their scheme to maintain them.

194.    At Morgan Stanley, as in many banks, corporate strategy and trading were separate and did not communicate regularly. Therefore, while O'Flynn provided Wipf with projections concerning how much she planned to reduce the balance sheet cost through central clearing, she did not raise her plan to embrace central clearing more widely with senior management or executives on the stock loan desk.

195.    In late 2015 or early 2016, however, executives from Morgan Stanley's stock loan business got wind of O'Flynn's efforts, and made Wipf and others aware of the threat that a move toward central clearing posed to Morgan Stanley's outsized stock-lending profits. Specifically, these executives were concerned that central clearing would eliminate the credit quality justification for a middleman prime broker. Wipf then discussed this issue with others at Morgan Stanley, including with the Head of Securities Lending and Bank Resource Management in Europe, Matthew R. Collins.

196.    At this point, it would have been difficult for Wipf simply to direct Morgan Stanley to reverse course and cease all movement toward an all-to-all market with central clearing. Internally, the projected savings had been widely socialized as a justification for the

Extensible Markup Language messaging protocols, affirmation standards and timelines; and custodian, tri-party agents, and collateral schedules.

new Bank Resource Management Division, as well as O'Flynn's role. Externally, O'Flynn had publicly advocated central clearing to Morgan Stanley's customers, had encouraged OCC to modify its central clearing rules to permit this evolution, and had started working groups with other major industry participants to move towards central clearing. It would have been impossible, not to mention highly suspicious, for Morgan Stanley to explain to customers a valid basis for suddenly reversing course on a cost-savings strategy it had widely espoused, particularly since it could never reveal its true reasons:  that its internal cost-benefit analysis had revealed any cost savings resulting from central clearing paled in comparison to the extortionate profits the bank was able to wrest from those very customers in the current market structure.

197.    On a more basic level, the balance sheet benefits that would result from central clearing in the wake of Basel III were real—and Wipf had already told his superiors that he would be providing those savings. Indeed, Wipf incorporated the savings projections that O'Flynn had presented to him into the budgets he sent to his superior, Colm Kelleher, who, in turn, incorporated those savings into budgets he sent to Morgan Stanley's CEO, James Gorman. To detrimentally revise those budgets now not only would have cost O'Flynn and Wipf their credibility with their superiors and clients, but also would have affected their compensation and their jobs.

198.    Faced with this problem, Wipf devised a strategy that had two main components. The first required Morgan Stanley and the other Prime Broker Defendants to structure their own clearing mechanisms or "pipelines" to OCC in such a way as to protect the Prime Broker Defendants' position as intermediaries. Specifically, when the Prime Broker Defendants cleared their trades, they needed to make sure that:  (1) the clearing would maintain the opacity of the traditional stock loan market—with neither the lender nor the borrower knowing the price the

counterparty paid or received, (2) there would be no independent trading platform linked to a clearing house, and (3) the clearinghouse would not publish market data.

199.    The second part of the plan was to ensure that the only way for market participants to clear trades was to use pipelines controlled by the Prime Broker Defendants. To do that, the Prime Broker Defendants needed to completely control access to the clearinghouses.

200.    There were only two major clearinghouses with an SEC license to clear securities lending transactions in the U.S. in 2016:  DTCC and OCC. DTCC did not offer clearing for stock lending. OCC, on the other hand, did offer clearing of stock loan trades.

201.    The Prime Broker Defendants had considerable influence over OCC, with seats on the Board of Directors, and themselves had direct access to central clearing for stock loan transactions through OCC.[49]  Bank of America and Goldman Sachs alone contributed roughly 40-50% of the capital in OCC's clearing fund. But they were not the only ones with access to OCC for central clearing. AQS also had a deal with OCC that allowed anyone who traded on AQS to clear their trades through OCC.

202.    Wipf and other Morgan Stanley senior executives feared that lenders and borrowers would increasingly shift their trades to AQS to take advantage of its clearing function, and use its connection to OCC and its electronic platform to trade among themselves. Moreover, unlike OCC's clearing program for OTC trading, OCC's program for the AQS exchange platform for technical reasons (including that the program ran all loans through a single DTC account) allowed trades to be netted under relevant accounting rules, thereby optimizing the benefits of central clearing under Basel III.

---

[49] Affiliates of the Prime Broker Defendants are all members of OCC and many of their high-ranking employees serve on OCC's Board of Directors. For instance, in 2009, the OCC Board of Directors included Frank J. Bisignano, the Chief Administrative Officer of Prime Broker Defendant JP Morgan Chase; Mitchell J. Lieberman, Managing Director, Global Securities Services for Prime Broker Defendant Goldman Sachs; and Gary Yetman, Managing Director of Prime Broker Defendant Merrill Lynch.

203.     These concerns were exacerbated by the existence of a pending deal that had been initiated in early 2015 for OCC itself to purchase AQS and to offer open access to central clearing for AQS customers. AQS executives, together with senior management from OCC, had been engaged in a product development initiative since 2012 that would expand the AQS securities lending platform to allow centrally cleared equity repurchase agreements, a separate but related securities finance function that enables the reinvestment of cash collateral from securities lending activity. So-called "equity repo" activity accounts for between $400 billion and $700 billion in investment activity in the U.S. alone, and is critical to successful and liquid U.S. financial markets.

204.     AQS developed its equity repo service in an effort to continue its business in the face of the Prime Broker Defendants' boycott. The inclusion of equity repurchase transactions on the AQS platform would have greatly enhanced the platform's efficiencies and benefits, and its attractiveness to market participants. AQS had attracted the participation of Fidelity, Invesco, Federated Investors, State Street, Northern Trust, BlackRock, eSecLending, Barclays, and a number of other firms to a working group that would ultimately meet with the New York Federal Reserve Bank in support of increasing the scope of AQS's cleared trading activity.

205.     By mid-2014, OCC's board had granted its approvals, joint OCC/AQS marketing material had been completed, press releases were drafted, testing dates had been agreed to, and Quadriserv investors had contributed additional capital to support the implementation of the equity-repo product. However, this elevated engagement by OCC along with a broader set of industry constituents had not gone unnoticed, and following calls from Prime Broker Defendants to OCC, a continuing series of production delays increased operating losses and, having played

its last cards with investors, Quadriserv was forced to begin discussions with potential acquirers who could take the AQS platform forward.

206.     With dwindling access to much needed capital to continue to fund its business, Quadriserv entered into an agreement with Plaintiff, a more sufficiently capitalized enterprise, to sell AQS and continue to keep AQS afloat pending finalization of the planned business venture with OCC. Plaintiff and Quadriserv, although technically separate corporate entities were largely overseen by the same executives. The sale of AQS to Plaintiff was finalized on July 27, 2015. Nevertheless, upon the consummation of the sale, day to day operations of AQS remained largely unchanged.

207.     By 2015, Plaintiff recognized that OCC was the most logical acquirer of AQS and most likely to continue AQS's goal of offering an electronic platform open to all market participants in the stock loan market.

208.     Following extensive joint planning and diligence, the material terms of this acquisition had been agreed to by 2016. But the OCC board (in effect controlled by Prime Broker Defendants) had not approved the acquisition and the deal documents had not been signed.

209.     The prospective acquisition of AQS by OCC presented a significant threat to the Prime Broker Defendants. It created the possibility of a pathway to central clearing that the Prime Broker Defendants could not control. To keep this from happening, Wipf and his colleagues at Morgan Stanley developed a plan that they code-named "Project Gateway." The goal of Project Gateway was to erect an iron-clad "gate" through which all stock loan transactions must pass on their way to central clearing, which was now recognized as the

inevitable result of Basel III. Project Gateway made certain that this would be a "gate" that the Prime Broker Defendants would collectively control.

210.    Wipf reached out to Conley of Goldman Sachs. Over a series of private calls and dinners at restaurants in New York City, Wipf and Conley reached an explicit agreement on the strategy and implementation of Project Gateway. They agreed that the two banks (who together held the majority of the market share of stock lending revenue) should neutralize AQS by arranging to acquire it. They agreed that they would do this by securing the agreement of other Prime Broker Defendants to use EquiLend to purchase AQS for the sole purpose of eliminating any alternate path to central clearing.

211.    Wipf informed his colleagues at Morgan Stanley—including O'Flynn and Collins—of this agreement in January 2016, during a regular internal teleconference (held on an internal system known as iConference) referred to as a "pipeline call" or a "global sales call." (Recordings of this call likely exist.)  In addition to Wipf, O'Flynn and Collins, other participants included Tejash Patel, currently Managing Director & Co-Head of U.S. Securities Lending, and Thomas Kinnally, currently Global Head of Client Financing, Firm Financing and Collateral Risk Management.

212.    At the outset of the call, Wipf informed his colleagues that he had spoken to Conley at Goldman Sachs about AQS. He said that he and Conley agreed that Goldman Sachs and Morgan Stanley needed to act together to "get a hold of this thing." By the expression "get a hold of this thing," Wipf meant that Goldman Sachs and Morgan Stanley needed to act together to acquire AQS and shut it down. Wipf said that getting rid of AQS was necessary because AQS

provided a pathway to central clearing that was outside the control of the Prime Broker Defendants.[50]

213.    Morgan Stanley and Goldman Sachs subsequently coordinated and secured the participation of other Prime Broker Defendants (each of which was an EquiLend board member) in Project Gateway. These discussions took place at private dinners and meetings that often occurred at industry conferences or under the auspices of EquiLend board meetings. At these meetings, there was common agreement among the Prime Broker Defendants that they needed to control a "universal gateway" to central clearing through which every stock loan transaction would have to pass. To further this goal, the Prime Broker Defendants all agreed to support Project Gateway and to clear all stock loan transactions through their own direct pipelines to OCC—pipelines that would not be attached to AQS or any other electronic trading platform.

214.    As part of their support for Project Gateway, the Prime Broker Defendants agreed to exert their influence as directors of OCC and directors of EquiLend to prevent OCC from acquiring AQS. OCC's executive management, having been supportive of AQS, suddenly changed course following the appointment of Craig Donahue as CEO and the subsequent hiring of Scot Warren, a former Goldman Sachs employee, with securities lending business development responsibilities. Warren initially met and spoke with AQS on a regular basis about the planned AQS/OCC acquisition, though he notably asked AQS representatives "where does Goldman stand on this" when they first met to discuss the proposed acquisition. Warren abruptly stopped communicating with AQS management after he participated in a meeting with an EquiLend "working group" in New York City on April 17, 2015, which included representatives

---

[50] Morgan Stanley also seemingly took suppressive action concerning its then-Executive Director in Bank Resource Management, Bruce West, who was acting as the bank's liaison with AQS. In early 2015, shortly after he began actively to use AQS as a trading platform and to tout within Morgan Stanley that AQS allowed him to "do the work of six traders in one," he suddenly departed from the bank.

of Goldman Sachs and Morgan Stanley. OCC staff members who were supportive of AQS, including Carolyn Mitchell and Mark Baumgardner, were terminated in August 2015.

215.    After almost a year-long negotiation resulting in an agreement on all material terms and a transition protocol that included the hiring of several full-time employees from AQS by OCC, OCC abruptly pulled out of the deal. It stopped returning calls from AQS and, in a sudden about face and with no explanation, cancelled the transaction.

216.    Tellingly, shortly after the deal between OCC and AQS collapsed, EquiLend itself offered to buy AQS. At this point, AQS's owners faced a desperate situation after years of unknowingly being blocked by the Prime Broker Defendants' conspiracy, and having spent nearly $100 million with little volume or profit to show for it, Conley of Goldman Sachs suggested to AQS that it discuss an acquisition by EquiLend. As a result, AQS's owners eventually accepted a low-ball offer from EquiLend of less than $5 million for the assets of AQS.

217.    On August 1, 2016, EquiLend purchased the assets of AQS. In an accompanying press release, Brian Lamb, CEO of EquiLend, stated:  "Momentum has been building in the past two years in support of CCPs [central clearing] in the securities finance marketplace. Balance sheet costs, risk weighting and tougher capital-adequacy requirements have highlighted to the industry the potential benefits of using central clearing services."[51]  He claimed that, by "providing seamless access to OCC's Market Loan Program, the securities finance market now will have unprecedented access to central clearing services."[52]

---

[51] *EquiLend Acquires AQS to Facilitate OCC CCP Connectivity for Securities Finance Market*, EQUILEND, http://www.EquiLend.com/news/articles/2016/EquiLend_acquires_aqs.php.

[52] *Id.*

70

218.    What Lamb did not say is that the Prime Broker Defendants only wanted central clearing on their terms – terms that OCC, specifically Scot Warren and Craig Donahue, would help to ensure were in place. After buying AQS, the Prime Broker Defendants did not increase their participation in the AQS platform or take other action to make it prosper. Instead, they bought it to complete their control of central clearing for stock loans. In May 2017, just over a year after abandoning a potential acquisition of AQS, and nearly a year since EquiLend's successful acquisition of the company, OCC and EquiLend would announce an agreement for EquiLend to provide a substantially identical set of services to OCC that had been contemplated by AQS, using the AQS technology platform, at a cost of $15-20 million over five years, more than five times what OCC would have originally paid to own the platform.

219.    If the Prime Broker Defendants had acted unilaterally, each would have been driven by the pressures of Basel III to pursue the pro-competitive path to central clearing that O'Flynn of Morgan Stanley had first pursued. In that event, the stock loan market would look like the modern, electronic U.S. stock market, providing the benefits of fair access, transparency, and efficiency to investors, with adjustments to support the unique nature of stock loan trading.

220.    Borrowers would be able to choose any broker they wished to price, trade, clear, and settle stock loans. And they could do so without facing pressure to steer all their stock loan trading through the same broker at inflated rates. Lenders could post their inventory on the stock loan trading and clearing platform of their choice, enjoying not only genuine choice, but far higher returns. There would be, in a word, competition, and lower transaction costs for all.

221.    To this day, no lender or borrower can trade and centrally clear stock loans without the significant involvement and tacit approval of the Prime Broker Defendants. With their successful capture of AQS, the Prime Broker Defendants stand blockade at the "gate" of

securities lending to prevent lenders and borrowers from clearing and trading securities loans in a more efficient and less costly environment.

## IV.   THE PRIME BROKER DEFENDANTS' USE OF EQUILEND AS A FORUM FOR COLLUSION TRIGGERS SPECIAL SCRUTINY UNDER THE ANTITRUST LAWS

222.   As previously described, the Prime Broker Defendants routinely used their positions on the EquiLend board to co-opt EquiLend as a vehicle through which to promote and achieve their anticompetitive objectives. In doing so, EquiLend was not acting as a legitimate market participant according to its own economic best interests as an independent competitive venture. Instead, it was being used in illegitimate, non-competitive ways and taking actions that in many cases did not further its own economic interests.

223.   EquiLend Holdings LLC was formed in 2001, for the ostensible purpose of "optimiz[ing] efficiency in the securities finance industry by developing a standardized and centralized global platform for trading and post-trade services."[53] EquiLend mainly provides reconciliation of stock loan transactions. Reconciliation is a process that, post-trade, determines whether the shares from each counterparty were actually matched, whether margin due matched margin received, whether collateral given matched collateral received, and so on. EquiLend has gone on to add additional post-trade services, such as a settlement instructions repository, contract comparison, mark-to-market comparison, billing comparison, billing delivery, recalls, and returns.

224.   EquiLend has also for many years offered a service called AutoBorrow. AutoBorrow is a quasi-trading service that provides a daily automated, sequential execution for general collateral stock loans. As with EquiLend's effort to mimic other competitor's products, AutoBorrow is similar to SunGard's LCOR product. All AutoBorrow transactions are priced at a

---

[53] *See About Us*, EQUILEND, at http://www.EquiLend.com/about/ (last visited Nov. 16, 2017).

predetermined, fixed rate. Each trading day, AutoBorrow contacts broker-dealer subscribers in a one-by-one, sequential order, with a basket of every general collateral stock that agent lenders are currently offering. Each broker-dealer in the queue, in turn, decides how much stock loan quantity they wish to borrow, and that quantity is then executed. The predetermined, fixed rate for each stock loan does not reflect any particular market price for that stock loan security. Thus no price discovery takes place, and the stock loan executions remain bilateral (i.e., one-to-one).

225.    In contrast to AQS, EquiLend does not offer fully electronic, price transparent trading capabilities or the ability to negotiate terms with multiple potential counterparties simultaneously, nor does it offer central clearing to market end users. Its trading platform is presently considered to be "archaic" and "entrenched" with very poor functionality and a significant inability to effectively "match" or "fill" stock loan transactions. EquiLend's acquisition of AQS bore no relation, or procompetitive complement, to the products that EquiLend's business model has traditionally offered. This discontinuity can only be explained by the strategy of the Prime Broker Defendants brought to light here, to capture and prevent the development of electronic stock loan trading with actionable, real-time price discovery available to all.

226.    The original investing firms in EquiLend were Barclays Global Investors, Bear, Stearns & Co., The Goldman Sachs Group Inc., J.P. Morgan Chase & Co., Lehman Brothers Holdings Inc., Merrill Lynch & Co., Morgan Stanley, Northern Trust Corp., State Street Corp., and UBS Warburg—each of which committed $4 million to the newly formed enterprise. During the relevant period, the ten owners of EquiLend included all six of the Prime Broker Defendants:

Bank of America (formerly Merrill Lynch), Credit Suisse,[54] Goldman Sachs, JP Morgan, Morgan Stanley, and UBS.

227.    Since EquiLend's inception, the Prime Broker Defendants have dominated and controlled EquiLend through its Boards of Directors. Those board members of EquiLend Holdings LLC (EquiLend's USA entity) during the relevant period who were also employees of the Prime Broker Defendants include:  *Fred Nadd-Aubert*, Director, Prime Services & Strategic Product Development at Credit Suisse; *Gene Gemelli*, Director, Prime Services, Strategic Product Development at Credit Suisse; *Shawn Byron*, Managing Director, Goldman Sachs; *William Conley*, Head of Global Securities Lending at Goldman Sachs; *William Marcoullier*, New York Desk Head at JP Morgan; *Michael Kelleher*, Managing Director, Equity Finance at JP Morgan; *Ben Challice*, Managing Director, Global Head of Collateral Management & Agency Lending at JP Morgan; *Stefano Bellani*; Managing Director, Global Head of Trading Services at JP Morgan Chase; *Judy Polzer*, Global Head of Securities Lending Product at JP Morgan; *Robert Genkinger*, Managing Director, Equity Finance Sales & Trading at Bank of America Merrill Lynch; *Anthony Schiavo*, Vice Chair, Managing Director, at Morgan Stanley; and *Brendan Cusick*, Managing Director at UBS. Conley of Goldman Sachs took a particularly influential role on stock lending matters within this group. For EquiLend Europe Ltd., board members who were also employees of the Prime Broker Defendants include: *Karl Bishti*, European Prime Brokerage Desk Head at Credit Suisse; *Ralph Lehnis*, Managing Director, Credit Suisse; *Martin Cosgrove*, Managing Director, Goldman Sachs; *Michael Slomienski*, Vice President, Goldman Sachs; *John Shellard*, Managing Director, JP Morgan; *Jonathan Cossey*, Managing Director, Head of Equity Finance at JP Morgan; *Edward McAleer*, Managing

---

[54] Credit Suisse became a co-owner of EquiLend in 2005.

Director, Morgan Stanley; **Matt Collins**, Executive Director, Head of European Securities Lending at Morgan Stanley; **Rajeev Patel**, Global Head of Securities Lending and Head of EMEA Equity Finance at Bank of America; and **James Buckland**, Global Head of Stock Borrow & Lending at UBS.

228.    EquiLend is nominally organized as a joint venture, but this does not shield it—or the Prime Broker Defendants—from the antitrust laws. The reason is that EquiLend does not act in its own economic interests as an independent, rational market participant by improving its products and services so as to meet customer demand and generate increased revenue for the company. Instead, EquiLend has been used by the Prime Broker Defendants as a centralized forum for collusion and the advancement of their particular anticompetitive interests in the stock loan market.

229.    The cover story that EquiLend is a legitimate, for-profit business enterprise is belied by the actions taken, and not taken, by EquiLend and its member banks. The Prime Broker Defendants used EquiLend to:  (i) suppress price transparency by refusing to release pricing data to its customers, despite having access to this data and despite a clear market demand for such data; (ii) force competitors out of the market by coercing their customers to use EquiLend and/or DataLend, even though EquiLend and DataLend offered lower quality or entirely different services than what their customers desired and what prospective competitors offered; and (iii) stymie procompetitive market developments by purchasing valuable patents and trading platform technology from AQS and others, and then refusing to use or capitalize on those assets in any way, despite the fact that such patents and platform technology were essential for market developments that were in high demand and could have brought extra revenue into the company.

230.    EquiLend's role as a vehicle of collusion is illustrated by the way its board members steadfastly ignored the distinction between their prime brokerage businesses and their supposedly independent "joint venture." When making decisions on behalf of EquiLend, Conley talked about starting DataLend to ensure wholesale prices would not "kill our business"— meaning the Prime Broker Defendants' stock lending business. Similarly, as AQS made the rounds of the Prime Broker Defendants in an effort to sell the platform, at every turn they were told that the EquiLend directors had decided that any evolution toward central clearing would happen only through EquiLend—meaning, through a vehicle that the Prime Broker Defendants controlled. In meeting after meeting, the Prime Broker Defendants made clear that they considered themselves bound by understandings reached in EquiLend board meetings.

231.    If EquiLend had truly behaved as a profit-maximizing firm, it would naturally have sought to contribute to the competitive evolution of the stock loan market by promoting trading efficiency through a centrally-cleared electronic marketplace and selling clients transparent access to its market data. EquiLend would also have capitalized on the all-to-all trading platform that it purchased from AQS by further developing that technology for its own use or licensing to third parties.

232.    Instead, EquiLend remains a Potemkin village for Defendants' collusive and anticompetitive behaviors. The firm offers just enough operational efficiency to be relevant through its bilateral trading platform and the provision of certain administrative and back-office services. Yet it carefully avoids (and takes active steps to thwart others from engaging in) any activity that would threaten the Prime Broker Defendants' position as dominant market intermediaries.

233.     Even ignoring the actions EquiLend *failed* to take that would have modernized the

market, the actions it *did* take were not those of an independent enterprise. If EquiLend was

content to act as an industry utility, leaving innovation to other firms, it is unclear why it chose to

purchase the technology needed for an electronic, all-to-all stock lending platform with real-time,

transparent pricing, only to leave that technology on the shelf to collect dust. If EquiLend was

content with its position as a bilateral trading platform and trade processing service, it is unclear

what moved it to introduce a subpar data product at unbelievably low prices, at just the right time

to kill a product that threatened to expose the stock lending market to full price transparency.

That EquiLend was able to do so shows only that it was an effective tool of Defendants'

conspiracy, because it was capable of quickly shifting the direction of the development of the

stock lending market.

234.     The actions taken by the Prime Broker Defendants through EquiLend amounted

to naked restrictions on competition and output. They were intended to, and did, reduce the

volume and quality of stock lending overall, and the amount and quality of pricing data

distributed by EquiLend and available to market participants, to the detriment of all market

participants except for the Prime Broker Defendants. The Prime Broker Defendants' restrictions

on EquiLend's development and services were not necessary for or related to any procompetitive

actions by EquiLend. In fact, they ran directly contrary to EquiLend's stated purpose of

"optimiz[ing] efficiency in the securities finance industry."

235.     In short, EquiLend is not the independent joint venture that it purports to be.

Instead, it is an empty shell for collusion. EquiLend's actions should thus be viewed as illegal

concerted activity by the Prime Broker Defendants that is fully subject to Section 1 of the

Sherman Act.[55]

236.     Such collaborations among horizontal competitors, regardless of whether they are

organized as a joint venture, pose a high risk of anticompetitive harm. As the Antitrust

Guidelines for Collaborations Among Competitors issued by the Federal Trade Commission and

Department of Justice explain:

> Competitor collaborations may harm competition and consumers by increasing
> the ability or incentive profitably to raise price above or reduce output, quality,
> service, or innovation below what likely would prevail in the absence of the
> relevant agreement. Such effects may arise through a variety of mechanisms.
> Among other things, *agreements may limit independent decision making or
> combine the control of or financial interests in production, key assets, or
> decisions regarding price, output, or other competitively sensitive variables, or
> may otherwise reduce the participants' ability or incentive to compete
> independently*.[56]

237.     That risk is particularly acute here because the Prime Broker Defendants already

possess substantial market power (over 70% of the market) and new market developments thus

threaten only to "cannibalize their supracompetitive earnings."[57]  Because the Prime Broker

---

[55] *See, e.g.*, *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 200 (2010) (explaining that a joint venture that is nothing more than a "formalistic shell for ongoing concerted action" is subject to Section 1 liability); *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) (cooperative association made of up grocery stores liable for *per se* illegal conduct under § 1); *United States v. Sealy, Inc*., 388 U.S. 350 (1967) (group of mattress manufacturers could not escape *per se* § 1 liability by operating through a single corporation that they jointly controlled); *see also* Fed. Trade Comm'n & U.S. Dep't of Justice, *Antitrust Guidelines for Collaborations Among Competitors* 9 (2000) ("*Antitrust Guidelines*") ("In any case, labeling an arrangement a 'joint venture; will not protect what is merely a device to raise price or restrict output; the nature of the conduct, not its designation, is determinative.").

[56] *Antitrust Guidelines* at 6 (emphasis added); *see also id.* at 12 ("Anticompetitive harm may be observed, for example, if a competitor collaboration successfully mandates new, anticompetitive conduct or successfully eliminates procompetitive pre-collaboration conduct, such as withholding services that were desired by consumers when offered in a competitive market.").

[57] *Antitrust Guidelines* at 15; *see also id.* ("An exercise of market power may injure consumers by reducing innovation below the level that otherwise would prevail, leading to fewer or no products for consumers to choose from, lower quality products, or products that reach consumers more slowly than they otherwise would. An exercise of market power also may injure consumers by reducing the number of independent competitors in the market for the goods, services, or production processes derived from the R&D collaboration, leading to higher prices or reduced output, quality, or service.").

Defendants already control much of the stock lending market and profit greatly from its opaque structure, they have no incentive to foster innovation, launch new products or services, or improve the quality of existing products or services. Instead, the Prime Broker Defendants have the exact opposite incentive—to preserve the antiquated OTC stock-lending market at all costs, including by working together to stifle procompetitive developments that risk their disintermediation. The adoption of consortium strategies in such markets carries no positive benefits and only "increase[s] the likelihood of an exercise of market power by facilitating explicit or tacit collusion," as occurred here.[58]

## V.   DEFENDANTS SIMILARLY CONSPIRED TO BOYCOTT OTHER STOCK LOAN MARKET SOLUTIONS AIMED AT PROMOTING PRICE COMPETITION AND TRANSPARENCY

238.    In addition to AQS emerging as a potential solution that would provide transparency and all-to-all clearing services in the stock lending marketplace, two other significant players began to emerge: another potential stock lending clearing platform, SL-x, and a service that would provide price transparency for stock lending transactions, Data Explorers.

### A.   SL-x: Alternative Stock Lending Exchange Platform

239.    Like AQS, SL-x developed a platform offering an electronic marketplace for stock lending transactions. Founded in late 2010 and primarily developed over the course of the following two years, SL-x offered an electronic, front-end trading system for stock loans.

240.    Having observed the difficulties encountered by AQS's more ambitious market offering, however, SL-x executives sought to design a product intended to be less disruptive to

---

[58] *Antitrust Guidelines* at 12. Wall Street banks have pursued similar collusive strategies in other markets. One recent study, for example, found "more than 400 instances of large banks involved in at least 63 separate illegal conspiracies." *See* John M. Connor, *Big Bad Banks:  Big Rigging and Multilateral Market Manipulation*, American Antitrust Institute Working Paper No. 14-04 (May 5, 2014), https://www.antitrustinstitute.org/sites/default/ files/WorkingPaper14-04.pdf.

the existing market structure, while still taking steps toward a more efficient system. To do so, SL-x built an electronic platform where bids and offers were shared among prime brokers, broker-dealers, and agent lenders, enhanced with real-time pricing data.

241.    With access to live trading data and an electronic mechanism for the traders to request additional quotes, borrowers communicating with their broker-dealers would have access to more pricing and trade information, which they could use to negotiate lower trade pricing and better assess competing quotes between different broker-dealers.

242.    The Prime Broker Defendants' boycott of SL-x followed the same playbook they used to neutralize AQS. From the outset, Goldman Sachs was staunchly against the SL-x product and refused to support it. Conley of Goldman Sachs noted that a central trading platform with counterparty clearing would encourage smaller competitors to enter the stock lending market and compete with the Prime Broker Defendants.

243.    Taking the parallel approach that they had agreed on, each Prime Broker Defendant and EquiLend withheld capital and support from SL-x through the fall of 2011 and throughout 2012, intent on seeing whether this would cause SL-x to wither and die on the vine. Between 2012 and 2014, SL-x executives met with executives from Bank of America, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS. Each of these individuals sat on the board of EquiLend USA or EquiLend Europe. Because EquiLend's directors were high-ranking stock loan executives at their respective Prime Broker Defendants, SL-x was often forced to pitch its product to the very individuals who were regularly meeting and conspiring to ensure its failure. As a result of the conspiracy, each of these personnel refused to support SL-x.

244.    Many of the Prime Broker Defendants indicated that they would not break ranks with the other Prime Broker Defendants. And as they had done with AQS, the Prime Broker

Defendants in some instances threatened their clients with the loss of other prime brokerage services if they signed on to the SL-x platform against the Prime Broker Defendants' wishes.

245.    Many of the Prime Broker Defendants made strikingly similar statements to SL-x concerning EquiLend's role in their reluctance ultimately to engage with the SL-x platform. Several Prime Broker Defendants told SL-x executives point blank that they would only support the types of innovations that SL-x offered if this were done through EquiLend (which the Prime Broker Defendants controlled), and that it was generally recognized that any market transition would need to come from within EquiLend. Executives at several Prime Broker Defendants (including Credit Suisse and UBS) effectively confirmed to SL-x executives that the Prime Broker Defendants used their positions as Directors of EquiLend to meet and discuss threats to their business and to coordinate a unified response.

246.    As they did with AQS, the Prime Broker Defendants not only boycotted the platform themselves, but pressured other market participants to do so. Other market participants, such as BNY Mellon, State Street, and Northern Trust, met with SL-x personnel and acknowledged the benefits the platform might bring to the market. But they said that, since the Prime Broker Defendants—and particularly industry giants Goldman Sachs and Morgan Stanley—were aligned against the platform, they could not support it.

247.    The Prime Broker Defendants also pressured clearinghouses to refuse to provide clearing services to SL-x. The partnership between SL-x and OCC that appeared to be imminent in 2013 subsequently, and without explanation, never materialized. Similarly, a DTCC Managing Director admitted that the DTCC could not offer SL-x central stock loan clearing without the approval of Goldman Sachs and other Prime Broker Defendants.

248.    By 2014, the Prime Broker Defendants' collective boycott had largely succeeded in sidelining SL-x. Almost four years after development began, SL-x had largely burned through its financial resources. It applied to cancel its UK Financial Conduct Authority license as a trading facility and was forced to close and abandon its plan to enter the U.S. market.[59]

249.    Around the end of 2014, the Prime Broker Defendants began negotiating with SL-x's private equity owner, Palamon Capital Partners, to purchase SL-x's intellectual property (including several technology patents).

250.    In early 2015, EquiLend purchased SL-x's intellectual property. EquiLend had no intention of actually using this intellectual property, and EquiLend has never used SL-x's patents or attempted to commercialize its technology.

### B.    Data Explorers: Stock Lending Trade Data Provider

251.    Data Explorers was formed in 2002 by Charles Sackville and Mark Faulkner, an author of numerous publications regarding securities lending.[60] Data Explorers' services initially targeted agent lenders, whose pension fund clients were seeking to analyze the revenue streams they were earning and the risk they were assuming in connection by lending securities.

252.    Data Explorers endeavored to modernize the stock loan market by gathering complete stock loan transaction data from market participants and providing lenders, borrowers, and broker-dealers with access to the aggregated dataset. At first, Data Explorers gathered data from agent lenders, aggregating it and giving back very basic price information that would let agent lenders see how well their prices fared against other lenders.

---

[59] Mark Dugdale, Exclusive:  SL-x to Shut Up Shop, SECURITIES LENDING TIMES, (Sept. 17, 2014), http://www.securitieslendingtimes.com/securitieslendingnews/ article.php?article_id=219512.

[60] See, e.g., Mark C. Faulkner, An Introduction to Securities Lending, International Securities Lending Association, https://www.canseclend.com/wp-content/uploads/2016/02/Introduction_to_Securities_Lending_Canada.pdf (3d ed. 2006).

253.    Data Explorers offered only data that showed how market participants were faring relative to similarly situated players, with agent lenders only able to access aggregated "wholesale" data relating to the lending side of stock loan transactions, and borrowers only able to view retail or bid-side data relating to the borrowing side of transactions. For example, a borrower could see how its trades were priced relative to other borrowers, and lenders could see data comparing them to other lenders. In the opaque world of stock lending, even this limited insight improved transparency.

254.    Data Explorers launched a product called Performance Explorer, which allowed agent lenders to type in a ticker symbol to see the average lending rate for that security, based on the underlying data that was provided by participating agent lenders. Performance Explorer was followed by Transaction Explorer, a more advanced technology that gave agent lenders access to a deep array of "wholesale" data—but not the "retail" data from the borrower side of stock loan transactions—that Data Explorers had compiled from banks and other agent lenders.

255.    Data Explorers provided a separate version of Transaction Explorer to borrower clients. This version of Transaction Explorer enabled borrowers to access "bid rates" (what borrowers were paying to borrow securities), along with analytics showing how liquid or illiquid a given security was, how heavily borrowed or "short" a security was, and how many buy-side players were borrowing a security.

256.    Data Explorers kept wholesale data strictly segregated from retail or "bid-side" data within Transaction Explorer. Data Explorers did this to avoid conflict with the Prime Broker Defendants, who were opposed to technology that would allow agent lenders to view bid side data, or borrowers to view wholesale data. With borrowing and lending data segregated in their separate silos, the Prime Broker Defendants remained the only market participants who knew the

size of the spread between what hedge funds were charged to borrow and what agent lenders were paid to lend.

257.    By 2007, every major agent lender was participating in Transaction Explorer, along with approximately 20 borrower clients who participated in the bid-side version of the technology. Lenders and borrowers showed strong interest because they could put their own transactions in context, gauging their price negotiations with broker-dealers and creating other important performance markers for their own deals.

258.    Data Explorers tried to convince the prime brokers that the value of market level data was worth sharing access to their own data over time, Data Explorers secured access to several of the Prime Broker Defendants' pricing data in return for providing them with data analytics.

259.    The Prime Broker Defendants, however, were uniformly insistent that the wall between wholesale and retail data be maintained. They constantly demanded assurances from Data Explorers that borrowers' and lenders' data were being segregated in Transaction Explorer and repeatedly called Data Explorers with accusations that data was leaking from one side to the other. Despite Data Explorers' assurances, the Prime Broker Defendants' desire to collectively enforce that wall never abated.

260.    By 2009, Data Explorers had spent years and invested considerable resources to amass market data from agent lenders and beneficial owners. Up to this point, the Prime Broker Defendants had tolerated Data Explorers' growing presence, in part because they were content to use Data Explorers' information for their own decision making, and because of Data Explorers' willingness to ensure that borrowers never saw lending-side data, and vice versa.

261.    As the Prime Broker Defendants knew, however, Data Explorers always intended that its product offerings would evolve along with the market, to provide the type of real-time, actionable pricing data that market participants wanted. As new entrants like AQS and SL-x pushed the market forward toward fully electronic and transparent stock loan trading, and Data Explorers' product portfolio continued to expand among borrowers and lenders, the Prime Broker Defendants grew increasingly wary that Data Explorers would eventually package data that would expose the breadth of the price gap between borrowers and lenders—the gap from which dealer profits were drawn.

262.    The Prime Broker Defendants' mounting anxiety manifested in accusations that Data Explorers was leaking data between borrowers and lenders. In a series of ten meetings over the course of 2011 and 2012, Goldman Sachs' Shawn Byron and William Conley repeatedly grilled Data Explorers, paranoid about the prospect that Data Explorers was not siloeing borrower and lender data, despite Data Explorers' constant assurances that there was no leakage.

263.    The Prime Broker Defendants gradually decided they could not entrust market data to a firm they did not control. Eventually, this distrust would coalesce into a coordinated plan to destroy Data Explorers, once again using EquiLend.

264.    In one early example of this resistance, State Street faced powerful opposition when its support for Data Explorers became known to the Prime Broker Defendants. A representative from Goldman Sachs contacted Peter Economou at State Street and demanded that State Street not report any trading data concerning State Street's trades with Goldman Sachs to Data Explorers, threatening State Street's business if it did not comply. State Street, regarding the data as their own, refused to comply, further heightening the Prime Broker Defendants desire to act against Data Explorers. Goldman Sachs also contacted numerous hedge funds, including

SAC Capital Advisors, in a campaign to try to keep them from sharing any trading data with Data Explorers, with inconsistent success.

265.    The Prime Broker Defendants also took surreptitious steps to undermine the quality of the market data that Data Explorers provided to its customers. For example, when borrower clients instructed Morgan Stanley to provide Data Explorers with their market data, Morgan Stanley would provide a file that contained stale, sparsely populated data scrubbed clean of any timely or actionable information.

266.    While Data Explorers did not offer an electronic trading platform like AQS, the Prime Broker Defendants understood the threat it posed. In the OTC stock loan market, borrowers and lenders do not have access to real-time pricing. The Prime Broker Defendants benefitted from this opacity which made it difficult, if not impossible, for borrowers and lenders to engage in price discovery. Releasing this data would not only give borrowers and lenders ammunition to push back on the Prime Broker Defendants' opaque pricing and execution practices, it would constitute a fundamental step towards a more transparent electronic trading environment.

267.    In 2011, the Prime Broker Defendants met, under the auspices of discussing EquiLend business, to discuss the threat posed by Data Explorers and how to neutralize that threat.

268.    The solution that emerged during those discussions was that EquiLend would set up a competing business—DataLend—that, controlled by the Prime Broker Defendants, would work to suppress Data Explorers and edge them out of the market. As reportedly stated by Goldman Sachs' Conley in those discussions, DataLend would be set up to ensure that beneficial

owners could never see the spread between what they were paid to lend securities and what borrowers were charged to borrow them.

269.     EquiLend's plan represented a sharp reversal for the Prime Broker Defendants. In the past, EquiLend had internally considered whether to launch a data product in-house. Those plans disintegrated because the Prime Broker Defendants resisted anything that smelled of transparency.

270.     The Prime Broker Defendants formed DataLend as a division within EquiLend. They then agreed, in lockstep, to distribution agreements with DataLend that placed substantially identical restrictions on how each Prime Broker Defendant's trading data could be used. These agreements included a prohibition on disclosing any prime broker data to lender or borrower customers. Among other things, the Prime Broker Defendants agreed amongst themselves, and then with DataLend, that they would not permit bid-side data (that is, data showing what borrowers paid to borrow securities) to be provided to any beneficial owners. Conley from Goldman Sachs, Mike Kelleher from JP Morgan, and other Prime Broker Defendants on the board of EquiLend were involved in the discussions that led to these parallel agreements.

271.     The design of these restrictions—and the intent of the Prime Broker Defendants from the outset—was to offer, through DataLend, just enough trading data to undermine Data Explorers, but to withhold from the market the real-time retail and wholesale data that they knew would lead to pricing compression (and a reduction in their fees).

272.     The key to Defendants' plan was to cut off Data Explorers' access to agent lender data. It was relatively easy for the Prime Broker Defendants to ensure their own data never made it into borrowers' or lenders' hands. It was more difficult to ensure that borrowers and lenders never got access to each other's data. In order to prevent data leakage across the borrower/lender

divide, the Prime Broker Defendants targeted agent lenders—the handful of firms who aggregated stock loan supply—and sought to monopolize access to their data.

273.    In order to lure agent lenders away from Data Explorers, the Prime Broker Defendants agreed to provide them directly with data similar to that being provided by Data Explorers, but at very little cost or, in some cases, virtually for free. For example, Data Explorers had multiple contracts with agent lenders in the range of $1-2 million for data provision services. To undercut Data Explorers' pricing and poach their customer base, DataLend offered to provide the same data services to agent lenders effectively for nothing.

274.    DataLend's providing data access to agent lenders only was safe for the Prime Broker Defendants, and did not pose as great a risk as providing that same data to end-user beneficial owners and borrowers. Providing trading data to agent lenders did not implicate the ability of borrowers to see market data or to have any visibility into (or ability to negotiate) the price they were being charged for stock loans. Nor did the provision of trading data to agent lenders improve the negotiating leverage of beneficial owners, who would never see this data themselves.

275.    EquiLend's plan worked. Agent lenders used the new stream of low-cost information provided by DataLend to renegotiate prices with Data Explorers. Data Explorers' revenues plummeted and its momentum came to a dead stop.

276.    Crippled by the assault from DataLend, Data Explorers was acquired by Markit, a large market data and post-trade processing firm. Although Markit is an independent company, the Prime Broker Defendants have considerable influence over it. Markit operates in a number of different financial markets and is closely interconnected with the major banks, including all of

the Prime Broker Defendants. As such, Markit has shown no interest in carrying out Data

Explorers' original vision of bridging the data divide between wholesale and retail customers.

277.    By 2014, the Prime Broker Defendants' collective boycott had largely succeeded

in sidelining the threat posed by Data Explorers. Data Explorers, having been purchased by

Markit and unable to withstand the Prime Broker Defendants' coordinated scheme to starve it of

information and customers, was relegated to the fringes of the market.

## VI.    DEFENDANTS' CONSPIRACY CAUSED ANTICOMPETITIVE HARM

278.    As a result of their conspiracy, the Prime Broker Defendants continue to dominate

the stock loan market, collectively controlling over 70% of the stock loan brokerage market and

taking for themselves more than 65% of the multi-billion-dollars per year in gross revenue

generated by stock lending activity.[61]

279.    As detailed above, the Prime Broker Defendants have maintained their dominant

market position and supracompetitive profits by collectively boycotting and suppressing any

platforms or services that might lift the veil of opacity or lead to a fully electronic and

transparent trading environment. The result of the Prime Broker Defendants' anticompetitive

actions has been to keep the stock loan market and each of its participants in the Stone Age.

Stock lending persists in an inefficient, antiquated OTC structure that depends on the central

position of the Prime Broker Defendants.

---

[61] Collectively, the Prime Broker Defendants controlled the vast majority of the prime brokerage industry, with a
market share (based on hedge fund clients) as of 2016 of 70.4%—with Goldman Sachs at 19.1%, Morgan Stanley at
16.4%, J.P. Morgan at 13.7%, Credit Suisse at 8.3%, UBS at 6.6%, and Bank of America at 6.3%. *See Prime Broker
Ranking*, HEDGE FUND ALERT, (May 3, 2017), https://www.hfalert.com/rankings/rankings.pl?Q=149. These
share estimates are based on *number* of clients, rather than trade volume or revenues. Because the hedge fund
industry is heavily weighted toward major players, the Prime Broker Defendants likely control a much larger share
of the actual volume of stock loan trades.

280.    OTC market structures may make sense where there is customization of terms and no standard contract. However, stock loans are standardized contracts that are well-suited for a transparent market structure such as a trading platform or an exchange. By preventing the development of such platforms or exchanges, Defendants have directly imposed significant financial harm on other market participants.

281.    In the current bilateral OTC market, trade negotiation remains one-on-one, placing both borrowers and lenders at a substantial bargaining disadvantage vis-à-vis the Prime Broker Defendants. These market end-users lack the information that the Prime Broker-dealers possess about pricing (i.e., what the other side of the transaction is willing to pay/accept) and volume/availability (i.e., which counterparties own the desired stock and how much is available to trade) for any specific loan in question. Borrowers and lenders also lack any mechanism to effectively "price shop" or efficiently compare dealer pricing and terms over many dealers. When offered terms by a dealer, there is no way for the lender or borrower to be confident that the dealer's quote is at or near the best available quote in the market, nor to know which other dealer might be willing to supply more favorable terms and pricing.

282.    Because the Prime Broker Defendants have inserted and collusively maintained themselves as middlemen, lenders and borrowers cannot work to obtain better terms and pricing by trading directly with the corresponding party that has the actual motive to transact. Nor can a lender or borrower realistically force multiple dealers to compete against each other for a transaction because of the bilateral nature of the bargaining process.

283.    The current stock loan market involves high search costs and inefficient pricing. It can take numerous phone calls over several hours to locate a hot stock and negotiate pricing. The lender has no indicative level of pricing other than the demand information provided by the

brokers, which the lender has no way to verify. In other words, the securities lending market
requires considerable manual effort to complete transactions that in other markets take seconds
or minutes at most. Because of the fragmented nature of the market, identical loans can trade
simultaneously through different channels at very different prices. These high search costs
preclude arbitrage across liquidity pools.

284.    While a lender or borrower can, in theory, reject the price terms quoted by the
dealer with whom it is negotiating and search for better terms, these negotiations would be
cumbersome and difficult to do. The market participants cannot choose the best terms from
among a large number of various dealers simultaneously. And the fact that a lender or borrower
could eventually negotiate quotes from multiple dealers does not in itself cause dealers to
compete aggressively with each other.[62]

285.    When facing a lender or borrower, each dealer holds a degree of monopoly power
because the counterparty has no ability to pick the best of many simultaneously executable
terms. The Prime Broker Defendants' exploitation of this monopolistic market power both (i)
reduces the volume of trades that would otherwise occur in the stock lending market, and (ii)
raises the costs associated with searching for desirable transaction terms (i.e., reduces what is
known as "matching efficiency").

286.    Quadriserv's internal research conducted in advance of launching the AQS
trading platform predicted a significant narrowing of spreads in the stock loan marketplace. This
analysis found that an electronic trading platform like AQS would offer substantial savings to
both lenders and borrowers. Quadriserv's analysis predicted a 32% reduction in the total fees
paid by stock borrowers as a result of credit and pricing efficiencies on AQS, effectively saving

---

[62] *See* Haoxiang Zhu, *Finding a Good Price in Opaque Over-the-Counter Markets*, 25:4 REV. OF FIN. STUD.
1255, 1255-56 (2012).

borrowers approximately $4.5 billion per year in fees paid on stock loan transactions. This analysis also projected that fees paid to stock lenders would increase from an approximate 26% of gross annual stock loan revenue paid to beneficial owners in the current inefficient OTC market to an approximate 52% of gross annual revenue under the efficient AQS model, netting beneficial owners approximately $1.44 billion more in gross revenues each year.

287.     AQS's stock lending exchange was also set up to be a very profitable business. AQS's revenue sources included the following:

a.     **Transaction Fees –** in the form of (i) an open/close fee of $2.50 to the borrower and lender for every transaction, amounting to $10 total, and (ii) maintenance fee for the duration of the transaction to cover mark-to-market calculations and other services.

b.     **Market Data Fee –** for market data in stock lending marketplace available at different price points and mediums (e.g., AQS interface, Bloomberg, Loanet, Reuters, etc.).

c.     **Other Fees –** membership, application, regulatory, and financial information exchange/application programming interface fees.

288.     Based upon Quadriserv's review of the launch of similar types of exchanges, Quadriserv anticipated the ability to scale up quickly and realize a substantial return for its investors. Specifically, in 2009, Quadriserv estimated total annual gross revenue of approximately $180 million for the U.S. market alone by 2011, reaching over $360 million by 2013, based on a conservative assumption of less than 15% of overall market on the AQS platform. Further, AQS's revenue was expected to more than double if the technology was expanded worldwide, as originally intended. Instead, because of Defendants' anticompetitive

conduct, Plaintiff was forced to sell AQS at a significant loss in 2016 to EquiLend – the same entity that was utilized by the Prime Broker Defendants to coordinate and execute their collective boycott of AQS.

### EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

289.    Defendants' conspiracy was conducted in secret, since that is the only way it could have prospered. Defendants also affirmatively concealed their anticompetitive conduct from Plaintiff since the inception of Defendants' conspiracy. As a result, Plaintiff did not previously discover, nor could they have discovered through the exercise of reasonable due diligence facts comprising their claims, including facts concerning the nature of the injuries alleged above; facts concerning to whose conduct their injuries were attributable; facts concerning when such injuries occurred; and facts concerning the intent, formation, and execution of Defendants' conspiracy.

290.    Defendants' wrongful conduct was carried out, at least in part, through means and methods specifically designed to avoid detection and which, until very recently, successfully eluded detection. In particular, Defendants participated in secret meetings and communications whereby they agreed upon the course of anticompetitive conduct described in this Complaint. These included private meetings of the EquiLend board, which are not open to the public, as well as one-on-one meetings between Defendants' senior executives. Plaintiff was not present at and had no way to attend or access the proceedings of these secret meetings, and had no way of accessing Defendants' other relevant communications. Defendants also concealed their actions through the use of secret names and code words like "Project Gateway" and meetings of "the five families" for their conspiratorial conduct.

291.    Plaintiff had no reason contemporaneously to know or suspect that these meetings were being used to plan and execute a conspiracy to stifle and boycott innovation. Indeed, the

significant and substantial efforts and investments of AQS, along with the financial and other backing of market participants, would not have been rational if Defendants' conspiracy had been known. That financial resources were prioritized for these initiatives by savvy market participants belies any suggestion that Defendants' actions were known to Plaintiff.

292.    The very nature and structure of the securities lending market itself—an OTC trading environment with Defendants serving as intermediaries—was designed and maintained by Defendants. This structure made it impossible for Plaintiff to compare quotes or otherwise scrutinize Defendants' bid/ask spreads. Preserving this lack of price transparency is part of the reason Defendants conspired in the first place.

293.    In addition, Defendants publicly misrepresented to customers, potential vendors, and the general public their support for a trading platform that could centrally clear securities lending transactions. Through those false statements, Defendants actively misled Plaintiff as to the true, collusive, and coordinated nature of their actions. Defendants made these false statements with the purpose and effect of concealing their conspiracy to preserve the opaque OTC market that enabled them to charge supracompetitive spreads for intermediating securities lending transactions.

294.    For example, EquiLend states on its web site that: "In 2000, a group of 10 global financial institutions joined together, looking for ways to optimize efficiency in the securities finance industry by developing a standardized and centralized global platform for trading and post-trade services. EquiLend Holdings LLC was formed in 2001, and the platform went live in 2002." But as discussed throughout this Complaint, the Prime Broker Defendants used EquiLend to achieve the exact opposite ends—i.e., preventing the opaque, OTC securities lending market

from evolving into a more efficient, centrally cleared electronic platform with improved price transparency.

295.    Defendants' market power and willingness to use it to silence, punish, and exclude those who dared to cross them is one important reason why their conspiracy was able to operate under the radar until recently. As noted above, Defendants wielded their considerable clout to bully and threaten even large, established entities in the stock loan market. Defendants' threats—and the power behind them—kept those to whom they were directed quiet about the conspiracy they furthered. Those who were targeted feared incurring the wrath of those Defendants on whose services and relationship they depended if they did anything that would inform the market about the strategies to quash emerging market innovation.

296.    The foregoing allegations constitute a continuing violation of the antitrust laws, including misconduct and recurring injuries within the limitations period. Accordingly, Plaintiff can recover for damages suffered throughout the limitations period, even absent a finding of equitable tolling or fraudulent concealment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Violation of Section 1 of the Sherman Act)

297.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

298.    As alleged above, Defendants entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to (1) allocate the stock lending market between themselves, and (2) jointly boycott AQS and other entities that would introduce competition on stock loan rates in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Such contract, combination, or conspiracy constitutes a naked, per se violation of the federal

antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

299.    Defendants' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

300.    Defendants' conduct in boycotting AQS cannot be plausibly justified as being intended to enhance overall market efficiency. Among other things, Defendants' conduct led to substantially wider bid/ask spreads than would occur through trading on an anonymous, all-to-all stock lending platform.

301.    Stock loan transactions are, and are widely perceived by those in the industry to be, a unique financial product. The market for stock loan in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

302.    Other products are not substitutable for stock loan. Taking short positions on equity securities that an investor does not already own requires that the investor first borrow the security in the stock loan market.

303.    The relevant geographic market is the United States. The Prime Broker Defendants, however, dominate more broadly defined geographic markets as well, including the global market.

304.    As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, Plaintiff has been injured and financially damaged in its business and property, including by having lost capital, profits, and goodwill, by incurring substantial and unnecessary expenses, and by being seriously weakened, in amounts that are presently undetermined. Plaintiff's damages are directly attributable to Defendants' illegal

boycott of AQS's business and their allocation of the stock lending market among themselves. Plaintiff's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## SECOND CAUSE OF ACTION
### (Violation of the Donnelly Act)

305.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

306.    Defendants' combination, conspiracy and arrangements alleged above, violate the Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*

307.    As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to (1) allocate the stock lending market between themselves, and (2) jointly boycott AQS and other entities that would introduce competition on stock loan rates in the United States. Such contract, combination, or conspiracy constitutes a violation of New York antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

308.    Defendants' conduct in boycotting AQS cannot be plausibly justified as being intended to enhance overall market efficiency. Among other things, Defendants' conduct led to substantially wider bid/ask spreads than would occur through trading on an anonymous, all-to-all stock lending platform. Customers throughout the United Stated therefore were forced to incur increased costs than had Defendants not engaged in their unlawful conduct.

309.    As a direct and proximate result of Defendants' scheme and concrete acts in furtherance thereof, Plaintiff has been injured and financially damaged in its business and property, including by having lost capital, profits, and goodwill, by incurring substantial and unnecessary expenses, and by being seriously weakened, in amounts that are presently

undetermined. Plaintiff's damages are directly attributable to Defendants' illegal boycott of

AQS's business and their allocation of the stock lending market among themselves. Plaintiff's

injuries are of the type the antitrust laws were designed to prevent, and flow from that which

makes Defendants' conduct unlawful.

**THIRD CAUSE OF ACTION**
**(Unjust Enrichment)**

310.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though

fully set forth herein.

311.    By their wrongful acts as alleged herein, Defendants have been unjustly enriched

at the expense of Plaintiff by, among other things, continuing to enjoy wider bid/ask spreads in

the stock lending market, and engaging in an illegal conspiracy to undermine AQS and divert

any potential pecuniary benefits from its platform to themselves through unfair and

anticompetitive trade practices.

312.    Based on equity and good conscience, restitution is required.

**FOURTH CAUSE OF ACTION**
**(Tortious Interference with Business Relations)**

313.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though

fully set forth herein.

314.    By their wrongful acts as alleged herein, Defendants injured prospective business

relations Plaintiff had with OCC in early 2016, specifically the acquisition of AQS from Plaintiff

by OCC.

315.    Defendants injured Plaintiff's prospective business relations by, among other

things, implementing the "Project Gateway" plan to take control of AQS and blocking the OCC

agreement to purchase AQS from Plaintiff as detailed above.

316.     Plaintiff seeks restitution of the monies of which it was unfairly and improperly deprived, as described herein.

## FIFTH CAUSE OF ACTION
### (Violation of Deceptive Practices Act)

317.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

318.     The New York Deceptive Practices Act, Gen. Bus. Law § 349, declares unlawful any deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state, whether or not subject to any other law of this state, and allows any person who has been injured by reason of any violation of that statute to bring a private action.

319.     As alleged above, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in restraint of trade to allocate the stock lending market between themselves, and jointly boycott AQS and other entities that would introduce competition on stock loan rates in the United States. Such conduct was misleading, deceptive, and unlawful.

320.     Defendants' improper conduct had a broad application on consumers generally throughout the United States and abroad by undermining competition in the stock lending market and preventing all-to-all stock lending.

321.     As a result of Defendants' combination, conspiracy, and arrangements in violation of the New York Deceptive Practices Act, Gen. Bus. Law § 349, Plaintiff is entitled to recover its actual damages, plus punitive damages and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

a. Find Defendants jointly and severally liable for the damages incurred by Plaintiff;

b. Award Plaintiff treble damages;

c. Award reasonable attorneys' fees and costs;

d. Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

e. Decree that Defendants and their co-conspirators have unlawfully conspired to boycott AQS in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

f. Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiff;

g. Decree that Defendants have tortiously interfered with Plaintiff's prospective business relations;

h. Decree that Defendants have engaged in deceptive acts or practices in violation of the New York Deceptive Practices Act, Gen. Bus. Law § 349;

i. Permanently enjoin Defendants from continuing their unlawful conduct, which has prevented competition from entering the stock loan market, a market valuable to the nation's financial system and broader economy; and

j. Order such other, further, and general relief as is just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated:  January 30, 2018

Respectfully submitted,

/s/ Thomas P. Ogden
David H. Wollmuth
Thomas P. Ogden
Ronald J. Aranoff
James J. Brennan
Fletcher W. Strong
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
togden@wmd-law.com
raranoff@wmd-law.com
jbrennan@wmd-law.com
fstrong@wmd-law.com

*Attorneys for Plaintiff*