# WOLLMUTH MAHER & DEUTSCH LLP

500 FIFTH AVENUE

NEW YORK, NEW YORK 10110

TELEPHONE (212) 382-3300
FACSIMILE (212) 382-0050

April 4, 2018

VIA EMAIL AND ECF

The Honorable Richard J. Sullivan
United States District Court
Southern District of New York
40 Foley Square, Room 2104
New York, New York 10007

      Re:    *QS Holdco Inc. v. Bank of America Corp., et al.*,
               Case No. 18-cv-00824 (RJS) (S.D.N.Y.)

Dear Judge Sullivan:

      We represent Plaintiff QS Holdco Inc. ("Plaintiff" or "QS Holdco") in the above-referenced action. We write in response to the Defendants' letter dated March 23, 2018 concerning Defendants' anticipated motion to dismiss on standing and capacity to sue grounds. In short, Defendants' arguments should be rejected because Plaintiff is the most direct victim of Defendants' antitrust violations, and there was no transfer of the claims alleged here in a manner that would clearly encompass an antitrust claim. As a result, QS Holdco is a proper plaintiff in this litigation.

**The Complaint's Allegations of Anti-Competitive Conspiracy**

      Non-party Quadriserv Inc. was the original developer and former owner of AQS, a revolutionary electronic trading platform for the stock loan market that currently operates in an opaque over-the-counter platform that has been described as a trillion dollar "mother of all dark pools." Compl. ¶¶ 4, 38. AQS was designed to permit market participants to borrow and loan stock without paying outsized and unearned fees to the small group of banks, made up primarily of Defendants that now control the market. *Id.* ¶¶ 140-42. In 2015, Quadriserv transferred the AQS platform to PDQ Inc., which later became known as QS Holdco Inc.—the Plaintiff. *Id.* ¶¶ 37, 38. QS Holdco and Quadriserv share common ownership. *Id.* ¶ 38. As of January 25, 2018, Quadriserv assigned its antitrust and other litigation claims against Defendants to QS Holdco. *Id.* ¶ 41.[1]

---

[1] Defendants refer to purportedly unanswered requests to obtain the assignment agreement between QS Holdco and Quadriserv prior to the resolution of Defendants' anticipated motion to dismiss. That assertion is inaccurate. In response to Defendants' request for the assignment agreement, Plaintiff told Defendants that it would be willing to provide the assignment agreement if Defendants were willing to provide reciprocal pre-motion to dismiss discovery on issues of interest to Plaintiff. Defendants declined Plaintiff's *quid pro quo* invitation.

Hon. Richard J. Sullivan
April 4, 2018
Page 2

For the vast majority of stock loan trades, Defendants operate as "middlemen," extracting more than 65% of the multi-billion-dollars per year in gross revenue generated by stock lending activity. *Id.* ¶ 278. Recognizing the threat that the AQS platform represented, Defendants conspired to boycott AQS and starve it of its lifeblood: liquidity. *Id.* ¶ 168. The Complaint sets forth in granular detail Defendants' coordinated effort to block and boycott the emergence of AQS. *See, e.g., id.* ¶ 114. Defendants not only coordinated their collective decision to block AQS, they even went so far as to block access, refuse clearing services, and threaten their own customers from using the platform. *Id.* ¶¶ 173-75.

Defendants' illegal conduct was undertaken through, among other things, Defendants' participation in EquiLend, a broker-dealer consortium that allowed Defendants to meet collectively and coordinate their conduct. *Id.* ¶¶ 13, 180. In this way, Defendants' misconduct was purposely kept secret from QS Holdco. Defendants' actions were revealed only *after* their conspiracy forced QS Holdco to sell the distressed AQS platform to EquiLend at a massive discount to what it would have been worth absent the conspiracy. After purchasing AQS, EquiLend intentionally shelved the technology in such a way as to ensure they would maintain the opaque, over-the-counter marketplace that Defendants continue to control and from which Defendants continue to extract their multi-billion dollar fees. *Id.* ¶ 233.

**Defendants' Standing Arguments Should Be Rejected**

*First*, contrary to Defendants' assertions, the former owner of a corporation is a proper party to bring antitrust claims for the corporation's injuries when, as here, the owner is the most direct victim of the antitrust violation and precluding the prior owner's suit would leave the antitrust injury unremedied. *Fischer v. CF & I Steel Corp.*, 614 F. Supp. 450, 452-53 (S.D.N.Y. 1985). Defendant EquiLend, an alleged conspiracy participant and the current owner of AQS, has no intention of suing itself. Thus, QS Holdco, with its assignor Quadriserv, is the most direct victim of the antitrust violations alleged in the Complaint, and prohibiting its claims would leave those violations unremedied. There is simply no one else to bring this suit. Defendants' reliance on *Rand v. Anaconda-Ericsson, Inc.* is misplaced because that case addressed unique standing issues that arise in the context of claims held by a bankruptcy estate and enforced by the bankruptcy trustee. 794 F.2d 843, 848-49 (2d Cir. 1986). The existence of a bankruptcy proceeding was a key component of the Court's analysis in *Rand*. No bankruptcy proceeding exists here.

Tellingly, before this antitrust action was filed, Defendants admitted in their motion to dismiss briefing in the companion class action case referenced in Defendants' March 23rd letter that "the more direct victims of the alleged conspiracy—AQS, SL-x and Data Explorers" are the most efficient enforcers to bring these antitrust claims. *See Iowa Public Employees' Retirement System v. Bank of America Corp.*, Case No. 17-6221 (KPF) (S.D.N.Y.), Memorandum of Prime Broker Defendants in Support of Their Joint Motion to Dismiss All Claims [Dkt. No. 110] at 45; *see also* EquiLend's Supplemental Memorandum in Support of Motion to Dismiss [Dkt. No. 107] at 1, 13 (joining and adopting Prime Broker Defendants' motion to dismiss brief).

*Second*, QS Holdco retained the litigation claims at issue in this lawsuit. Perhaps recognizing that AQS's former shareholders have antitrust standing, Defendants argue that Plaintiff's antitrust causes of action were transferred to EquiLend in conjunction with EquiLend's purchase of AQS from QS Holdco (then known as PDQ, Inc.), pursuant to a Purchase Agreement

Hon. Richard J. Sullivan
April 4, 2018
Page 3

dated July 31, 2016. But while no specific language is required, the Purchase Agreement could only have assigned antitrust claims if it made "an unambiguous assignment of causes of action in a manner that would clearly encompass the antitrust claim," which it did not. *DNAML Pty, Limited v. Apple Inc.*, 2015 WL 9077075, at *3 (S.D.N.Y. Dec. 16, 2015). Instead, the assignment of claims in the Purchase Agreement was limited to "Liability Claims" related to the AQS business. At the time of that assignment, antitrust claims had nothing to do with the business of AQS. If EquiLend intended to acquire AQS' antitrust claims, then it could have expressly stated so in the Purchase Agreement. It did not. In fact, the agreement expressly assigned other types of litigation claims related to the business such as "product liability claims." Thus, *Am. Home Prod. Corp. v. CAMBR Co.*, cited by Defendants, is inapposite because it involved the unqualified transfer of "all" causes of action. 2001 WL 79903, at *1 (S.D.N.Y. Jan. 30, 2001). The antitrust claims at issue in this litigation were never assigned to EquiLend.

*Third*, if the Court gave the Purchase Agreement the meaning Defendants urge, EquiLend's acquisition of AQS effectively would include a global release of antitrust claims that would be unenforceable and contrary to public policy. *See* Defs. Letter at 3. The purpose of the Purchase Agreement was not to give a release, and, even if it was, Defendants concealed their conspiracy throughout the negotiations regarding the sale of the AQS platform. This is not a case in which an injured party voluntarily and knowingly released litigation claims as part of a litigation settlement. Rather, if EquiLend actually did intend in effect to obtain a release of QS Holdco's antitrust causes of action (although not reflected in the text of the Purchase Agreement or any negotiations), then the release was the end game for Defendants' conspiracy in that it surreptitiously removed Defendants' last area of exposure. Such a release, however, would be against public policy and courts refuse to enforce a release or assignment of claims where that release or assignment was part of the underlying fraud or conspiracy. This doctrine was recognized by the Supreme Court over 80 years ago, *see Radio Corp. of Am. v. Raytheon Mfg. Co.*, 296 U.S. 459, 462 (1935), and continues to be recognized today, *see, e.g., King v. Donnkenny, Inc.*, 64 F. App'x 376, 378 (4th Cir. 2003). The doctrine serves a vital purpose by ensuring that antitrust conspirators cannot fraudulently insulate themselves from liability, and by empowering "private attorneys general" to enforce the antitrust laws.[2] Thus, even if Defendants did intend to obtain the general release they now urge, it would be unenforceable.

Very truly yours,

Ronald J. Aranoff

---

[2] Contrary to Defendants' assertions, (Defs. Letter at 3), the jury trial waiver clause in the Purchase Agreement does not apply. As discussed, the antitrust claims were not transferred to EquiLend by virtue of the Purchase Agreement. Moreover, because EquiLend failed to raise its antitrust violations during negotiations, the provision, which covers proceedings "arising out of or relating" or "contemplated" by the Purchase Agreement, is not pertinent. Purchase Agreement § 8.6.