**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

QS HOLDCO, INC.,

                    Plaintiff,

      v.

BANK OF AMERICA CORPORATION, *et al.*,

                    Defendants.

No. 18-cv-00824 (RJS)

# PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS

WOLLMUTH MAHER & DEUTSCH LLP
David H. Wollmuth
William A. Maher
Thomas P. Ogden
Ronald J. Aranoff
Brant Duncan Kuehn
James J. Brennan
Fletcher W. Strong
500 Fifth Avenue
New York, New York 10110

*Attorneys for Plaintiff QS Holdco, Inc.*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 2

    A.    Defendants Conspired to Boycott Plaintiff's Stock Lending Platform ........................ 2

    B.    EquiLend's Purchase of AQS Assets Did Not Include Antitrust Claims ................... 3

ARGUMENT ........................................................................................................................... 4

I.        PLAINTIFF HAS STANDING TO ASSERT ANTITRUST CLAIMS ........................ 5

    A.    QS Holdco, as Former Owner of AQS, Has Antitrust Standing .................................. 5

    B.    The EquiLend APA Did Not Transfer Antitrust Claims ............................................. 8

II.      PUBLIC POLICY PRECLUDES DISMISSAL ......................................................... 13

    A.    The Purported Assignment Was Integral to Defendants' Ongoing
         Conspiracy ................................................................................................................. 13

    B.    The Purported Assignment Was Procured Through Fraud and Is Void ..................... 18

III.    DISMISSAL WITHOUT DISCOVERY WOULD BE INAPPROPRIATE ............... 19

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Case**                                                                                                   **Page(s)**

*Am. Home Prods. Corp. v. CAMBR Co.*,
    No. 00-cv-2021, 2001 WL 79903 (S.D.N.Y. Jan. 30, 2001) .............................................12

*All. of Am. Insurers v. Cuomo*,
    854 F.2d 591 (2d Cir. 1988).........................................................................................20

*All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*,
    436 F.3d 82 (2d Cir. 2006)............................................................................................19

*Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank*,
    850 F. Supp. 1199 (S.D.N.Y. 1994), *aff'd*, 57 F.3d 146 (2d Cir. 1995) ...........................19

*Bloss v. Va'ad Harabonim of Riverdale*,
    203 A.D.2d 36 (1st Dep't 1994) ....................................................................................18

*Brooklyn Bridge Park Coal. v. Port Auth. Of N.Y. & N.J.*,
    951 F. Supp. 383 (E.D.N.Y. 1997) ................................................................................10

*Carter v. HealthPort Techs., LLC*,
    822 F.3d 47 (2d Cir. 2016).............................................................................................4

*Carter v. Twentieth Century-Fox Film Corp.*,
    127 F. Supp. 675 (W.D. Mo. 1955) ......................................................................... 14-17

*Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*,
    17 N.Y.3d 269 (2011) ..................................................................................................18

*Coast Mountain Hardwoods, Inc. v. Weyerhaeuser Co.*,
    No. 03-cv-552, 2004 WL 4076673 (D. Or. Feb. 25, 2004) ...............................................5

*Congress Fin. Corp. v. John Morrell & Co.*,
    790 F. Supp. 459 (S.D.N.Y. 1992)................................................................................18

*DNAML Pty, Ltd. v. Apple Inc.*,
    No. 13-cv-6516, 2015 WL 90770753 (S.D.N.Y. Dec. 16, 2015) .......................................8

*Dobbins v. Kawasaki Motors Corp., U.S.A.*,
    362 F. Supp. 54 (D. Or. 1973) ......................................................................................14

*Fischer v. CF & I Steel Corp.*,
   614 F. Supp. 450 (S.D.N.Y. 1985)..................................................................5-7

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016).........................................................................5

*G.K.A. Beverage Corp. v. Honickman*,
   55 F.3d 762 (2d Cir. 1995)...........................................................................6

*GMG Cap. Inv., LLC v. Athenian Venture Partners I, L.P.*,
   36 A.3d 776 (Del. 2012) .............................................................................20

*In re Am. Express Merchants' Litig.*,
   634 F.3d 187 (2d Cir. 2011)................................................................. 7, 15-16

*In Re Coudert Bros.*,
   487 B.R. 375 (S.D.N.Y. 2013).....................................................................10

*In Re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. AIG, Inc. v. Bank of Am. Corp.*,
   943 F. Supp. 2d 1035 (C.D. Cal. 2013) ......................................................20

*In re Currency Conversion Fee Antitrust Litig.*,
   361 F. Supp. 2d 237 (S.D.N.Y. 2005)..........................................................17

*In re Interest Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017)............................................................5

*In re Jamuna Real Estate, LLC*,
   382 B.R. 263 (Bankr. E.D. Pa. 2008) .................................................... 12-13

*In re Magnetic Audiotape Antitrust Litig.*,
   334 F.3d 204 (2d Cir. 2003).................................................................. 19-20

*In re Steel Antitrust Litig.*,
   No. 08-cv-5214, 2015 WL 5304629 (N.D. Ill. Sept. 9, 2015)...........................13

*Iowa Pub. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   No. 17-cv-6221 (S.D.N.Y.)......................................................................... 7-8

*Kamen v. Am. Tel. & Tel. Co.*,
   791 F.2d 1006 (2d Cir. 1986).................................................................5, 19

*Lawlor v. Nat'l Screen Serv. Corp.*,
   349 U.S. 322 (1955)...............................................................................7, 15

*Lerman v. Joyce Int'l, Inc.*,
    10 F.3d 106 (3d Cir. 1993)......................................................................................12

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*,
    354 F. Supp. 2d 293 (S.D.N.Y. 2004)....................................................................11

*McFarland v. Salerno*,
    40 A.D.3d 514 (1st Dep't 2007) .............................................................................18

*Merced Irrigation Dist. v. Barclays Bank PLC*,
    220 F. Supp. 3d 412 (S.D.N.Y. 2016)......................................................................7

*Nycal Corp. v. Inoco PLC*,
    988 F. Supp. 296 (S.D.N.Y. 1997)..........................................................................12

*O'Brien v. Progressive N. Ins. Co.*,
    785 A.2d 281 (Del. 2001) ....................................................................................9, 11

*P.T. Bank Central Asia v. ABN AMRO Bank N.V.*,
    301 A.D.2d 373 (1st Dep't 2003) ............................................................................18

*Radio Corp. of Am. v. Raytheon Mfg. Co.*,
    296 U.S. 459 (1935)...........................................................................................13-15

*Rand v. Anaconda-Ericsson, Inc.*,
    794 F.2d 843 (2d Cir. 1986)......................................................................................6

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)...................................................................................................7

*Rock-It, Inc. v. Futura Coatings, Inc.*,
    74 F. Supp. 2d 420 (D. Vt. 1999)..............................................................................6

*Rosen v. Dick*,
    No. 73-cv-2388, 1974 WL 443 (S.D.N.Y. Sept. 3, 1974) ......................................15

*SPCP Grp., LLC v. Eagle Rock Field Servs., LP*,
    No. 12-cv-3610, 2013 WL 359650 (S.D.N.Y. Jan 30, 2013) ...................................9

*State v. Home Indem. Co.*,
    66 N.Y.2d 669 (1985) ..............................................................................................20

*Taxin v. Food Fair Stores, Inc.*,
    287 F.2d 448 (3d Cir. 1961).....................................................................................16

*Thompson v. Gjivoje*,
    896 F.2d 716 (2d Cir. 1990).............................................................................10

*Traffic Scan Network, Inc. v. Winston*,
    No. 92-cv-2243, 1993 WL 390144 (E.D. La. Sept. 24, 1993).............................. 14, 16-17

*United Rentals, Inc. v. RAM Holdings, Inc.*,
    937 A.2d 810 (Del. Ch. 2007)..........................................................................10

*U.S. Bank, Nat'l Ass'n, v. UBS Real Estate Sec. Inc.*,
    205 F. Supp. 3d 386 (S.D.N.Y. 2016).......................................................... 10-11

*VKK Corp. v. Nat'l Football League*,
    244 F.3d 114 (2d Cir. 2001)....................................................................... 16-17

*Webster v. New York Life Ins. Co.*,
    386 F. Supp. 2d 438 (S.D.N.Y. 2005)..............................................................12

*Wechsler v. Diamond Sugar Co.*,
    29 A.D.3d 681 (2nd Dep't 2006)....................................................................11

*Westmoreland Asbestos Co. v. Johns-Manville Corp.*,
    39 F. Supp. 117 (S.D.N.Y. 1941)....................................................................15

## **Other Authorities**

6 Am. Jur. 2d Assignments § 8 ...................................................................................18

Restatement (Second) of Contracts § 208..................................................................17

Restatement (Second) of Contracts § 324....................................................................8

Plaintiff QS Holdco, Inc. ("Plaintiff" or "QS Holdco") respectfully submits this Memorandum of Law in opposition to Defendants' joint motion to dismiss on standing grounds.[1]

## PRELIMINARY STATEMENT

Plaintiff owned and developed a revolutionary electronic trading platform, AQS, which challenged Defendants' dominance of the stock loan market. Defendants conspired to shut AQS out of that market and starve it of liquidity in order to remove a major competitor and continue their market dominance. In July 2016, Defendants succeeded in this anti-competitive scheme by forcing Plaintiff to sell the AQS platform at a deep discount to an entity controlled by Defendants. In connection with the August 2017 filing of an antitrust class action against Defendants, Plaintiff discovered the full scope of Defendants' wrongdoing and recognized that Defendants' anti-competitive conspiracy had hobbled the AQS platform and forced its sale. Plaintiff then filed this action seeking to recover the damages caused by Defendants' conspiracy.

Defendants' challenges to Plaintiff's standing are without merit because Plaintiff is the most efficient and most directly injured enforcer of the antitrust laws violated by Defendants' scheme. As Defendants themselves told the Court in the companion class action before Judge Failla, AQS is the proper plaintiff to enforce these antitrust violations. What Defendants did not tell Judge Failla—and what makes this case unique—is that Defendants now own AQS and, unsurprisingly, have shown no inclination to pursue claims against themselves.

Defendants argue that an entity they own and control, EquiLend Clearing LLC (with defendants EquiLend Holdings LLC and EquiLend LLC, "EquiLend"), acquired AQS and any and all of AQS's causes of action, as well as Plaintiff's litigation claims. But EquiLend did *not* acquire the antitrust causes of action that Plaintiff asserts in this litigation as the former owner of

---

[1] "Mot." refers to the Memorandum in Support of Defendants' Joint Motion to Dismiss All Claims, dated June 1, 2018 [ECF No. 76]. Capitalized terms not defined in this Opposition have the definitions set forth in Defendants' Memorandum.

AQS.   Under the clear language of the relevant agreement—the EquiLend APA, defined below—these causes of action were not assigned to EquiLend and remain with Plaintiff.

Moreover, even if the EquiLend APA were given the meaning Defendants urge, any assignment of antitrust claims to EquiLend would have been an integral part of Defendants' conspiracy, permitting Defendants to continue to extract extra-competitive profits with impunity. For this reason, such an assignment would be void and unenforceable as against public policy.

Should the Court determine that there is any ambiguity in the assignment language of the EquiLend APA or that it is unclear whether the Defendants' acquisition of AQS from the Plaintiff was integral to the antitrust conspiracy as described in the Complaint, Plaintiff requests the opportunity to conduct discovery on the relevant subjects.

## BACKGROUND

### A.  Defendants Conspired to Boycott Plaintiff's Stock Lending Platform

The stock loan market remains one of the most closed, inefficient, and opaque financial markets in the world—a trillion-dollar "mother of all dark pools."  Compl. ¶¶ 1, 4.  The Prime Broker Defendants control over 70% of this market and operate as "middlemen" in the vast majority of stock loan trades, taking more than 65% of the gross revenues generated each year in the stock loan market, which amounts to more than $9 billion annually.  *Id.* ¶¶ 6, 278.

Plaintiff is the former owner of AQS, an electronic trading platform that offered transparent pricing and central clearing, and the ability for parties to trade directly without a prime broker acting as a gatekeeping middleman.  *Id.* ¶¶ 8, 10.  Recognizing the threat that the AQS platform posed to their profits, Defendants conspired to boycott and eliminate the platform. *Id.* ¶¶ 10, 114, 168-72, 177.   Defendants concealed their anti-competitive conduct through secretive methods that, until only months before this litigation was filed, eluded Plaintiff's

detection.  *Id*. ¶¶ 289-90.  Defendants participated in secret meetings and communications not accessible to Plaintiff, including private board meetings and one-on-one meetings between Defendants' senior executives, and hid their actions through the use of code names like "Project Gateway."  *Id*.

After years of unknowingly being blocked by the Prime Broker Defendants' conspiracy and having spent nearly $100 million with little trading volume or profit to show for it, Plaintiff finally acceded to an acquisition of AQS by EquiLend, a stock loan trading platform dominated and controlled by the Prime Broker Defendants.  *Id*. ¶¶ 180, 216.  Unbeknownst to Plaintiff, the Prime Broker Defendants had agreed to use EquiLend to purchase AQS in order to eliminate it as a threat to their illegal scheme.  *Id*. ¶ 210.

Faced with a desperate situation, Plaintiff accepted a low-ball offer from EquiLend of less than $5 million for AQS.  *Id*. ¶ 216.  After purchasing AQS, EquiLend intentionally shelved the platform's technology to preserve the opaque marketplace that Defendants continue to control and from which they continue to extract anti-competitive profits.  *Id.* ¶ 233.

### B.  EquiLend's Purchase of AQS Assets Did Not Include Antitrust Claims

EquiLend purchased Plaintiff's securities lending business through an Asset Purchase Agreement, dated July 31, 2016, between EquiLend and Plaintiff (the "EquiLend APA").  The agreement defines the acquired "Business" as: "(i) operating an automated securities lending market and (ii) providing market data relating to securities lending (together, the "***Business***")."  EquiLend APA, attached to the Declaration of Brant Duncan Kuehn ("Kuehn Decl.") as Exhibit A, at 1.

The EquiLend APA does not expressly transfer antitrust claims or otherwise describe the claims at issue in this action.  Section 2.1 of the EquiLend APA defines the "Purchased Assets"

covered by the agreement, and concludes with a clause noting that the transferred assets "include all of the Assets of Seller, including the assets held by its subsidiaries which will remain within and held by those subsidiaries, *necessary for the operation of the Business*, except for the Excluded Assets." *Id.* (emphasis added).  Even the clause in Section 2.1 primarily relied upon by Defendants is limited to intangible assets "*relating to the Purchased Assets or the Business*." EquiLend APA at § 2.1(k) (emphasis added).[2]

The limited scope of the "Assets" and the "Business" being transferred is reinforced by provisions throughout the EquiLend APA.  For example, Section 3.22 notes that the "Purchased Assets include all assets, properties, contracts, permits or other items *used or held for use in the Business and are adequate for the conduct of the Business* by Purchaser in substantially the same manner in which the Business has been conducted by Seller and the Subsidiaries prior to the date of this Agreement." (emphasis added).  And the definition of "Assets" itself is "properties, rights, interests and assets of every kind, real, personal or mixed, tangible and intangible, *used or usable by Seller in the Business*."  EquiLend APA at Annex A (emphasis added).[3]

## ARGUMENT

In deciding a facial challenge to standing under Rule 12(b)(1), a court must "accept as true all material [factual] allegations of the complaint," and draw "all reasonable inferences in favor of the plaintiff."  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016) (internal quotations omitted).  Where a defendant introduces facts outside the complaint or

---

[2] Although Defendants have focused on Section 2.1(k), they also cite Section 2.1(m), which also transfers assets. But Section 2.1(m) is also limited by the provision of Section 2.1 specifying that the assets assigned are those "necessary for the operation of the Business."  EquiLend APA § 2.1.

[3] Plaintiff acquired AQS from Quadriserv, Inc., AQS's original developer, which shared common ownership with Plaintiff.  *Id.* ¶¶ 37, 38.  Plaintiff was unaware of Defendants' antitrust conspiracy when it entered into the EquiLend APA and when it acquired AQS from Quadriserv through an asset purchase agreement dated July 27, 2015.  Compl. ¶ 216.  After learning of Defendants' antitrust conspiracy, Quadriserv assigned its antitrust and other litigation claims against Defendants to Plaintiff, which then filed this litigation, asserting the antitrust claims of all the prior owners of AQS.  *Id.* ¶ 41.

challenges the allegations of the complaint, a court deciding a Rule 12(b)(1) motion to dismiss may order discovery so that the plaintiff can meet its burden of establishing subject matter jurisdiction. *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).

Plaintiff has met its burden of pleading facts that support Plaintiff's standing to bring antitrust and state statutory and common law claims against Defendants. Nevertheless, as set forth below, to the extent that the Court wishes to consider further evidence, Plaintiff respectfully requests the opportunity to conduct discovery related to Plaintiff's standing.

## I.   PLAINTIFF HAS STANDING TO ASSERT ANTITRUST CLAIMS

### A.   QS Holdco, as Former Owner of AQS, Has Antitrust Standing

Antitrust standing requires a plaintiff to establish that it suffered "antitrust injury" and is an "efficient enforcer" of the antitrust laws. *Gelboim v. Bank of Am. Corp.,* 823 F.3d 759, 772 (2d Cir. 2016). That the Complaint adequately alleges that Plaintiff has suffered antitrust injury is not disputed.[4] Plaintiff is also an efficient enforcer of the antitrust laws. Courts assessing whether a plaintiff is an efficient enforcer of the antitrust laws consider four factors: "(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 491 (S.D.N.Y. 2017) (citation omitted). Although the entity that was the most direct victim of an

---

[4] Plaintiff has suffered an antitrust injury as a result of Defendants' conspiracy to block AQS and drive Plaintiff to sell AQS to EquiLend for a "low-ball offer," thereby eliminating competition in the stock lending market. Compl. ¶¶ 22, 216. *See Coast Mountain Hardwoods, Inc. v. Weyerhaeuser Co.*, No. 03-cv-552, 2004 WL 4076673, at *2 (D. Or. Feb. 25, 2004) (seller who sold assets to defendant for "a fraction of its true value" suffered antitrust injury where the objective of the acquisition was to preserve and extend defendant's monopoly); *Fischer v. CF & I Steel Corp.*, 614 F. Supp. 450, 453 (S.D.N.Y. 1985) (explaining that shareholder may suffer antitrust injury).

antitrust violation is normally the most efficient enforcer to address the antitrust violations, there are exceptions.  Courts recognize that current and former shareholders of a corporate antitrust victim have standing when the corporation no longer exists or is unable to seek a remedy.  *See, e.g., Fischer v. CF & I Steel Corp.*, 614 F. Supp. 450, 453 (S.D.N.Y. 1985); *see also Rock-It, Inc. v. Futura Coatings, Inc.*, 74 F. Supp. 2d 420, 424 (D. Vt. 1999) (employee had standing to pursue antitrust claims for injuries suffered by corporation as she "very well may be the sole 'private attorney general' available to raise these claims").[5]

In *Fischer*, the court found that former shareholders of a corporation that merged with another corporation were "the proper parties to sue for their corporation's injury."  614 F. Supp. at 453.  The court assessed the four antitrust standing factors and found that they favored standing for the former shareholders.  *Id.*  With regard to the first two factors concerning the directness of injury, the court concluded that the former shareholders were the "most direct victims and there are none more directly injured . . . .  The depreciation in value of their stock was a direct result of the violation complained of."  *Id.* at 452.  As the court emphasized, the merged corporation "made no effort to prosecute the antitrust claim which originally belonged to [the corporation].  As a result, precluding [the former shareholders] from prosecuting would result in allowing the [antitrust] injury . . . to remain unremedied."  *Id*. at 452.  The *Fischer* court also found that the "damages are anything but speculative, since the discrepancy, if any, between the market price and [the sale] price is a precise amount.  There is no problem in apportioning

---

[5] Defendants' reliance on *G.K.A. Beverage Corp. v. Honickman* is misplaced.  The case involved attenuated claims brought by distributors, not owners or shareholders, of the antitrust victim that was allegedly targeted by soda manufacturers, resulting in harm to the distributors' downstream retail sales business.  55 F.3d 762, 766 (2d Cir. 1995).  *Rand v. Anaconda-Ericsson, Inc.* is similarly inapposite because it addressed unique standing in the context of claims held by a bankruptcy estate and enforced by the bankruptcy trustee.  794 F.2d 843, 848-49 (2d Cir. 1986).  The existence of a bankruptcy proceeding was a material component of the Court's analysis in *Rand*.  *Id.* at 848 (noting complications that permitting shareholder standing "would have, if adopted, on bankruptcy proceedings.").

damages pro rata among the former . . . shareholders." *Id.* at 453.[6]

As in *Fischer*, QS Holdco is the sole remaining direct victim that can prosecute antitrust claims related to the conspiracy against the AQS securities lending platform.  EquiLend, a conspiracy participant and the current owner of AQS, will not sue itself, or the other Defendants, which control EquiLend.  In addition, there will be no complex apportionment of damages among former shareholders, because Plaintiff is the only one.  And as in *Fischer*, damages are not speculative because they can be calculated as the difference between the sale price and the true market value of AQS absent Defendants' boycott, and related damages.

Indeed, one of the fundamental aspects of antitrust jurisprudence is the empowerment of "efficient enforcers" to act as "private attorneys general" to enforce the antitrust laws.  *See, e.g., Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955); *Merced Irrigation Dist. v. Barclays Bank PLC*, 220 F. Supp. 3d 412, 415 (S.D.N.Y. 2016); *In re Am. Express Merchants' Litig.*, 634 F.3d 187, 199 (2d Cir. 2011).  According to the Second Circuit, the "effective negation of a private suit under the antitrust laws is troubling because such 'private suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations.'"  *Am. Express*, 634 F.3d at 192 (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 344 (1979)).  In fact, before this antitrust action was filed, Defendants admitted in their motion to dismiss briefing in the companion class action case that "the more direct victims of the alleged conspiracy—AQS, SL-x and Data Explorers" are the most efficient enforcers to bring these antitrust claims.  *See* Kuehn Decl. Exh. B, *Iowa Pub. Emps.' Ret. Sys. v. Bank of Am. Corp.*, Case No. 17-6221 (KPF) (S.D.N.Y.), Memorandum of

---

[6] Contrary to Defendants' arguments, the *Fischer* court's analysis was based upon the Supreme Court's antitrust standing factors, and the same result applies here regardless of the fact that the antitrust violation in *Fischer* related to Section 10 of the Clayton Act, which was repealed in 1990.  *See Fischer,* 614 F. Supp. at 452-53.

Prime Broker Defendants in Support of Their Joint Motion to Dismiss All Claims [Dkt. No. 110] at 45; *see also* Kuehn Decl. Exh. C, EquiLend's Supplemental Memorandum in Support of Motion to Dismiss [Dkt. No. 107] at 1, 13 (joining and adopting Prime Broker Defendants' motion to dismiss brief).

**B.  The EquiLend APA Did Not Transfer Antitrust Claims**

The EquiLend APA sold QS Holdco's securities lending "business" to EquiLend. Although Defendants note the transfer of certain "claims" as part of the "Purchased Assets" in Sections 2.1(k) and 2.1(m) of the EquiLend APA, they ignore that the agreement limits the transferred claims to those "relating to the Purchased Assets or the Business," § 2.1(k), or "necessary for the operation of the Business," § 2.1.  They also ignore that where the EquiLend APA intended to assign litigation claims, it did so explicitly—naming the types of litigation claims assigned, without listing antitrust claims or the other causes of action asserted in this litigation.  Accordingly, the EquiLend APA did not provide for an unlimited transfer of "all claims" as Defendants incorrectly assert.

While no specific language is required to assign antitrust (or other litigation) claims, the EquiLend APA could only have assigned antitrust claims if it made "an unambiguous assignment of causes of action in a manner that would clearly encompass the antitrust claim." *DNAML Pty, Ltd v. Apple Inc.*, No. 13-cv-6516, 2015 WL 9077075, at *3 (S.D.N.Y. Dec. 16, 2015).  *See also* Restatement (Second) of Contracts § 324 (assignor must "manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee").

At the pre-motion hearing, Defendants focused on Section 2.1(k) of the agreement as the source of the purported assignment of "affirmative claims" by QS Holdco against third-parties.

Kuehn Decl. Exh. D, Transcript of April 17, 2018 Conference ("Tr.") at 14.   The claims transferred by that section are not all "claims," but rather "Liability claims."   Defendants concede that "Liability claims" does not explicitly include antitrust, deceptive trade practices, or common law tort causes of action.   Tr. at 21.   Neither does the defined term "Liability" list "causes of action" or "litigation claims," let alone "antitrust claims."   EquiLend APA, Annex A. Rather, the types of claims included in the definition clearly contemplate the sort of claims involved in running the day-to-day operations of a securities lending business, such as indebtedness, letters of credit, and trade claims.   *Id.* ("Liability means any direct or indirect indebtedness, liability, assessment, expense, claim, loss, damage, deficiency, obligation or responsibility . . . (including any liability under any guarantees, letters of credit, performance credits or with respect to insurance loss accruals.)").

Defendants' proposed broad interpretation of "Liability claims" not only is unsupported by the definition of "Liability," but is inconsistent with the assignment provisions of the EquiLend APA itself.   Section 2.1(k) transfers "Liability claims, contract rights, *and warranty or product liability claims against third parties* relating to the Purchased Assets or the Business." *Id.* § 2.1(k) (emphasis added).   If "Liability claims" had the broad meaning Defendants urge, then "Liability claims" would include warranty and product liability claims against third parties, rendering the explicit inclusion of those claims in the assignment meaningless.   *See, e.g., SPCP Grp., LLC v. Eagle Rock Field Servs., LP*, No. 12-cv-3610, 2013 WL 359650, at *6 (S.D.N.Y. Jan. 30, 2013) (contract must be construed "so as to give full meaning and effect to the material provisions," and "reading of the contract should not render any portion meaningless"); *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) ("Contracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless.'").

9

The Defendants' reliance on Section 2.1(m) is also unavailing.  Like Section 2.1(k), 2.1(m) is limited by the final sentence of Section 2.1, which states that "[t]he Purchased Assets shall include all the Assets of Seller . . . necessary for the operation of the Business . . . ."  Defendants argue that this provision "only sets a floor for the scope of the assets being transferred. It does not impose an upper limit."  Mot. at 9.  But the provision on its face is not "without limitation," and is not intended to set a floor—rather, it describes what assets are included in the transfer.  Indeed, other provisions in the EquiLend APA explicitly note that they are not terms of limitation.  *See, e.g.*, EquiLend APA § 2.2(d) ("All Contracts that are not listed on Schedule 2.1(a) . . . which shall include *without limitation* . . . .") (emphasis added).  Had EquiLend intended that provision to act as a floor (as it now argues), it need only have included the same or similar language it used elsewhere, "without limitation," or "but not limited to."[7]

Further, in interpreting an agreement, courts must look to its context and purpose.  *See e.g., U.S. Bank, Nat'l Ass'n, v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 413 (S.D.N.Y. 2016) (explaining that a contract should be read as a whole and interpreted to give effect to its general purpose); *In Re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) ("[C]ourt should accord [contractual] language its plain meaning giving due consideration to the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.") (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)); *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) (considering extrinsic evidence to interpret the agreement between the parties).  Here, Defendants' proposed interpretation is antithetical to the

---

[7] Defendants' citation to *Brooklyn Bridge Park Coal. v. Port Auth. Of N.Y. & N.J.* does not support their argument. Mot. at 9.  That case ruled that a warehouse on Brooklyn's Pier 3 qualified as a terminal facility under the Port Authority's statutory charter, and thus the lease to a construction company fell within the Authority's powers.  951 F. Supp. 383, 388-89 (E.D.N.Y. 1997).  In dicta, the court pointed out that "include" is generally an enlarging word, rather than a limiting word.  *Id.* at 389.  But it did not expand the definition of "terminal facility" beyond the definition listed in the charter, or decide that the structures identified as "terminal facilities" served merely as a "floor" to all other types of structures.

purpose of the EquiLend APA, which expressly contemplated that QS Holdco would continue in business post-closing with, among other assets and operations, its retained repo operations.[8]  As noted at pages 4-5, *supra*, the EquiLend APA repeatedly reinforces the fact that the purpose was strictly limited to transferring assets necessary to running the AQS business.  These assets do not include the causes of action asserted in this litigation.  Thus, the most reasonable interpretation in light of the purpose of the agreement (and its plain language) is that the "Liability" claims transferred to EquiLend were claims related to the day-to-day business of the securities lending operations of AQS.  *U.S. Bank, Nat'l Ass'n,* 205 F. Supp. 3d at 413; *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) (noting that a contract provisions should be read as a whole and not on any single passage in isolation).  Such claims plainly do not include the causes of action asserted in this litigation.

Adopting EquiLend's argument would radically alter the assignment provisions of the EquiLend APA, transforming it into a general release of all claims, not only those related to the business that was the subject of the agreement.  *U.S. Bank, Nat'l Ass'n,* 205 F. Supp. 3d at 412; *see also Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 299 (S.D.N.Y. 2004) (when language in a release is "so non-specific," the court will not conclude as a matter of law that the parties intended to be released from certain claims); *Wechsler v. Diamond Sugar Co.*, 29 A.D.3d 681, 682 (2nd Dep't 2006) (to interpret a release, courts must consider the subject matter of a release in the context of the dispute being settled).  Here, the purpose of the EquiLend APA was the assignment of an operating business, and the Complaint alleges that QS Holdco and its principals did not know that EquiLend and its controllers—the

---

[8] "Repo" refers to equity repurchase transactions—short-term lending secured by securities.  *See* Compl. ¶ 203.

Prime Broker Defendants—engaged in a conspiracy to prevent the business's success.[9]  Compl. ¶¶ 216, 289-96.  Even if EquiLend—which did know about the antitrust conspiracy—intended effectively to obtain a release from QS Holdco by purchasing AQS, EquiLend's unexpressed, subjective intent is irrelevant.  *See e.g., Webster v. New York Life Ins. Co.*, 386 F. Supp. 2d 438, 442 n.2 (S.D.N.Y. 2005) ("[I]t is not the real intent but the intent expressed or apparent in the writing which is sought; it is the objective, not the subjective, intent that controls"); *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 301–02 (S.D.N.Y. 1997) (New York law has an "exclusive reliance upon evidence of objective manifestations of intent rule in contract interpretation").

The cases cited by Defendants do not alter this result.  *Am. Home Prods. Corp. v. CAMBR Co.* is inapposite because it involved the unqualified transfer of all "causes of action . . . against third parties," and more critically, was decided on a motion for summary judgment—not a Rule 12(b)(1) motion to dismiss.  No. 00-cv-2021, 2001 WL 79903, at *1 (S.D.N.Y. Jan. 30, 2001).  In addition, the language at issue in that case listed specific litigation claims that were *excluded* from the sale.  *Id.* at *2-3.  *See also Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112 (3d Cir. 1993) (involving unqualified assignment of "'all of' LOPC's 'causes of action . . . claims and demands of whatsoever nature'").  This is the precise *opposite* of the EquiLend APA, which explicitly *includes* certain litigation causes of action against third parties—the "warranty or product liability claims against third parties."  EquiLend APA § 2.1(k).  The assignment of antitrust claims must be express, a higher standard than for the assignment of other claims.  *See Lerman*, 10 F.3d at 112 (assignment of a claim under the Clayton Act and RICO statute must be express); *In re Jamuna Real Estate, LLC*, 382 B.R. 263, 274–75 (Bankr. E.D. Pa. 2008)

---

[9] Defendants assert that AQS was aware of certain acts that were part of the conspiracy, Mot. at 11, but as the Complaint alleges, AQS did not know Defendants had *conspired together to block AQS*, which was orchestrated in secret.  Compl. ¶¶ 216, 289-91, 293.

(declining to alter established Third Circuit precedent requiring express assignment of antitrust or RICO claims).  In a recent Northern District of Illinois case, the court found that two separate transfers of substantially all of the transferor's assets did not cause the transfer of antitrust claims.  *In re Steel Antitrust Litig.*, No. 08-cv-5214, 2015 WL 5304629, at *4 n. 3 (N.D. Ill. Sept. 9, 2015).  As in that case, notwithstanding the transfer of Plaintiff's assets related to the AQS business, "[b]ecause [QS Holdco] did not expressly transfer its antitrust claims, it retains its antitrust claims."  *Id*.[10]

## II.   PUBLIC POLICY PRECLUDES DISMISSAL

Even if EquiLend had obtained a clear and unambiguous assignment of antitrust claims, such an assignment—which in this circumstance would act as a release—would be void.

### A.  The Purported Assignment Was Integral to Defendants' Ongoing Conspiracy

An assignment or release of Plaintiffs' claims would be void as an integral part of Defendants' antitrust conspiracy.  As Justice Cardozo recognized, a release of antitrust claims may be invalid "when it is so much a part of an illegal transaction as to be void in its inception." *Radio Corp. of Am. v. Raytheon Mfg. Co.*, 296 U.S. 459, 462 (1935).  This rule—known as the "part and parcel doctrine"—serves an important purpose.  It ensures that antitrust conspirators cannot fraudulently insulate themselves from liability, thus neutering one of the key features of the antitrust statutes—the empowerment of "private attorneys general" to enforce the statute's

---

[10] Defendants attempt to sidestep the plain language of the EquiLend APA by arguing that because the Complaint is seeking damages from a boycott of the AQS platform, "[o]bviously those claims relate to AQS's business."  Mot. at 8.  Defendants miss the point.  Nowhere in the agreement is there any suggestion that antitrust claims were part of the underlying "Business" being sold to EquiLend.  The "Business" being sold was an operating securities lending platform, not an anti-competitive conspiracy litigation.  EquiLend APA at 1.

13

provisions.[11]   In the years since Justice Cardozo articulated this principle, courts have many times applied the part and parcel doctrine.

In *Traffic Scan Network, Inc. v. Winston*, the court set aside a release relied upon by the defendants because the plaintiffs had "sufficiently alleged a 'part and parcel' defense to the release."  No. 92-cv-2243, 1993 WL 390144, at *2 (E.D. La. Sept. 24, 1993).  The facts in *Traffic Scan* are similar to those in this case: the plaintiff alleged that the defendant had driven plaintiff's business into near failure through a predatory pricing scheme, at which point the plaintiff was forced to sell its business at a "drastically reduced price."  *Id*.  The defendant obtained a release from the plaintiff that was executed simultaneously with the contract of sale.  *Id*.  Distinguishing cases in which a release was obtained subsequent to the purchase of a competitor, the court found that the two plaintiffs had shown that the release was integral to the antitrust violation.  *Id*. ("Because the release *may* be invalid as an integral part of the alleged antitrust scheme, it does not bar Traffic Scan's claims and summary judgment is inappropriate.") (emphasis in original).

Similarly, in *Carter v. Twentieth Century-Fox Film Corp*., the court rejected a release signed in conjunction with a movie theater lease that the plaintiff alleged was part of a conspiracy to eliminate a competitive theater business.  127 F. Supp. 675, 680-81 (W.D. Mo. 1955).  The court applied the part and parcel doctrine (although not by name), stating:

> Nor need we consider whether the present anti-trust claim was within the intent of the parties when they executed this release, for if the instrument they executed,

---

[11] Defendants quote *Dobbins v. Kawasaki Motor Corp. U.S.A.* for the proposition that the "limited procedural issue decided in *Raytheon* has little relevance today, separate courts of law and equity having been abolished."  362 F. Supp. 54, 58 (D. Or. 1973).  However, Defendants ignore that *Dobbins* also expressly endorsed the part and parcel doctrine itself, stating unequivocally: "I conclude a part and parcel argument may be used by a plaintiff to avoid a release in an antitrust action where it is shown that the release was an object of the combination or conspiracy or where it was an integral part of the scheme in restraint of trade."  *Id.* at 58.

14

whatever its purview, is the result of a conspiracy in unreasonable restraint of trade, or resulted in a monopoly, it is and was of no legal effect.

*Id.* at 681.  According to the court,

> [T]he release was integrated into the lease contract, the end result of which, if plaintiff's theory of action is sustained, can only be said to have been the culmination of the conspiracy to effectively remove plaintiff from competition in the business of exhibiting motion pictures in the Sedalia, Missouri, area.  As such, said lease contract is just one of the many acts charged in the complaint by which defendants are alleged to have been able to establish the impact of the conspiracy and that caused the unreasonable restraint of interstate trade on which this action is based.

*Id.* at 678-79.  *See also Westmoreland Asbestos Co. v. Johns-Manville Corp.*, 39 F. Supp. 117, 119-20 (S.D.N.Y. 1941) (denying defendants' motion for summary judgment on antitrust claims and permitting case to go to trial to determine whether release was "obtained by fraud, deceit and trickery" or "void and inoperative because it forms an integral part of, and was obtained with the intent to further the monopolistic conspiracy itself") (citing *Raytheon*, 296 U.S. at 462); *Rosen v. Dick*, No. 73-cv-2388, 1974 WL 443, *1 (S.D.N.Y. Sept. 3, 1974) ("It is well settled that a release may be set aside if it was 'so much of a part of an illegal transaction as to be void in its inception,'" and refusing to dismiss claims where allegation "would easily support a finding that the release . . . was part and parcel of a broader illegal agreement") (quoting *Raytheon*, 296 U.S. at 462).

The same concerns articulated by Justice Cardozo in *Raytheon* have led federal courts to reject contractual waivers of antitrust claims.  *Lawlor*, 349 U.S. at 329 ("[I]n view of the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action," an agreement which confers even "a partial immunity from civil liability for future violations" of the antitrust laws is inconsistent with the public interest); *Am. Express*, 634 F.3d at 199 (class action waiver provisions that would effectively preclude plaintiffs from

15

acting as private attorneys general pursuing antitrust violations are void as a matter of public policy).   Simply put, the federal courts have long recognized that the release or waiver of antitrust claims are subject to special scrutiny.

Defendants' citation to *VKK Corp. v. Nat'l Football League* is not on point.   Mot. at 14 (citing 244 F.3d 114, 125 (2d Cir. 2001)).   First, *VKK* addressed and upheld a grant of summary judgment dismissing claims following discovery and trial.   *VKK*, 244 F.3d at 121.   Here, on a pre-discovery motion to dismiss for lack of standing, the *VKK* decision is plainly inapposite. Moreover, while the opinion noted that the Third Circuit had questioned the viability of the part and parcel doctrine, the Second Circuit did not question the doctrine's viability and went on to analyze whether the facts in *VKK* supported invoking the doctrine.   *Id*. at 126 (citing *Taxin v. Food Fair Stores, Inc.*, 287 F.2d 448, 451 (3d Cir. 1961) (granting dismissal on summary judgment where plaintiffs had not been able to introduce evidence that release was part and parcel of conspiracy)).   On those facts, the court ultimately determined the doctrine was not applicable.   Specifically, the court found that the conspiracy alleged in the case was complete when the plaintiff agreed to sell the New England Patriots football team, and that the release—a separate agreement—was not part of the anti-competitive scheme.   *VKK*, 244 F.3d at 126.   But here, as in *Traffic Scan* and *Carter*, the purported assignment was a central act of the conspiracy. And while it was the final act from Plaintiff's perspective, the purported assignment has permitted Defendants to continue the conspiracy.   The assignment remains an integral part of Defendants' ongoing scheme, and it is thus well within the part and parcel doctrine.[12]

---

[12] Defendants argue that a boycott does not "require a transfer of an entire business" and thus the AQS acquisition was not part of the conspiracy.   Mot. at 15.   But they ignore that—as alleged in the Complaint—the acquisition of AQS was, in fact, intended to further the boycott, and, without the purchase, it would have been costly and perhaps impossible to continue the boycott indefinitely.   Compl. ¶¶ 18-19, 24.

Contrary to Defendants argument, application of the part and parcel doctrine to fact patterns like those in this case, or in *Traffic Scan* or *Carter*, would not "render void all releases relating to conspiracies alleged to continue post-release."  Mot. at 16 (quoting *VKK*, 244 F.3d at 126).  Here, if Defendants did attempt to obtain an assignment of antitrust claims, the doctrine is applicable not merely because the conspiracy continued, but because obtaining the assignment was a key act in the conspiracy itself.  Compl. ¶¶ 19, 210.  Likewise, Defendants' argument that the part and parcel doctrine would render all commercial assignments or releases subject to challenge is misguided.  Mot. at 16; Tr. at 28-29.  Commercial parties have an easy way to avoid such challenges—comply with federal antitrust laws and do not attempt to perpetuate a conspiracy through release or assignment.  If a party that has engaged in an antitrust violation wants peace, it may have it—but only by obtaining a clear and unambiguous release from all injured parties, paying fairly, and ceasing the illegal conduct.[13]

Finally, Defendants' argument that the doctrine is unnecessary here because "others are available to sue," Mot. at 15, flies in the face of Defendants' own argument in the ongoing companion class action case that class plaintiffs are the incorrect party, and that only AQS (now owned by Defendants) is the proper plaintiff.  *Supra* at 7.  Indeed, Defendants' reliance on the purported assignment to shield itself from that action as well as this action illustrates just how integral the assignment is to their plan.

---

[13] The Court is empowered by law and the EquiLend APA to strike the illegal assignment and leave the rest of the agreement in place.  *See* EquiLend APA § 8.2 ("If any provision of this Agreement for any reason shall be held to be illegal, invalid, or unenforceable, such illegality shall not affect any other provision of this Agreement shall be construed as if such illegal, invalid or unenforceable provision had never been included herein."); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 250 (S.D.N.Y. 2005) ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.") (quoting Restatement (Second) of Contracts § 208 (1981)).

17

**B.  The Purported Assignment Was Procured Through Fraud and Is Void**

Beyond the part and parcel doctrine, a release may be invalidated for any of "the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake." *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011).  Any purported assignment of antitrust claims in the EquiLend APA would be void because it was procured through fraud.  *Bloss v. Va'ad Harabonim of Riverdale*, 203 A.D.2d 36, 37 (1st Dep't 1994) ("Where fraud or duress in the procurement of a release is alleged, a motion to dismiss should be denied.").  Such fraud can be affirmative misrepresentation of facts or an omission when a party is under a duty to make a disclosure.  *McFarland v. Salerno*, 40 A.D.3d 514, 514-15 (1st Dep't 2007) (misrepresentation as to legal effect of assignment required assignment to be rescinded); 6 Am. Jur. 2d Assignments § 8 ("Fraud in obtaining an assignment may void the assignment, and such assignment may be rescinded.").

"Under New York Law, a duty to disclose material facts arises where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Congress Fin. Corp. v. John Morrell & Co.*, 790 F. Supp. 459, 472 (S.D.N.Y. 1992).  In particular, that duty arises where one party has superior knowledge or "special facts" not readily available to the other party.  *P.T. Bank Central Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 378 (1st Dep't 2003) (plaintiff stated claim for fraud where bank failed to disclose special facts about bridge loan).  Defendants falsely represented that the purpose of the transaction was to develop the AQS business and technology, when in reality Defendants were attempting to further their conspiracy to put an upstart competitor out of business and protect the profits of the Prime Broker Defendants.  Compl. ¶¶ 22, 217-18.  These facts were "peculiarly within the knowledge" of EquiLend (and the Prime Broker Defendants

18

that controlled it), and could not have been discovered by Plaintiff through ordinary diligence. *Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank*, 850 F. Supp. 1199, 1216-17 (S.D.N.Y. 1994), *aff'd*, 57 F.3d 146 (2d Cir. 1995) (for purposes of fraudulent failure to disclose, information was peculiarly within defendant's knowledge where it was not readily available to the plaintiff and could not be accessed from other sources).

## III.   DISMISSAL WITHOUT DISCOVERY WOULD BE INAPPROPRIATE

At the April 17, 2018 pre-motion conference, the Court indicated that it would be open to applications seeking discovery on the interpretation of the EquiLend APA and the part and parcel doctrine.  Tr. at 30.  Plaintiff respectfully submits that the Court should deny the Defendants' motion without discovery.  The allegations of the Complaint are sufficient to establish standing at this stage of litigation—Plaintiff is the most efficient enforcer, the language of the EquiLend APA does not assign Plaintiff's causes of action, and to the extent any claim assignment did attempt to strip Plaintiff of its claims, the assignment was part of the conspiracy described in the Complaint and cannot be enforced.  To the extent that the Court accepts Defendants' contrary arguments, then discovery is necessary because Defendants' challenge is no longer facial.  In essence, Defendants dispute Plaintiff's factual allegations that the purchase of AQS was an integral part of the conspiracy, Compl. ¶¶ 209-10, 212, and seek interpretation of an agreement that from Defendants' point of view is at best ambiguous.  In these circumstances, discovery would be warranted.  *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).

On a motion to dismiss on standing, "the District Court has leeway as to the procedure it wishes to follow."  *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87–88 (2d Cir. 2006).  Before dismissing a case for lack of jurisdiction, courts have required discovery of facts supporting jurisdiction.  *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d

Cir. 2003).  Failure to permit discovery has been held to be an abuse of discretion.  *All. of Am. Insurers v. Cuomo*, 854 F.2d 591, 597 (2d Cir. 1988).

To the extent the Court determines that there is any merit to Defendants' arguments regarding the interpretation of the EquiLend APA, then that agreement is at worst ambiguous, and the Court should order discovery regarding the parties' intent.  *See State v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985) (if a contract is ambiguous, parties may submit evidence to aid factfinder); *GMG Cap. Inv., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) (same); s*ee also In Re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. AIG, Inc. v. Bank of Am. Corp.*  943 F. Supp. 2d 1035, 1049 (C.D. Cal. 2013) (ordering discovery regarding ambiguous asset purchase agreement transferring RMBS from AIG to Federal Reserve).

Similarly, if the Court decides to consider Defendants' assertions that the EquiLend APA was not integral to the antitrust conspiracy alleged in the complaint, the Court should order fact discovery on that point.  *See, e.g., All. of Am. Insurers*, 854 F.2d at 597-98 (reversing dismissal where plaintiff raised insolvency defense to Defendants' motion to dismiss on standing grounds and trial court failed to order discovery to properly "explore" facts supporting plaintiff's defense).

## CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that the Court deny the Defendants' Joint Motion to Dismiss, or alternatively, stay ruling on the Defendants' motion pending the parties engaging in discovery on the issue of standing.

Dated:     New York, New York
            July 13, 2018

Respectfully submitted,

WOLLMUTH MAHER & DEUTSCH LLP

By:   /s/ Thomas P. Ogden
       David H. Wollmuth
       William A. Maher
       Thomas P. Ogden
       Ronald J. Aranoff
       Brant Duncan Kuehn
       James J. Brennan
       Fletcher W. Strong

500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050

*Attorneys for Plaintiff*

21