UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



QS HOLDCO INC.,

    Plaintiff,

-v-

BANK OF AMERICA CORPORATION *et al.*,

    Defendants.

No. 18-cv-824 (RJS)
OPINION AND ORDER

RICHARD J. SULLIVAN, Circuit Judge:

  Plaintiff QS Holdco Inc. ("QS Holdco") brings this action against seven financial services companies[1] asserting antitrust claims under the Sherman Act and New York law in connection with Defendants' alleged boycott of a stock lending platform, AQS, that was formerly owned by Plaintiff. (Doc. No. 1 (the "Complaint" or "Compl.").) Now before the Court is Defendants' joint motion to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). (Doc. No. 75.) For the reasons discussed below, Defendants' motion – which the Court construes as a motion made pursuant to Federal Rule of Civil Procedure 17(a) – is GRANTED.

I. Background

  "'Stock lending' or 'securities lending' refers [to] the lending of securities by one party to another. The lender puts up stock, typically to a broker who needs it to cover short positions or

---

[1] The remaining Defendants are Merrill Lynch, Pierce, Fenner & Smith Inc., Merrill Lynch Professional Clearing Corp., and Merrill Lynch L.P. Holdings, Inc. ("Bank of America"), Credit Suisse Securities (USA) LLC, Credit Suisse Prime Securities Services (USA) LLC, and Credit Suisse First Boston Next Fund, Inc. ("Credit Suisse"), Goldman Sachs & Co. LLC and Goldman Sachs Executions & Clearing, L.P. ("Goldman Sachs"), J.P. Morgan Securities LLC, J.P. Morgan Prime, Inc., and J.P. Morgan Chase Bank, N.A. ("JP Morgan"), Morgan Stanley & Co. LLC, Prime Dealer Services Corp., and Strategic Investments I, Inc. ("Morgan Stanley"), UBS Americas Inc., UBS Securities LLC, and UBS Financial Services Inc. ("UBS"), and EquiLend LLC, EquiLend Holdings LLC, and EquiLend Europe Limited ("EquiLend").

for some other reason; the borrower posts collateral tied to the stock price; and the lender earns a small fee." *Ridge Clearing & Outsourcing Sols., Inc. v. Khashoggi*, No. 07-cv-6611 (RJH), 2011 WL 3586455, at *3 n.6 (S.D.N.Y. Aug. 12, 2011), *aff'd sub nom. Broadridge Sec. Processing Sols., LLC v. Khashoggi*, 507 F. App'x 57 (2d Cir. 2013). Without a public market to facilitate this practice, broker-dealers like Defendants hold the powerful intermediary position of locating lenders and providing pricing services. (Compl. ¶ 97.) Defendants in particular dominate the stock loan market because, as Plaintiff alleges, they have "complete control over real-time price data, which is unavailable to both borrowers and lenders." (Compl. ¶ 99.)

In 2006, Quadriserv Inc. ("Quadriserv") "began developing an electronic platform that would directly match borrowers and lenders in the stock loan market." (Compl. ¶ 126.) AQS, as the SEC-registered platform came to be known, was aimed at facilitating stock loan transactions and used technology that "permitt[ed] all market participants to trade anonymously in real time . . . ." (Compl. ¶¶ 126–127.) Quadriserv also pursued and then adopted an electronic clearinghouse for AQS that eliminated the risk of default by independently backing each trade with capital. (Compl. ¶¶ 130, 140.)

Plaintiff alleges that AQS's launch in 2009 threatened Defendants' powerful role as intermediaries in the market. (Compl. ¶ 131–132.) As a result, Defendants conspired to boycott AQS. Specifically, Plaintiff alleges that Defendants met with AQS executives to gain intelligence and "feign[ed] interest" in the platform (Compl. ¶ 151), only to "refuse[] to give their customers access to AQS" (Compl. ¶ 153). Plaintiff also alleges that Defendants – together referred to by Goldman Sachs partner William Conley and other representatives as the "five families" – scheduled meetings to "develop [a] uniform position" on platforms like AQS. (Compl. ¶ 163.) These meetings and other conspiratorial acts allegedly occurred in part at board meetings for

EquiLend, a dealer consortium that offered its own trading platform, but which did not use central clearing or real-time price data. (Compl. ¶¶ 180, 182, 224.) Plaintiff alleges that Defendants, who together controlled EquiLend's board, "did not view EquiLend as an investment" but rather saw it as a means "to advance an agenda to halt the widespread dissemination of pricing data to the market at large." (Compl. ¶¶ 182, 184.)

Notwithstanding Defendants' efforts, interest in AQS increased significantly in 2014 when government regulations that favored central clearing operations went into effect. (Compl. ¶ 186.) According to Plaintiff, Defendants then redoubled their efforts to "ensure that the only way for market participants to clear trades was to use pipelines controlled by . . . Defendants." (Compl. ¶ 199.) In 2015, Quadriserv began negotiations with Options Clearing Corporation ("OCC") for the sale of AQS. (Compl. ¶ 203.) Plaintiff alleges that Defendants felt threatened by this possibility, and made calls to thwart the deal. (Compl. ¶¶ 205–206.) In July 2015, Plaintiff – then known as PDQ – acquired AQS from Quadriserv. (Compl. ¶ 206.) Thereafter, Plaintiff continued to explore the possibility of a transaction with OCC, since it "was the most logical acquirer" of AQS. (Compl. ¶ 207.) Plaintiff alleges that, ultimately, "OCC abruptly pulled out of the deal" and "stopped returning calls from AQS" without explanation (Compl. ¶¶ 215–216), putting Plaintiff in a "desperate situation" (Compl. ¶ 216). When a subsidiary of EquiLend, EquiLend Clearing LLC, offered to buy AQS in 2016, Plaintiff alleges it was forced to sell at a loss. (Compl. ¶¶ 216, 288.) OCC and EquiLend came to their own deal – allegedly "substantially identical" to that pursued by Plaintiff – in May 2017, after which OCC began to use AQS's services. (Compl. ¶ 218.)

On January 30, 2018, Plaintiff commenced this action asserting claims under the Sherman Act, New York's Donnelly Act, and New York's Deceptive Practices Act, as well as for common

3

law unjust enrichment and tortious interference with business relations theories.[2] (Compl. ¶ 27.) Following a pre-motion conference, Defendants filed a joint motion to dismiss (Doc. No. 75), which was fully briefed on July 27, 2018 (Doc. No. 83).

II. DISCUSSION

Defendants move to dismiss this action pursuant to Rule 12(b)(1) on the grounds that Plaintiff assigned its antitrust claims to EquiLend as part of the sale of AQS in 2015. (Doc. No. 76 at 1.) Although Defendants do not directly address Article III standing in their briefs, they argue that because Plaintiff "does not own" the claims alleged in the Complaint, it lacks standing to assert them. (Doc. No. 76 at 1, 6.) In addressing this argument, the Court first considers whether an assignment of claims implicates the Court's subject matter jurisdiction, in which case Rule 12(b)(1) would apply, or whether this motion is properly made pursuant to Rule 17(a), which requires that an action be brought by the real party in interest.

A. Rule 12(b)(1)

The law is clear that a party seeking to invoke the Court's jurisdiction bears the burden of proving that subject matter jurisdiction exists. *See Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

Defendants argue that the Court lacks subject matter jurisdiction over this dispute because Plaintiff assigned all its claims to EquiLend when it sold AQS. But it is by no means clear that such an assignment prevents a federal court from exercising subject matter jurisdiction over an action. In fact, the only authority cited by Defendants for this proposition is the Restatement

---

[2] Similar allegations have been made against Defendants in a class action currently before Judge Failla. *See Iowa Pub. Emps.' Ret. Sys. v. Bank of Am. Corp.*, No. 17-cv-06221 (KPF) (S.D.N.Y.) (Doc. No. 73).

4

(Second) of Contracts § 317, which merely provides that "an assignment extinguishes any right previously held by the assignor." But while such an assignment may affect a party's *right* to bring suit, it does not affect the power of the Court to hear that suit – which is what subject matter jurisdiction is all about.

Article III standing is a bare minimum requirement that establishes the jurisdiction of the Court, and nothing more. "Standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (internal quotation marks and citations omitted). In order to have Article III standing, a plaintiff must show that: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Of course, more than one party can have Article III standing to assert a claim as long as they can individually establish the elements of standing.

The real party in interest principle codified in Rule 17, on the other hand, is actually about prudential standing, which does not implicate federal jurisdiction under Article III, but rather ensures that an assignor and assignee are not both bringing the same action. *See Digizip.com, Inc. v. Verizon Servs. Corp.*, 139 F. Supp. 3d 670, 679 (S.D.N.Y. 2015) ("A number of cases have noted that the concern over who is the real party in interest under Fed. R. Civ. P. 17(a) addresses only the prudential aspect of the standing rule, and therefore that the application of Rule 17 does not implicate Article III standing."); *see also Warth v. Seldin*, 422 U.S. 490, 500–01 (1975) ("[P]rudential rules of standing . . . , apart from [Article III's] minimum requirements, serve to

limit the role of the courts in resolving public disputes[.]"). Under Rule 17(a), "[e]very action shall be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a). "The real party in interest principle embodied in Rule 17 ensures that only a person who possesses the right to enforce a claim and who has a significant interest in the litigation can bring the claim." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.á.r.l*, 790 F.3d 411, 420 (2d Cir. 2015) (internal quotation marks omitted). This principle is distinct from Article III jurisdiction. *See Digizip.com, Inc.*, 139 F. Supp. 3d at 679 (concluding that Article III standing is not implicated when "[t]he only real concern with respect to standing is whether [the plaintiff] was the proper owner of those claims at the time it brought this suit – in other words, the concern addressed in Rule 17 as to whether [the plaintiff] was the 'real party in interest'"). Thus, an assignment more accurately affects the real party in interest to the litigation under Rule 17(a) – not Article III standing. *See id.*; *Cranpark Inc. v. Rogers Grp. Inc.*, 821 F.3d 723, 730 (6th Cir. 2016) (holding that "one who sells his interest in a cause of action is not deprived of Article III standing" but "is susceptible to a real-party-in-interest challenge"); *Norris v. Causey*, 869 F.3d 360, 366–67 (5th Cir. 2017) (same).[3]

Here, Defendants broadly challenge Plaintiff's "right" to sue (Doc. No. 76 at 5), but they do not seriously challenge Plaintiff's Article III standing. Nor could they. On its face, the Complaint alleges that, as a result of Defendants' actions, Plaintiff suffered loss of profits, loss of goodwill, and the loss of prospective business relations, all culminating in Plaintiff's eventual sale

---

[3] The Second Circuit has not yet articulated the distinction made here, but has stated that, under New York law, "[a]n unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 125 (2d Cir. 1984); *accord Valdin Investments Corp. v. Oxbridge Capital Mgmt., LLC*, 651 F. App'x 5, 7 (2d Cir. 2016) (relying on *Aaron* to dismiss a claim for lack of subject matter jurisdiction because the "assignment of [plaintiff's] rights extinguished its claims against [defendant] and deprived it of any interest in this litigation"). The Second Circuit in *Aaron*, however, did not specify whether it was speaking to Article III standing or prudential standing.

of AQS at an alleged loss. (Compl. ¶¶ 288, 304, 315.) Plaintiff also asserts that money damages would provide redress for these injuries. Indeed, Defendants do not really contend that the Court lacks jurisdiction to hear these claims; rather, they assert that Plaintiff has relinquished its ability to sue by assigning ownership of its claims to EquiLend, which they argue is now the only party able to sue. (Doc. No. 76 at 4.) Therefore, Defendants' motion is better characterized as a Rule 17(a) challenge, not an Article III jurisdictional one. Accordingly, the Court will consider Defendants' motion to dismiss as a challenge under Rule 17(a).

B.  Rule 17(a)

Rule 17 itself does not specify the proper procedures or timing by which to make a challenge. *See U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, No. 98-cv-3099 (JGK), 2001 WL 300735, at *9 n.7 (S.D.N.Y. Mar. 27, 2001) ("The Federal Rules of Civil Procedure do not specify a procedure for raising an objection that a plaintiff is not the real party in interest, although a real party in interest objection closely resembles the defense of failure to state a claim for relief under Rule 12(b)(6)." (internal quotation marks omitted)); 6A Charles Alan Wright, et al., *Federal Practice and Procedure* § 1554 (3d ed. 2010). Generally, courts have allowed Rule 17(a) challenges to be made pursuant to Rule 12(b)(6), in part because when a plaintiff "does not own the contractual right upon which it attempts to sue, it is not the proper party in interest [under Rule 17(a)] and cannot state a proper claim" under Rule 12(b)(6). *Leucadia Nat. Corp. v. FPL Grp. Capital, Inc.*, No. 93-cv-2908 (LAP), 1993 WL 464691, at *3 (S.D.N.Y. Nov. 9, 1993); *see Whelan v. Abell*, 953 F.2d 663, 672 (D.C. Cir. 1992). Accordingly, the Court will address the Rule 17(a) challenge as it would a Rule 12(b)(6) motion to dismiss, considering only the pleadings, attached exhibits, and documents incorporated by reference therein, including the

two contracts relevant to this dispute. *See, e.g., DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010).[4]

As noted above, Defendants argue that AQS and the claims alleged in the Complaint were assigned by Plaintiff to EquiLend Clearing LLC, a subsidiary of Defendant EquiLend, in a purchase agreement on July 31, 2016 (Doc. No. 77 Ex. 2 ("EquiLend Agreement")). (Doc. No. 76 at 6.) For that to be true, Plaintiff must have obtained ownership over the claims when it purchased AQS from Quadriserv on July 27, 2015 (Doc. No. 77 Ex. 1 ("PDQ Agreement")). "To effect a transfer of the right to bring an antitrust claim, the transferee must expressly assign the right to bring that cause of action, either by making specific reference to the antitrust claim or by making an unambiguous assignment of causes of action in a manner that would clearly encompass the antitrust claim." *DNAML Pty, Ltd. v. Apple Inc.*, No. 13-cv-6516 (DLC), 2015 WL 9077075, at *3 (S.D.N.Y. Dec. 16, 2015).

Here, both relevant agreements use the same language. Specifically, the agreements transfer: (1) "[a]ll other intangible assets (including all Liability claims, contract rights and warranty or product liability claims against third parties) relating to the Purchased Assets or the Business;" (2) "[a]ll of the outstanding shares of capital stock of the subsidiaries of the Seller set forth in Schedule 2.1(l);" and (3) "[e]xcept as specifically provided in Section 2.2, all other assets, properties, claims, rights and interests of the Seller which exist on the Closing Date, of every kind and nature and description, whether tangible or intangible, real, personal or mixed." (PDQ Agreement § 2.1(k)–(m); EquiLend Agreement § 2.1(k)–(m)).

Both contracts define "Liability" quite broadly:

---

[4] In connection with the motions to dismiss, the Court has also considered Defendants' memorandum of law in support of its motion to dismiss (Doc. No. 76), Plaintiff's memorandum in opposition (Doc. No. 81), Defendants' reply memorandum in support of its motion to dismiss (Doc. No. 83), and the various declarations in support thereof and exhibits attached thereto.

> "Liability" means any direct or indirect indebtedness, liability, assessment, expense, claim, loss, damage, deficiency, obligation or responsibility, known or unknown, disputed or undisputed, joint or several, vested or unvested, executory or not, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, determinable or undeterminable, accrued or unaccrued, absolute or not, actual or potential, contingent or otherwise (including any liability under any guarantees, letters of credit, performance credits or with respect to insurance loss accruals).

(PDQ Agreement, Annex A, at 28; EquiLend Agreement, Annex A, at 34.) The transfer of "*Liability* claims" is expansive, including unknown, undeterminable, and even potential claims. And the transfer of "all other . . . claims" in Section 2.1(m) is remarkably broad and unconditional, extending to "all claims . . . of every kind and nature and description" that existed on the closing date. This is not a mere asset purchase, as in *DNAML*, where the contract only referred to a transfer of "Business and Assets," which were not defined to include claims. 2015 WL 9077075, at *5. Rather, the agreements here use broad language – so broad, in fact, that they transfer all claims whether or not Quadriserv knew about them at the time of transfer. *See Am. Home Prod. Corp. v. CAMBR Co.*, No. 00-cv-2021 (VM), 2001 WL 79903, at *1 (S.D.N.Y. Jan. 30, 2001) (finding antitrust claims were assigned to a purchaser when the language of the agreement included "[s]ellers' rights, claims, credits, causes of action or rights of set-off against third parties relating to [seller]"). Together, the broad transfer provision and broad definition of "liability" explicitly encompass a general claim transfer, which clearly includes the antitrust claims asserted here. Accordingly, the language of the agreements supports only one conclusion: all claims (including antitrust claims) were assigned from Quadriserv to Plaintiff in 2015 and from Plaintiff to EquiLend in 2016.

Plaintiff nevertheless argues that even if its antitrust claims were assigned under the agreements, the assignment to EquiLend Clearing LLC – which is effectively owned by Defendants – was void for reasons of public policy because the forced sale was the object of

9

Defendants' alleged conspiracy. Specifically, Plaintiff relies on the so-called "part and parcel" doctrine, which provides that a release of claims is rendered void where that release was "integral" to the alleged antitrust conspiracy. *See VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 125 (2d Cir. 2001) (citing *Radio Corp. of Am. v. Raytheon Mfg. Co.*, 296 U.S. 459, 462 (1935)); *see also Dobbins v. Kawasaki Motors Corp., U.S.A.*, 362 F. Supp. 54, 58 (D. Or. 1973). However, courts have rarely applied this doctrine to invalidate releases. *See VKK Corp.*, 244 F.3d at 125 (observing that the part and parcel doctrine is "rarely discussed and more rarely applied," that no court of appeals has ever applied it to invalidate a release, and that the Third Circuit has "expressed grave doubt as to [the doctrine's] existence" (citing *Taxin v. Food Fair Stores, Inc.*, 287 F.2d 448, 451 (3d Cir. 1961)). Moreover, the facts in this case closely resemble those in *VKK Corp.*, in which the Second Circuit upheld the release in question. There, a partial owner of the New England Patriots, VKK, brought antitrust claims against the NFL even though VKK had previously released its claims as required by NFL policy. *Id.* at 120–21. VKK argued that the release was part of the antitrust conspiracy alleged in the complaint and that the release was void under the part and parcel doctrine. *Id.* at 126. The Second Circuit disagreed, concluding that the alleged conspiracy was aimed at preventing franchise relocation, and "was complete when [VKK] agreed to sell the Patriots . . . because VKK could not move the team." *Id.* Because "[t]he [r]elease . . . only stopped VKK from bringing suit to recover damages[,]" the release of claims was not integral to the alleged conspiracy. *Id.* The Court also found it significant that VKK could have brought the antitrust suit *prior* to the release. *Id.*

The same is true here. The conspiracy alleged in the Complaint was a boycott of the AQS platform with the goal of driving AQS out of the market. (*See* Compl. ¶ 10 ("[T]hey jointly agreed to boycott AQS and starve it of liquidity."); *id.* ¶ 172 ("The conspiracy . . . [was] to boycott and

eliminate AQS . . . ."); *id.* ¶¶ 47, 53, 58, 65, 73, 80 (Defendants "agreed . . . to boycott AQS and acquire it").) But while the eventual transfer of claims was incidental to EquiLend's purchase of AQS, the transfer (which was effectively a release) is not alleged to have been the goal of the scheme, nor was it necessary to the boycott. Furthermore, as in *VKK Corp.*, nothing prevented Plaintiff – or Quadriserv, for that matter – from pursuing its antitrust claims prior to the sale, particularly since Quadriserv, the original owner of AQS, was on notice of the conspiracy as early as 2009. (*See* Compl. ¶ 152 ("[I]t swiftly became clear to AQS executives that [Defendants] had agreed to a common stance vis-à-vis AQS."); *see also id.* ¶¶ 154, 160–162, 166, 185.) In short, Plaintiff has alleged no facts to support an application of this rare doctrine – "whatever [its] status" may be, *VKK Corp.*, 244 F.3d at 127 – or any other basis to invalidate the legitimate transfer of claims reflected in agreements for which Plaintiff received consideration.

Accordingly, because Plaintiff assigned the antitrust claims at issue here to EquiLend Clearing LLC, Plaintiff is no longer the real party in interest, and its claims must be dismissed pursuant to Rule 17(a).[5]

---

[5] Although Rule 17(a) "prohibits federal courts from dismissing a case 'for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action[,]'" *Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 225–26 (2d Cir. 2018) (quoting Fed. R. Civ. P. 17(a)(3)), here, the real party in interest, EquiLend Clearing LLC, is a subsidiary of Defendant EquiLend LLC and has known about the suit – and Plaintiff's lack of prudential standing – since its inception. Accordingly, given that the real party in interest has had ample time to ratify, join, or be substituted into the action – but more importantly, has no incentive to sue its parent company – the Court finds that there is no need to delay dismissal.

III. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss the Complaint is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion pending at document number 75 and close this case.

SO ORDERED.

Dated:     August 6, 2019
              New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation